IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN A. ABRAMS, et al., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:12-cv-177-MHT-SRW |
| | ) | |
| THOMAS H. TUBERVILLE, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS H. TUBERVILLE'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs, John A. Abrams, Priscilla W. Abrams, Debra Clark, Baron J. Lowe, Melanie D. Lowe, Fredrick Glen Williams, Kristy A. Williams, and Flynn R. Dubose, Jr., all invested in a commodities hedge fund that generally operated under the name TS Capital Fund, L.P. They bring claims under the Securities Act of 1933, the Securities Exchange Act of 1934, the Commodities Exchange Act, and various state law pendant claims related to the underlying federal law claims, including breaches of fiduciary duty, fraud, conversion, unjust enrichment, and negligence. Plaintiffs bring their claims against the companies that sold them limited partner interests in the limited partnership that operated (or should have operated) the hedge fund and the two principal owners of those companies, Thomas H. Tuberville ("Tuberville") and John David Stroud ("Stroud"). It appears that Plaintiffs have suffered a complete loss of their investments. Plaintiffs claim, among other things, that Defendants failed to comply with the disclosure and registration requirements of the securities laws (federal and state) imposed upon the issuing companies and their controlling persons. They claim that certain of Defendants failed to comply with provisions of the Commodities Exchange Act, including claims for fraud and failures to

register as associated persons of commodities pool operators. Plaintiffs claim that Defendants breached duties owed to Plaintiffs as limited partners in the fund, by affirmatively raiding and otherwise improperly conducting the operations of the fund and also by failing to take appropriate actions to prevent that from occurring. Default judgments have been entered against all Defendants except Tuberville on all Counts in the Second Amended Complaint. However, a decision on the amount of damages to which Plaintiffs are entitled will not be made until time of trial on the remaining claims in the case. Because of the default judgments against all Defendants, except Tuberville, the litigation now is focused on Tuberville and his relationship and roles in the formation and operation of the hedge fund and the investment scheme foisted upon Plaintiffs. Tuberville claims that he had no responsibility or duty to any of Plaintiffs, but that he was also duped by his partner Stroud (who is currently facing criminal charges as a result of many of the activities that are subject of this action). Plaintiffs claim that Tuberville was a principal in each of the Entity Defendants and bears co-equal responsibility and liability with Stroud for the damages and losses Plaintiffs incurred. A central issue underlying a variety of the claims (and correspondingly Tuberville's defense to those claims) is whether Tuberville and Stroud were partners of a general partnership, such that each is liable for the misconduct of the other. Tuberville moves for summary judgment claiming, as he must, that there are no genuine issues of material fact and he is entitled to judgment as a matter of law. Plaintiffs submit that this case is replete with disputed facts. There are many facts - some disputed, some not - which support Plaintiffs' claims and, consequently, not only is Tuberville's motion due to be denied, but that, by this response to Tuberville's motion, Plaintiffs demonstrate that they are fully capable of satisfying their burden of proof at trial. Accordingly, Plaintiffs submit that Tuberville's motion should be denied.

**JURISDICTION**

This civil action arises under United States law, namely, § 12(a)(2) of the Securities Exchange Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and §§ 4b(a), 4b(e), and 4o(1) of the Commodities Exchange Act. Accordingly, the Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 7 U.S.C. § 25(c). Additional claims in this action arise under Alabama law. This Court has supplemental jurisdiction over those claims pursuant to Alabama law, because they are so related to the claims in the action within the original jurisdiction of the Court that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(a).

**SUMMARY JUDGMENT STANDARD**

Tuberville's inability to make the showing the law requires makes the relief requested in his motion for summary judgment inappropriate. This Court may only grant Tuberville's motion if it is satisfied that Tuberville has shown that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. According to the Supreme Court, Tuberville, as the party seeking summary judgment, "bears the initial responsibility of informing the district court of the basis for [his] motion, and identifying those portions of [the record] which [he] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quotation omitted). Tuberville meets this burden only if he satisfactorily shows that there are no disputes of material facts and the applicable law requires judgment in his favor, or if he satisfactorily shows that Plaintiffs cannot present evidence in support of some element of the claims on which they bear the ultimate burden of proof. *Id.* at 322-23. Tuberville argues that Plaintiffs lack evidence of their claims, but relies merely on proof that Plaintiffs lack personal knowledge of many of the facts which support their claims. So long

as Plaintiffs can point to admissible evidence in support of their claims, the law does not require that the evidence come from their own personal knowledge.

Only if Tuberville satisfies his initial burden does the burden shift to Plaintiffs to set forth the specific facts creating triable issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. at* 248. "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. Instead, Plaintiffs must show that the facts the applicable case law identifies as material are in dispute or that the applicable law does not support judgment in the movant's favor on those facts.

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Anderson,* 477 U.S. at 249. Furthermore, summary judgment is inappropriate if reasonable minds might differ on the inferences arising from the facts, even if those facts are undisputed. *See, Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fid. & Deposit Co.,* 750 F.2d 838, 841 (11th Cir. 1985)). A court reviewing the record to evaluate a summary judgment motion must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480 (11th Cir. 1985). Finally, the trial court has the discretion to deny summary judgment in a case where there is reason to believe that the better course would be to proceed to trial. *See Anderson,* 477 U.S. at 255. ("Neither do we suggest that the … trial court may not deny summary judgment in a case where there is

reasonable belief that the better course would be to proceed to a full trial.") *Accord United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292 (11th Cir. 1991) ("A trial court is permitted, in its discretion, to deny even a well-supported motion for summary judgment, if it believe the case would benefit from a full hearing.")

Tuberville, as a party asserting that certain facts cannot be or are not genuinely disputed, is subject to the requirements of Federal Rule of Civil Procedure 56(c). That rule specifically contemplates reliance on, *inter alia*, deposition testimony. FED. R. CIV. P. 56(c)(1)(A). Importantly, that rule also contemplates that Plaintiffs may object to any deposition testimony or other cited material to support or dispute a fact if that material "cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(1)(2). A party need not make a separate motion to strike, but may object that the material cited to support a fact cannot be presented at trial in an admissible form. FED. R. CIV. P. 56(c) advisory committee's note (2010 amendment).

Pursuant to Rule 56(c)(1)(2), Plaintiffs object to Tuberville's "Statement of Undisputed Facts" to the extent it is predicated on inadmissible hearsay not within any recognized exception to the exclusion of hearsay found in the Federal Rules of Evidence. Specifically, Plaintiffs object to Tuberville's reliance on testimony which contains hearsay statements of Stroud. For example, Tuberville includes the following:

- Tuberville understood from Stroud's alleged statements to him that he could have his car payments, cell phone, and health insurance paid out of his investment account. (ECF No. 104 at 11).

- Tuberville understood from Stroud's alleged statements to him that the credit card Stroud gave him was "connected" to his investment account. *Id.*

- Stroud allegedly told Tuberville that paying for the car and other perquisites out of his investment account had tax advantages. *Id.*

- Stroud allegedly told Tuberville that Stroud Capital paid the operating overhead such as rent and Rachel Broach's salary. *Id.*

- Stroud's alleged statements to Glen Williams as regarding from whom TS Capital Partners took investments prior to 2010. (ECF No. 104 at 12).

- Stroud's alleged statements to Glen Williams regarding whether or not Stroud asked for Williams to lie during the NFA audit and what Stroud later told him about whether he had done so. (ECF No. 104 at 22).

- Stroud's alleged statements to Glen Williams regarding when Stroud stopped trading. (ECF No. 104 at 24).

Federal Rule of Evidence 802 precludes the admission of material which meets the definition of hearsay and is not within a recognized statutory or rule-based exception. to this exclusion. FED. R. EVID. 802. Hearsay is a statement made not while testifying and offered to prove the truth of the matter asserted in the statement. FED. R. EVID. 801(c). A statement may be a person's oral or written assertion or non-verbal conduct intended as an assertion. FED. R. EVID. 801(a). By definition, hearsay does not include statements offered against an opposing party which were made by that party. FED. R. EVID. 801(d)(2)(A). Thus, Plaintiffs may rely on statements Tuberville made to others out of court through the testimony of a witness with personal knowledge of Tuberville's statement. Stroud is not, however, an "opposing party" in relation to Tuberville because they are both defendants to this action.

Plaintiffs acknowledge that some other statements of Stroud mentioned in Tuberville's recitation of the facts are outside of the definition of hearsay because they are offered for some purpose other than the truth of Stroud's statement such as the effect they had on the person who heard the statement.[1] Plaintiffs object, however, to the statements noted above because

---

[1] Indeed, Plaintiffs also have offered testimony about some of Stroud's out-of-court statements to show the effect those statements had on the person who heard them. As such, the statements are not hearsay because they are not offered for the truth of the matter asserted. Obviously, Stroud's invocation of his privilege under the Fifth Amendment to the United States Constitution has made it more difficult for both Plaintiffs and Tuberville to address certain parts of the facts relevant to various claims and defenses.

Tuberville does rely on Stroud's out-of-court statements to Tuberville and Williams in an attempt to prove the truth of the matter that Stroud asserted in his statement to Tuberville or Williams. Because this seeks to inject inadmissible hearsay as a predicate for "undisputed" material facts, it is not proper under Federal Rule of Evidence 56(c). Accordingly, the Court should disregard these improperly predicated "facts" when considering the motion.

Due to Stroud's impending criminal charges and refusal to participate in discovery, Plaintiffs faced more difficult than usual challenges in authenticating evidence. Plaintiffs submit, however, that their submitted facts in opposition to the summary judgment motion have been properly authenticated and are capable of being introduced at trial in admissible form.

With respect to documents, both paper and electronically maintained, from the TS Capital Partners offices, Plaintiffs this following background proffer. On October 24, 2011, the Alabama Securities Commission ("ASC") received physical evidence from the offices of TS Capital Partners, LLC, located at 2138 Moore's Mill Road, Ste. A, Auburn, Alabama, 36830. (Lewis Aff.).[2] The seized materials included miscellaneous records of the business of Stroud Development Group, Stroud Capital Management, LLC, Stroud Capital Fund, LP, TS Capital Partners, LLC, TS Capital Management, TS Capital Fund, LP, and TS General Partners, LLC. *Id.* The seized materials also included computer hard drives. *Id.*

Plaintiffs' counsel sent a subpoena to the ASC requesting copies of all materials seized. *Id.* In response to the subpoena, the ASC made the physical documents available for copying by counsel for Plaintiffs and counsel for Tuberville. (Lewis Aff.; Calhoun Aff. ¶ 10).[3] Additionally, the ASC used forensically sound copies of the hard drive of the seized computers.

---

[2] The Affidavit of Kim Lewis of the ASC is submitted in Plaintiffs' Evidentiary Submission filed on this date as Exhibit 1. It is cited in this brief as Lewis Aff.
[3] The Affidavit of Richard F. Calhoun, Jr. and exhibits thereto are submitted in Plaintiffs' Evidentiary Submission filed on this date as Exhibit 2.

(Lewis Aff.).  Richard Calhoun received and reviewed both the paper copies and the copies of the hard drive materials produced pursuant to the subpoena to the ASC.  (Calhoun Aff. ¶¶ 10 & 12).  Plaintiffs marked all documents selected for use in the litigation from the paper copies the ASC produced with an "ASC" Bates number for identification.  (Calhoun Aff. ¶ 12).  The same cloned image of the seized TS Capital computer hard drives was sent to AccessData[4] in Houston, Texas for forensic analysis.  (Calhoun Aff. ¶ 11).  Timothy D. Hanners a Senior Forensic Consultant for AccessData conducted a forensically sound analysis of the hard drive images Capell & Howard, P.C. submitted to AccessData.  (Hanners Aff.). [5]  Attached as Exhibit A to Hanners Affidavit are printed copies of emails that were extracted by AccessData from the hard drive images provided to Hanners by Capell & Howard, P.C.  (Hanners Aff. ¶ 8).  For the convenience of the Court, the documents in Exhibit A to the Hanners Affidavit have been Bates labeled "Hanners ######."  All references to such documents in this brief can be identified by this mark.  Plaintiffs submitted that this chain of custody authenticates the records of Stroud and the records of Stroud Development Group, Stroud Capital Management, LLC, Stroud Capital Fund, LP, TS Capital Partners, LLC, TS Capital Management, TS Capital Fund, LP, and TS General Partners, LLC maintained at the Moore's Mill address in either paper or electronic form.  In addition to the authenticity hurdle which Plaintiffs contend they have cleared, Plaintiffs anticipate that Tuberville will challenge whether certain of the evidentiary materials can be presented in a form that would be admissible in evidence in trial.  To the extent that Plaintiffs have been able to anticipate such arguments, they are addressed below.  Should the Court be inclined to allow further briefing to address specific evidentiary issues, Plaintiffs would be happy

---

[4] Prior to the close of discovery, Plaintiffs identified their intent to rely on the testimony of a representative of AccessData Group LLC.
[5] The Affidavit of Timothy D. Hanners of AccessData Group LLC and the exhibit thereto are submitted in the Plaintiffs' Evidentiary Submission filed on this date as Exhibit 3.

to oblige, but the Court is well-versed in the applicable procedural and evidentiary standards and may disregard any evidence which lacks a proper evidentiary basis. To the extent that Plaintiffs have relied on certain records from businesses other than those associated with Defendants, Plaintiffs have subpoenaed business records and provide a proper certification of the records. Additionally, Plaintiffs have identified custodians of records for each non-party subpoena recipient and are prepared to present a proper evidentiary basis at trial if needed. Financial records are grouped in exhibits by financial institution and account.

**FACTS**

Plaintiffs submit that the following recitation sets forth the facts and inferences the evidence in the record support when viewed in the light most favorable to Plaintiffs (as they must be for purposes of this motion).

**I. Tuberville**

For most of his adult life, Tuberville worked as one type of college football coach or another. (Tuberville Dep. 23:24-26:7).[6] From 1999 through December of 2008, Tuberville was head coach for Auburn University's football team. (Tuberville Dep. 25:2-8). From December of 2008 through January of 2010, Tuberville did not have a job as a football coach. (Tuberville Dep. 25:7-26:1). As part of his negotiations of the termination of his employment with Auburn University, he obtained continued free use of a vehicle for part of 2009 and health insurance benefits. (Tuberville Dep. 31:25-34:18). Auburn University bought out Tuberville's remaining contract time for approximately $5.1 million dollars, prior to taxes. (Tuberville Dep. 34:6-21; 99:19-100:1). Additionally, Auburn University paid Tuberville an additional $250,000 to consult with the Auburn University President during 2009. (Tuberville Dep. 32:14-16; 33:12-25; 34:6-21).

---

[6] Cited portions of the Tuberville Deposition may be located in Plaintiffs' Evidentiary Submission at Exhibit 4.

In December of 2008, Tuberville went to New York City for the College Football Hall of Fame. (Tuberville Dep. 73:7-11). Although he had already resigned from Auburn University, some representatives of Tigers Unlimited, an athletic foundation associated with Auburn University, wanted to introduce him to a potential donor for the Talon Society. (Tuberville Dep. 73:5-74:23). The Talon Society is a group of donors who have given or pledged significant sums to Tigers Unlimited. (*Id*.). The person to whom the representatives introduced Tuberville was Stroud. (*Id.).*

Stroud offered to show Tuberville and Tuberville's friend Bill Scott ("Scott") around the financial district the next day, and they accepted his invitation. (Tuberville 75:16-23). Stroud also showed Tuberville and Scott the commodities trading floor where many of the people asked for autographs and pictures with Tuberville. (Tuberville Dep. 77:11-78:2). Stroud mentioned having an office in Auburn as well, and he invited Tuberville and Scott to visit him there. (Tuberville Dep. 79:17-22).[7] Tuberville started stopping by Stroud's Auburn office once a week or so and began inviting Stroud to lunch with him and some of his friends. (Tuberville Dep. 81:25-83:6). Stroud became a member of Tuberville's group of friends. (*Id.)* They began to socialize together with their families as well. (Tuberville Dep. 83:7-22). Stroud even joined in on a group vacation to Jamaica with Tuberville and his friends. (Tuberville Dep. 84:7-12). Stroud talked about what he was doing with investing and what he did around Tuberville as they became friends. (Tuberville Dep. 84:6-7; 87:1-2).[8]

---

[7] Stroud's statement to Tuberville is offered to show its effect on Tuberville and not to establish the truth of Stroud's assertion. Consequently, it is not hearsay. *See* FED. R. EVID. 801(c)(2).

[8] Stroud's statement to Tuberville is offered to show its effect on Tuberville and not to establish the truth of Stroud's assertion. Consequently, it is not hearsay. *See* FED. R. EVID. 801(c)(2).

From June 2009 to December of 2012, Tuberville used a particular email account ending in "th@msn.com." (Tuberville Dep. 188:23-189:1).[9] Tuberville testified that he probably looked at emails that came to his th@msn.com email account. (*See, e.g.*, Tuberville Dep. 256:14-17; 258:14-15).

## II. Stroud and the Stroud Entities

Stroud, who is facing criminal charges, invoked his Fifth Amendment privilege to all questions asked at his deposition. At various other places in this factual narrative, witnesses other than Stroud describe things they believe to be true about his employment history, education, and actions, but without Stroud's testimony, actually describing information about his background is difficult from an evidentiary perspective.

Public records from the Delaware Secretary of State's office reveal the formation of certain entities with "Stroud" in the name. Stroud Capital Fund, L.P., a Delaware limited partnership was organized on July 7, 2008. (Calhoun Aff. ¶ 8 & Ex. C). Stroud Capital GP, LLC, a Delaware limited liability company formed on July 7, 2008. (*Id.*). Stroud Capital Management, LLC, a Delaware limited liability company was formed on June 10, 2008. (*Id.*). The records of the Delaware Secretary of State reflect that the registration of each of these to transact business in Delaware has been cancelled for failure to pay taxes due. (Calhoun Aff. ¶ 9 & Ex. D).

## III. TS Capital Partners

---

[9] Although personal email addresses do not appear to be subject to the redaction requirements of M.D. Ala. LR 5.2, Plaintiffs are mindful that Tuberville is a public figure and probably would not like his personal email address to be readily available. Accordingly, Plaintiffs are redacting their evidentiary submissions and identifying the email address only by two of the characters prior to the "@" which identifies the provider of his email account. Plaintiffs represent that it is undisputed that this email address appears as the address on a number of emails relevant to the claims in this action. If the Court wishes Plaintiffs to submit unredacted copies of the email and Tuberville's deposition testimony under seal or for *in camera* review, Plaintiffs will do so. Plaintiffs consulted Tuberville's counsel regarding this proposed redaction.

### A. Key Points of Evidence Relevant to the Question of Whether Tuberville is a General Partner of TS Capital Partners

Plaintiffs submit that there is substantial evidence demonstrating that Tuberville was a co-owner and partner with Stroud. For example, among the facts and circumstances showing that Tuberville was a general partner with Stroud are the following:

1. The use of the name TS Capital Partners, LLC (as well as the names of the other TS Capital entities) as the record is replete with testimony that the T stood for Tuberville and the S stood for Stroud (Broach Dep. 21:18-22; [10] Tuberville Dep. 115:5-8);

2. Tuberville's admission that he was an "investment partner" with Stroud in TS Capital Partners, LLC (Tuberville Dep. 175:11-176:23);

3. Tuberville's signature on bank account as a partner of TS Capital Partners, LLC (Regions–TSC Partners 00001, Regions–TSC Partners 00146, Regions–TSC Partners 000149;[11] Tuberville Dep. 217:17-219; Broach Dep. at 37:4-39:4);

4. Business card for TS Capital Partners listing him as "Managing Partner" (Broach Ex. 1; Broach Dep. 30:21-31:16; Memory Dep. 163:5-11);[12]

5. Stroud's introduction of Tuberville to Reggie DuBose as Stroud's "partner" in the firm (DuBose Dep. 97:8-14 & 107:2-19 & 109:17-110:6 & 110:19-111:14);[13]

6. Tuberville travels to New York City on TS Capital Partners business, including meetings with personnel of HedgeCo about the TS Capital Partners website (Memory Dep. 62:18-64:23; Hanners 000438-000448);

---

[10] Cited Excerpts of Broach Deposition and Exhibits can be found in the Evidentiary Submission at Ex. 26.
[11] Certified bank records from Regions Bank for the TS Capital Partners LLC Account ending in 6744 are in Ex. 46 filed separately under seal due to redaction problems.
[12] Excerpts of the Deposition of Stuart Memory are found in the Evidentiary Submission at Ex. 47.
[13] Excerpts of the Deposition of Flynn R. DuBose, Jr. are found in the Evidentiary Submission at Ex. 28.

7.    Tuberville's signing a lease of a BMW automobile by TS Capital Partners as its partner for his personal use (BMW 058;[14] Broach Dep. 41:4-13; 44:1-23; Tuberville Dep. 192:2-24; Def. Tuberville's Resp. to Ints. In Pltfs. Am. Second Consol. Discovery;[15] BMW 059, BMW 062-069, BMW 072, BMW 084-088, BMW 090, BMW 099, BMW 103-105);

8.    Correspondence and communications from and to employees of the TS Capital entities, such as Stuart Memory and Rachel Broach, who understood that he was a partner with Stroud (Hanners 276-294; Hanners 000455-000461);

9.    Third parties' understanding that Tuberville was a partner, *e.g.*, an attorney for Michael Makori, a former employee of TS Capital Partners, LLC, who sued TS Capital Partners sending correspondence regarding her claims against TS Capital Partners to Tuberville as a partner of TS Capital Partners (ASC 000276-ASC 000280);

10.    Multiple emails and text messages to and from Tuberville regarding TS Capital Partners and its affiliates' business matters (*see, e.g.,* Hanners 000268-000275; Hanners 000449-000450; Ex. 56 to Tuberville Dep. & Tuberville Dep. 263:15-22);

11.    TS Capital Partners, LLC unemployment insurance application showing Tuberville as a partner (Def.'s Ex. 2 to Patrick Dep. at CFTC-Patrick 00044 - CFTC-Patrick 0005);[16]

---

[14] Certified BMW records are at Ex. 11.

[16] Ex. 44 of Evidentiary submission.

12.      Al.com and *Birmingham News* articles[17] discussing Tuberville's association with Stroud in "T&S Capital Partners" (Advance Media, LLC 000001-000003; ECF 37-1);[18]

13.      IRS Form Schedule K-1 for TS Capital Partners showing Tuberville having a 50% partner interest in its capital, profits, and losses (Ex. 6 to Tuberville Dep.);

14.      Personal desk in his own office in the headquarters of TS Capital Partners in Auburn, Alabama (Tuberville Dep. 95:4-23; Broach Dep. 23:21-24:3);

15.      Projections provided to Tuberville showing that he and Stroud may begin in August 2009 receiving distributions from "the Fund" of more than $16,000 a month to be increased to more than $40,000 per month after one year (Hanners 000276-000294);

16.      Information on the TS Capital Partners website login page identifying him as a partner. (HedgeCo 000009).[19]

### B. Formation in June or July of 2009

Tuberville admits that he failed to perform any critical examination of Stroud or his background before getting involved with him financially. (Tuberville Dep. 84:13-85:13; Tuberville Dep. Ex. 2 at 7). Tuberville did not check Stroud's background. *Id.* He did not even conduct a basic search for Stroud on the Internet. *Id.* He did not search for lawsuits or

---

[17] Prior to the close of discovery, Plaintiffs subpoenaed Goldberg for deposition in this case. Goldberg filed a motion to quash which Plaintiffs opposed. (ECF Nos. 88 & 89). Chief Magistrate Judge Susan R. Walker set the motion for a hearing. (ECF No. 90). Through no fault of Plaintiffs or their counsel, the hearing was twice continued. (ECF Nos. 91 & 93). On May 14, 2013, the Court completed the hearing on the motion to quash. At that time Chief Magistrate Judge Walker indicated to the parties that it was unlikely that her ruling would issue prior to the deadline for responses to dispositive motions. Plaintiffs' counsel indicated that the deposition was needed for the opposition to Tuberville's motion. Plaintiffs and Tuberville have an agreement that if Magistrate Judge Walker denies the motion to quash, Goldberg's deposition will proceed even though other discovery in the case has ended. It may be necessary for Plaintiffs' counsel to seek leave to supplement the factual record with testimony from the Goldberg deposition after it proceeds, if it is allowed to proceed, but Plaintiffs did not wish to jeopardize the August trial setting by seeking an extension of the deadline for the response to the summary judgment motion.

[18] Ex. 5 to Evidentiary Submission.

[19] Ex. 8 to Evidentiary Submission.

arbitration awards against Stroud. *Id.* Tuberville did not seek any information from anyone who had known Stroud longer about his reputation or character. *Id.* Tuberville relied only on his impression of Stroud during the short time they had been friends and the assumption that Stroud must have a great deal of money to have been involved with the Tigers Unlimited Foundation. *Id.*[20]

On June 25, 2009, TS Capital GP, LLC[21] opened a bank account with Wachovia Bank. (Tuberville Dep. Ex. 46; Wachovia 000114).[22] The account number for this account ended in 5572. *Id.* Stroud and Tuberville are each identified on the signature card for the account as "partner" in TS Capital GP, LLC. *Id.*

On June 29, 2009, Tuberville instructed his broker with Merrill Lynch to wire $250,000 from his Merrill Lynch account to an account at Wachovia Bank held in the name of Stroud Capital Fund LP. (Tuberville Dep. Ex. 5 ; Tuberville Dep. 88:13-89:11; Wachovia 000068). The bank account at Wachovia ended in 5446. (Tuberville Dep. Ex. 5; Wachovia 000068).[23] This was the first time Tuberville put money with Stroud or any entity associated with him. (Tuberville Dep. 89:12-14). Although Tuberville directed that his money be wired to the account held in the name of Stroud Capital Fund LP, he testified that he and Stroud agreed it would be put "in a side account from Stroud Capital" and be traded separately from everyone else's money except Stroud's money. (Tuberville Dep. 89:15-20).[24] Interestingly, Tuberville also testified

---

[20] It is a sad irony that one of the escorts that Stroud frequented performed more due diligence on Stroud than Tuberville did. (Hanners 00005-000008). She asked for references, confirmed contact numbers and websites, and refused to meet him until he provided the information she required. (*Id.*).

[21] Documents forming this limited liability company were not actually filed with the Delaware Secretary of State until nearly a year later. (Calhoun Aff. ¶ 7 & Ex. B).

[22] Ex. 41.

[23] Ex. 35.

[24] To the extent that Tuberville objects that Stroud's statements may be inadmissible hearsay, Plaintiffs submit that Federal Rule of Evidence 801(d)(2)(B) applies because Tuberville admits adopting this statement and believing it was true. Thus, the statement is not hearsay. Alternatively, Plaintiffs submit that such a statement is admissible under Federal Rule of Evidence 801(d)(2)(E). The coconspirator exception is applicable in civil cases. *See, e.g.,*

that around the first time he gave Stroud money and formed the entity "separate from Stroud Capital" that Stroud told him that Tuberville's friends could also invest separately from Stroud Capital in the new entity and that it would be "fun for [Tuberville] to watch it and see how much money we make." (Tuberville Dep. 116:17-117:1-23).[25]  Tuberville understood the goal of this joint investment with Stroud in a separate account from Stroud Capital Fund LP was "to make money." (Tuberville Dep. 89:15-23).[26]  Stroud did not tell Tuberville what the side account would be called at the time of this initial transfer. (Tuberville Dep. 89:24-90:1).  Stroud promised not to charge Tuberville a commission. (Tuberville Dep. 89:19-20).[27]

Tuberville recalls hearing the name "TS Capital" shortly after transferring the money to Stroud for this "side account." (Tuberville Dep. 90:25-91:9).[28]  Tuberville does not know the precise date on which he and Stroud formed TS Capital Partners, which he refers to as TS Capital Partners, LLC, but he admits it was around the time of the Goldberg interview. (Tuberville Dep. 102:2-14).[29]  Tuberville also admits that the "T" in "TS Capital" referred to Tuberville and the "S" in "TS Capital" referred to Stroud. (Tuberville Dep. 115:5-8).

On an unknown date in June or July of 2009, Stroud offered to let Tuberville move his personal belongings including the Bear Bryant Coach of the Year Award, other memorabilia and

---

*SEC v. U.S. Environmental Inc.*, 114 F. App'x 426, 428 (2nd Cir. 2004); *SEC v. Tome*, 638 F. Supp. 629, 633 (S.D.N.Y. 1986) (collecting authority).  To rely on such evidence, a party must show nonhearsay evidence of the conspiracy. *Tome*, 638 F. Supp. at 633-34.  Plaintiffs do this through evidence relating to the email communications of Tuberville to Stroud.  Plaintiffs need not have alleged a conspiracy claim in the complaint to rely on this exception. *Id.* at 634.  Charging a substantive violation of law, as Plaintiffs have done, is sufficient if there is evidence that the conspirators were "joint venturers" or acted "in concert." *Id.*

[25] For argument regarding any potential objection on the basis of hearsay to Stroud's statements, please see argument in prior footnotes on same.

[26] For argument regarding any potential objection on the basis of hearsay to Stroud's statements, please see argument in prior footnotes on same.

[27] For argument regarding any potential objection on the basis of hearsay to Stroud's statements, please see argument in prior footnotes on same.

[28] For argument regarding any potential objection on the basis of hearsay to Stroud's statements, please see argument in prior footnotes on same.

[29] For argument regarding any potential objection on the basis of hearsay to Stroud's statements, please see argument prior footnotes on same.

personal photographs into the suite of offices Stroud used. (Tuberville Dep. 94:8-95:3[30]; Broach Dep. 24:4-6). Tuberville had a designated office within the suite which was his to use. (Tuberville Dep. 95:4-23). Tuberville had a desk, computer, phone, and television in his office at TS Capital. (Broach Dep. 23:21-24:3).

At some point between wiring the money in late June and July 26, 2009, Tuberville recalls giving an interview to a reporter named Charles Goldberg ("Goldberg"). (Tuberville Dep. 90:25-91:16). At that time, Tuberville knew Goldberg to be a beat reporter for the Birmingham News, and he understood that Goldberg was seeking an interview in conjunction with a planned article on Tuberville's "life after football." (Tuberville Dep. 91:10-25). On July 26, 2009, Goldberg published an article in *The Birmingham News* and its affiliated web outlet *al.com* recounting his interview with Tuberville. (Advance Media, LLC 000001-000003;[31] ECF No. 37-1). Both versions of the article included photographs of Tuberville and Stroud checking "the market" taken at what Goldberg describes as "T & S Capital Partners in Auburn." *Id.*[32];

---

[30] For argument regarding any potential objection on the basis of hearsay to Stroud's statements, please see argument in footnote 4.

[31] In response to a subpoena to Alabama Advance Media, LLC, Plaintiffs received an authentic and accurate copy of the news story Goldberg published on July 26, 2009. (Ex. 5). Pursuant to Federal Rules of Civil Procedure this article is self-authenticating. *See* FED. R. EVID. 902(6). Plaintiffs are seeking to depose Goldberg about Tuberville's statements to Goldberg during the interview. Tuberville's statements are outside of the definition of hearsay. Goldberg's statements, if reduced to testimony, would be capable of being reduced to admissible form. Goldberg's deposition has not yet been completed. Once Goldberg's deposition is completed, assuming it is allowed, Plaintiffs wish to seek leave to supplement this section to overcome any hearsay objection with respect to the article. For the reasons set forth in opposition to the amended motion to quash the subpoena to Goldberg, the deposition is appropriate. *See* ECF No. 89. Consequently, Plaintiffs submit that this evidence, while presently in a form which contains one layer of hearsay not within an exception, is not objectionable pursuant to Federal Rule of Civil Procedure 56(c)(2) because it can be presented at trial in admissible form. Alternatively, Plaintiffs submit that even absent Goldberg's testimony in this matter, the article itself is admissible to the extent that it may be offered for a purpose other than to prove the truth of the issues asserted in the article, but rather to prove that Tuberville made statements to a journalist about TS Capital, a fact with legal significance to whether the claimed exception from the registration requirements of state and federal securities law applied. The existence of a newspaper article quoting Tuberville is circumstantial evidence that the requirements for the exemption claimed could not apply and the applicable laws required the securities to be registered.

[32] Prior to the close of discovery, Plaintiffs subpoenaed Goldberg for deposition in this case. Goldberg filed a motion to quash which Plaintiffs opposed. (ECF Nos. 88 & 89). Chief Magistrate Judge Susan R. Walker set the motion for a hearing. (ECF No. 90). Through no fault of Plaintiffs or their counsel, the hearing was twice continued. (ECF Nos. 91 & 93). On May 14, 2013, the Court completed the hearing on the motion to quash. At

(Tuberville Dep. 93:16-94:18). The photographs show Tuberville's personal effects and memorabilia in the office. *Id.* The articles indicate that Tuberville was following investment markets, working at the offices of a "hedge fund" in Auburn, and drumming up business[33] for that hedge fund. *Id.* It further states that the "T" in "T & S" is for "Tommy." *Id.*

Although Tuberville and Stroud began using the name TS Capital Partners, LLC in the summer of 2009, they did not file the appropriate paperwork to legally form it as a limited liability company. Records of the Delaware Secretary of State do not include any filings creating a limited liability company by the name "TS Capital Partners, LLC" in Delaware at any time. (Calhoun Aff. ¶ 5).[34] Likewise, the Alabama Secretary of State has no record of the organization of a limited liability company by that name in Alabama at any time. (Calhoun Aff. ¶ 6).

TS Capital Partners hired Rachel Broach in July of 2009. (Broach Dep. 14:1-27; 28:14-19). Prior to coming to work at TS Capital, Broach was Stroud's house cleaner. (Broach Dep. 14:3-19). Initially, Stroud hired her to clean the TS Capital offices in addition to his home. (Broach Dep. 25:21-24). Stroud introduced Broach to Tuberville and identified Tuberville as his "silent partner." (Broach Dep. 21:23-22:14; 25:2-26:9).[35] At some point, Stroud told Broach the meaning of the TS Capital name saying that "T" stood for Tuberville and "S" stood for Stroud.

that time Chief Magistrate Judge Walker indicated to the parties that it was unlikely that her ruling would issue prior to the deadline for responses to dispositive motions. Plaintiffs' counsel indicated that the deposition was needed for the opposition to Tuberville's motion. Plaintiffs and Tuberville have an agreement that if Magistrate Judge Walker denies the motion to quash, Goldberg's deposition will proceed even though other discovery in the case has ended. It may be necessary for Plaintiffs' counsel to seek leave to supplement the factual record with testimony from the Goldberg deposition after it proceeds, if it is allowed to proceed, but Plaintiffs did not wish to jeopardize the August trial setting by seeking an extension of the deadline for the response to the summary judgment motion.

[33] Tuberville denies saying anything to Goldberg about being around to drum up business. (Tuberville Dep. 98:18-20).

[34] This affidavit authenticates the attachments which are within exceptions to the hearsay rules. *See* FED. R. EVID. 803(8) & (10).

[35] Plaintiffs submit that Stroud's statements are admissible under Federal Rule of Evidence 801(d)(2)(E). In the alternative, they are admissible to show the effect they had on causing Broach to believe she should comply with Tuberville's requests for assistance and information.

(Broach Dep. 21:18-22).[36]  When Stroud hired Broach to work at TS Capital, she answered phones, made deposits, delivered bills to the accountant's office, picked up checks from the accountant and signed them to pay the bills.  (Broach Dep. 14:23-15:9; 21:11-17).  Broach booked travel for Tuberville.  (Tuberville Dep. 178: 13-15).  Broach understood that she worked for TS Capital Partners, but she also understood that other TS Capital entities existed in addition to TS Capital Partners.  (Broach Dep. 28:14-19).[37]  In her view, they were all under the TS heading.  (Broach Dep. 28:23-29:2).

TS Capital acquired business cards for Stroud and Tuberville in the name of TS Capital. Shortly after Broach began working at TS Capital, it hired someone to design business cards. (Broach Dep. 32:3-10).  The card for Tuberville with which Broach is familiar was printed with "Coach Tommy Tuberville Managing Partner" and "T.S. Capital."  (Broach Ex. 1; Broach Dep. 30:21-31:16; Memory Dep. 163:5-11).  Stroud's business card identified him as "David Stroud, President, Portfolio Manager" and "T.S. Capital."  (Broach Dep. 31:17-19; Broach Ex. 1). Tuberville had his business cards on his desk.  (Broach Dep. 24:11-15).  Tuberville testified that he does not remember seeing his business cards, but that even if he had, he would not have asked any questions about a card identifying him as a Managing Partner in TS Capital because he was "an investment partner" in TS Capital.  (Tuberville Dep. 175:11-176:23).

### C.  Documents Relating to TS Capital Entities

There are at least three differently dated versions of the Confidential Private Offering Memoranda for Limited Partner Interests of TS Capital Fund, LP.  One is dated June 23, 2009, and there appear to be two versions of it.  Another version is dated June 17, 2010, and another

---

[36] Plaintiffs submit that Stroud's statements are admissible under Federal Rule of Evidence 801(d)(2)(E).  In the alternative, they are admissible to show the effect they had on causing Broach to believe she should comply with Tuberville's requests for assistance and information.
[37] Plaintiffs submit that Stroud's statements to Broach are admissible under Federal Rule of Evidence 801(d)(2)(E).

dated February 10, 2011. Each are essentially the same except that *one* of the June 23, 2009 does not contain information on Tommy Tuberville, but the other three do. Stuart Memory included some information about himself in the February 10, 2011 version.

At his deposition, Stuart Memory authenticated the 2010 version. (Memory Dep. 114:13-21 & Memory Dep. Def.'s Ex. 2). He also identified the 2011 version. (Memory Dep. 168:9-169:12 & Memory Dep. Pls.' Ex. 2). Furthermore, Memory testified that he included some biographical information about himself in the 2011 version. (Memory Dep. 168:9-169:12).

In the summary of terms, the partnership is described as TS Capital Fund Fund [sic], LP, a Delaware limited partnership. (Memory Dep. Def.'s Ex. 2 & Memory Dep. Pltfs.' Ex. 2). All of the Memoranda state that the liability of each limited partner will be limited to the capital such person invests in the partnership and that limited partners will have no voting rights except under limited circumstances. *Id.* The general partner of the limited partnership is identified as TS Capital GP, LLC, a Delaware limited liability company, the principals of which are David Stroud and Tommy Tuberville. *Id.* The general partner will be responsible for the overall investment strategy of the partnership. *Id.* TS Capital Management, LLC, a Delaware limited liability company, an affiliate of the general partner is responsible for certain administrative matters and providing management services to the partnership. *Id.* The minimum investment in the partnership is $250,000. *Id.* The partnership will bear its own investment expenses as well as all legal, accounting, and audit expenses. *Id.* The management company will bear or provide for overhead expenses in connection with operating the partnership, including rent, salaries and other expenses. *Id.* Under risk factors, the Offering Memoranda state that investing in the partnership will involve significant risk and is suitable only for persons who can bear the economic risk of the loss of their investment, who have a limited need for liquidity in their entire

investment and who meet other conditions set forth in the Memoranda. *Id.* The Memoranda provides that the management company [TS Capital Management, LLC] shall be paid a management fee computed at the annual rate of 2% of the net assets of the partnership and the general partner will be paid a performance allocation percentage of 20% per annum. *Id.* The general partner will maintain capital in the partnership in an amount equal to at least $1,000,000. *Id.*

The Offering Memoranda also differ by separately identifying MF Global, Interactive Brokers, and Lime Brokerage as the broker for the partnership. *Id.* Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo P.C. are identified as legal and tax counsel. *Id.* Rothstein Kass is identified as the auditor and responsible for auditing the annual financial statements of the partnership. *Id.* The Memoranda state that a partnership agreement and a subscription agreement are attached as Exhibits A and B, respectively, however, the Memoranda do not include Exhibits. *Id.*

Among the documents the ASC seized from TS Capital Partners was a draft of the Limited Partnership Agreements of TS Capital Fund, LP. (ASC 00000519-522). The agreement states that it was made and entered into as of the "[___] day July, 2008." *Id.* TS Capital GP, LLC is identified as the general partner and David Stroud is the initial limited partner. *Id.* The Agreement is bare bones and does not include many provisions customarily included in a limited partnership agreement particularly one for a sophisticated operation such as a commodities hedge fund. *Id.* The July 2008, date is obviously erroneous since it is unlikely that the name TS Capital Fund, LP or the name of the general partner TS Capital GP, LLC were known or determined in July 2008. *Id.* Like other documents, it is a reasonable inference that Stroud based upon a pre-existing initially files Stroud Capital limited partnership agreement. *Id.*

**D. TS Capital Operations July of 2009 through January of 2010**

From July of 2009 through January of 2010, Broach observed Tuberville actually working in the TS Capital offices two or three days a week. (Broach Dep. 22:15-21; 26:10-14). Tuberville confirms that when he was in the offices, he was working. (Tuberville Dep. 101:24-25). During this time, Stroud would call Broach and Tuberville into his office to see the computer screen and talk to them about whether "they" were up or down that day. (Broach Dep. 27:9-28:13).[38] Tuberville confirmed that Stroud would show him information on computer screens and told him whether the investments were up or down. (Tuberville Dep. 109:23-110:12). Tuberville asked Broach to help him with tasks including typing and travel arrangements, and she did so. (Broach Dep. 34:9-23).[39] There is no dispute in this case that the evidence establishes that TS Capital Partners[, LLC] was an commodity pool operator under the Commodities Exchange Act and the regulations promulgated under that act. (*See* Patrick Dep. 170:22).

A few months after his initial investment in 2009, Tuberville told his friend Scott that he was making money in the pooled investment with Stroud. (Tuberville Dep. 111:4-21).[40] Indeed, Tuberville admits that he "quite often" had lunch with Scott during the latter half of 2009. (Tuberville Dep. 111:18-21). According to Tuberville, he and Scott would "always" talk about his investment at these lunches. *Id.*

On July 24, 2009, TS Capital Partners leased the new white BMW 528i for Tuberville which TS Capital paid all lease payments on through October of 2011. (BMW 058; Broach Dep. 41:4-13; 44:1-23).[41] The lease payment of $767.89 was automatically drafted out of the "TS

---

[38] Stroud's statements to Broach and Tuberville is not offered here for the truth of what Stroud said to them, but to show the effect that it had on Tuberville and Broach.

[39] Tuberville's out-of-court statements to Broach are admissible under Federal Rule of Evidence 801(d)(2)(A).

[40] Tuberville's out-of-court statements to Scott are admissible under Federal Rule of Evidence 801(d)(2)(A).

[41] Tuberville admitted that he did not make the payments on this vehicle until late in 2011. (Tuberville Dep. 192:2-24).

Capital Partners, LLC" bank account at Regions ending in 6744. (BMW 066; Regions-TSC Partners 000001, 000005, 000009, 000013, 000019, 000024, 000030, 000034, 000040, 000044, 000049, 000053, 000061, 000066, 000072, 000078, 000083, 000088, 000097, 000103, 000109, 000115, 000121, 000126, 000131, 000137, 000141). Tuberville does not dispute that his signature appears on the BMW lease paperwork. (*See* Def. Tuberville's Resp. to Ints. In Pltfs. Am. Second Consol. Discovery;[42] BMW 059, BMW 062-069, 072, 084-088, 090, 099, 103-105). Several places in the paperwork Tuberville admits he signed he is identified as a partner and 50% owner in "TS Capital Partners," the entity to which the car was leased. (BMW 058, 062-69, 087, 103-104, 106). In fact, he even appears to have signed the lease itself "TS Captial Partners Tommy Tuberville by Tommy Tuberville Partner." (BMW 068). Interestingly, the dealership copied Tuberville's driver's license and proof of insurance. (BMW 062-063). Also included in the paperwork provided to the dealership was an account statement for the period ended July 6, 2009 from "TS Capital Fund, LP" which indicates it is an "Audited" statement of "TS Capital Partners David Stroud & Tommy Tuberville – General Partner." (BMW 071). This "audited" account statement shows that Tuberville's balance as of July 6, 2009 was $2,500,000. (BMW 071). It also indicates on the bottom that questions should be directed to TS Capital Management. Finally, the BMW dealer's file includes a copy of the "Amended and Restated Operating Agreement of TS Capital GP, LLC. (BMW 073-083).

In addition to paying the lease payments on the BMW, "TS Capital Partners, LLC" also paid for the license plates for the vehicle. (Regions-TSC Partners 000203; Regions-TSC Partners 000410; Tuberville Dep. Ex. 37.)[43]    Tuberville considered the car to be a business expense

---

[42] Ex. 34. Although the version of the documents attached to the interrogatories to Tuberville were produced by BMW Financial, there is significant overlap between them and the ones produced by the BMW dealership, but the BMW dealership copies are clearer.

relating to his investment in TS Capital Partners, LLC. (Tuberville Dep. 231:15-20). Tuberville was eager for a business vehicle and credit card to be provided to him. (Tuberville Dep. 233:16-21). The BMW replaced the free truck he had as a perk of being Auburn's football coach. (Tuberville Dep. 32:19-33:16; 192:9-12).

Tuberville enjoyed many other personal benefits as a result of his partnership in the TS Capital entities. TS Capital provided Tuberville with a cell phone at no cost until perhaps as late as April of 2010. (Broach Dep. 41:20-22; Regions-TSC Partners 000195; Regions-TSC Partners 000235; Hanners 000329). TS Capital provided health insurance to Tuberville. (Broach Dep. 41:6-10). TS Capital provided a debit card to Tuberville which Broach believes he used. (Broach Dep. 42:15-43:7). TS Capital paid for Tuberville to travel to New York City. (Broach Dep. 45:23-46:3; 47:19-23; 49:6-17). TS Capital Partners paid for the development of a Tommy Tuberville website. (Regions-TSC Partners 000169; Regions-TSC Partners 000177).

Whatever Tuberville's stated understanding about the source of these payments for the benefits or perquisites he received, the fact is that the cost of the perks Tuberville received was taken from the TS Capital Partners bank account at Regions and not from Tuberville's account. (Broach Dep. 41:23-42:5; 43:8-23; 51:1-12). Moreover, Broach clearly testified that there were no expenses deducted from his account. (Broach 95:16-96:2).

TS Capital also paid the lease payments on a new BMW for Stroud through October of 2011. (Broach Dep. 41:14-19; Regions-TSC Partners 000167; Regions-TSC Partners 000216; Regions-TSC Partners 000226; Regions-TSC Partners 000244; Regions-TSC Partners 000262; Regions-TSC Partners 000283 Regions-TSC Partners 000295; Regions-TSC Partners 000302; Regions-TSC Partners 000330 Regions-TSC Partners 000352; Regions-TSC Partners 000393 Regions-TSC Partners 000403; Regions-TSC Partners 000420; Regions-TSC Partners 000447

Regions-TSC Partners 000457; TSC Partners 000489; TSC Partners 000497; TSC Partners 000515 TSC Partners 000531; TSC Partners 000545; TSC Partners 000564; TSC Partners 000582; TSC Partners 000595; TSC Partners 000597).  The certified business records of the BMW dealer indicate that this vehicle, a new black BMW 528XI, was leased to Stroud Capital Fund on July 24, 2009 (BMW 008, BMW 013, BMW 016-018).  Oddly enough, Stroud supplied a second lease application to the BMW dealer which was submitted under the name of TS Capital Partners and showed Tuberville as a 50% partner (BMW 039-40).

On August 18, 2009, TS Capital Partners, LLC opened a non-personal checking/savings account ending 6744 with Regions Bank.  (Tuberville Dep. Ex. 42.; Tuberville Dep. 217:17-219: 23).  Tuberville's name and signature appear on the signature card for this account as "a duly authorized signature(s) of this proprietorship/partnership/corporation/organization/public entity which the Bank will recognize in the payment of funds and the transaction of other business for this account."  *Id.*  Tuberville admits this is his signature.  (Tuberville Dep. 218:24-219:1).  Stroud, Rachel Broach ("Broach") [44] and Tuberville did not instruct the bank to require more than one signature on checks, drafts, acceptances, notes, or transactions.  *Id.*  Stroud and Rachel Broach also signed the signature card.  (Tuberville Dep. Ex. 42; Tuberville Dep. 218:9-23).  Tuberville also signed two checks on this account to pay Broach for work done for TS Capital.  (Broach Dep. at 37:4-39:4; Regions–TSC Partners 000165; Regions–TSC Partners 000166).

By August 19, 2009, TS Capital was inquiring about office space in the "Hedge Fund Hotel" in New York City from the Evan Rapoport, the Co-Founder of HedgeCo Networks.  (Hedgeco 000761-765 & 773).  Rapoport had located the al.com story on Tuberville and Stroud.  (Hedgeco 000766-772).

---

[44] Since leaving TS Capital, Broach has remarried, and her name is now Rachel Senn.  (Broach Dep. at 8:13-16; 11:2-3; 11:20-23; 12:11-18).  Broach is used for clarity due to that being her name in the correspondence.

Sometime prior to September 24, 2009, TS Capital hired Scott Watkins ("Watkins") to create a "Tommytuberville.net" website. (Ex. 12 at Scott Watkins 000003; Regions-TSC Partners 000000009, 000011, 0000169). Sometime prior to January 14, 2010, TS Capital hired Watkins to develop a TS Capital website called "tscapital.net." (Broach Dep. 54:15-20; Regions-TSC Partners 000025, 000027, 000247; Ex. 12 at Scott Watkins 000004). The certified bank records identified above show that payments to Watkins for both these websites was made from the "TS Capital Partners, LLC" bank account at Regions which ends in 6744. The "Tommytuberville.net" website, although paid for by TS Capital, was used for Tuberville's commentary on college football, and Broach sent updates to Watkins to post on the website. (Hanners 000528-000529). Tuberville knew about the website and he was not paying for it. (Broach Dep. 111:9-112:22; 113:14-114:10).

Broach also corresponded with Watkins about the content of the "tscapital.net" website he was building in January of 2010. (Hanners 000001-000003). In particular, Broach told Watkins that Stroud wanted to "under founder pull Tommy in somehow" and eventually add how they met and the business came to be. (Hanners 000001-000003). Indeed, in January of 2010, Broach was also inquiring about perhaps building an app for Tuberville. (Hanners 000004). In so doing, she noted that Tuberville is a "partner here with David." *Id.*

Around the time of the Iron Bowl in 2009, Stroud offered Memory a job with one of the TS Capital entities. (Memory Dep. 161:22-162:4; 174:6-17). From his conversations with Stroud, Memory understood that the entity offering him the job was one in which Tuberville was involved. (Memory Dep. 174:6-21).[45] Memory's recollection is that Stroud called him and said

---

[45] Plaintiffs submit that Stroud's statements are admissible under Federal Rule of Evidence 801(d)(2)(E). In the alternative, they are admissible to show the effect they had on causing Memory to believe he should comply with Tuberville's requests for assistance and information.

that Stroud and Tuberville were starting a firm or fund and that they would like Memory to come on board as an analyst and liaison in New York. (Memory Dep. 14:8-15:10; 19:10-23). Memory always believed that Tuberville was a partner in TS Capital. (Memory Dep. 180:1-18).

At some point in January of 2010, Tuberville moved to Lubbock, Texas to be the head football coach at Texas Tech University. (Tuberville Dep. 25:1-25). After he was in Lubbock, Tuberville would ask Stroud how their investments were doing by telephone. (Tuberville Dep. 110:10-17). According to Tuberville, Stroud mostly responded by saying "we are up five percent or we are down one percent or up 10 percent." (Tuberville Dep. 110:21-25).

### E. TS Capital in 2010

Memory began work in January of 2010, but not in New York as he expected, but rather in Auburn, Alabama. (Memory Dep. at 13:18-23; 15:11-16:13). Upon his arrival, Memory observed that the whole office of TS Capital in Auburn was filled with memorabilia and pictures relating to Tuberville's career as a college football coach. (Memory Dep. 17:7-18:15). Memory received a business card listing him as a "Portfolio Manager" for "T.S. Capital" with an address in New York. (Memory Dep. at 162:5-23; Memory Dep. Pls.' Ex. 1). Stroud asked Memory to study for and take the Series 3 examination which would allow him to be registered with the National Futures Association governing the commodities markets. (Memory Dep. 20:8-18).[46] Memory took and passed the test in March or April of 2010. (Memory Dep. 21:4-7).

In March of 2010, Stroud had a CPA prepare some projections for "TS Capital." (Hanners 000276-000294). Stroud had the projections prepared from December 31, 2010-2014 with a 25% return on assets. (Hanners 000277). He emailed the projections to Tuberville at his th@msn.com account on March 29, 2010. (Hanners 000276). The projections reflect a loss of

---

[46] Plaintiffs submit that Stroud's statements are admissible under Federal Rule of Evidence 801(d)(2)(E). In the alternative, they are admissible to show the effect they had on Memory.

$502,500 for the year ending December 31, 2010, but ultimately reflect proprietary capital of $53 million with total assets of TS Capital in excess of $110 million at December 31, 2014. (Hanners 000276-000294). Broach received a delivered message confirmation for email forwarding this information to Tuberville. (Beale Dep. Ex. 16 – ASC 0000810).

On that same day, Stroud also emailed what he called a "pitch book" and "preliminary marketing piece" to Tuberville at his th@msn.com account. (Hanners 000295-000306). In the email, Stroud notes that he will send more material over the next few days and that he still needed to add Tuberville's bio and "Michelle's" bio to the pitch book. (Hanners 000295). The pitch book which was attached to the email refers to "TS Capital Management Quantitative Fund." (Hanners 000296). It touts an investment portfolio including equities, futures, and currencies. (Hanners 000299). It lists the investment manager as "TS Capital Management, LLC" and a minimum investment of $1,000,000. (Hanners 000306). It also mentions a 2% management fee and an incentive fee of 20% subject to a high-water mark. *Id.*

On April 4, 2010, Stroud sent an email to Tuberville at Tuberville's th@msn.com email account. (Hanners 000307). In the email, Stroud explains that he is attaching contracts for Michelle and Courtney. (Hanners 000307). He states that "Michelle" is a "go" and that he thinks Courtney will say yes, too. (Hanners 000307).

On April 21, 2010, Broach wrote an email to Tuberville at his personal email account ending in "th@msn.com." (Hanners 000334). Broach tells Tuberville that he is missed and asks for his assistant's number or email address. *Id.* That same day, Tuberville responds to Broach from his personal email account. *Id.* He tells her it is good to hear from her and asks if she knows if David ever came up with "our W2 for 2009." *Id.* Broach responds to Tuberville via

email stating "David said there was no W2 only the K1, but he said he would talk to you about today or tomorrow." (Hanners 000333).

After talking with HedgeCo on June 10, 2010, TS Capital began sending over legal documents and marketing materials for TS Capital. (HedgeCo. 000158-000189; 000425-000436; 000449-000452). Among the materials sent were the TS Capital GP, LLC Operating Agreement, the TS Capital Fund, LP Subscription Agreement, the June 23, 2009 Confidential Private Offering Memorandum Limited Partnership Interests of TS Capital Fund, L.P., a TS Capital Pitch Book, and Stroud's biography. *Id.*

On June 11, 2010, Joseph Goldstein G&S Fund Services, LLC, a HedgeCo Networks Subsidiary in New York, met with Stroud and his team, including Tuberville. (HedgeCo 000457-000459; Tuberville Dep. 130:2-131:13; 133:7-19). TS Capital Fund, LP received a proposal from Joseph Goldstein, the Managing Partner of G&S Fund Services, LLC, a HedgeCo Networks Subsidiary in New York. (Hanners 000405-000408). The proposal was for monthly accounting services, distribution of investor statements, audit management, preparation of initial draft of financial statements for the annual audit, distribution of offering materials with tracking services, processing of subscriptions and redemptions, providing AML compliance checks, banking services, financial control system, responses to due diligence investigations by potential investors, and new client implementation. *Id.* Stroud forwarded the proposal to Tuberville at his personal email account for his review. *Id.*[47]

---

[47] Plaintiffs rely on many electronic records identified through a forensically sound search of the cloned images of the computer drives the Alabama Securities Commission seized from the offices of TS Capital. Both Plaintiffs and Tuberville have had access to the same information from the Alabama Securities Commission. The statements in these emails Tuberville made are admissible under Federal Rule of Evidence 801(d)(2)(A). Stroud's statements are not hearsay because they are offered to show the effect they had on Tuberville and his knowledge of Stroud's activities rather than the truth of Stroud's statements in them. In the alternative, Plaintiffs submit that Stroud's statements are admissible under Federal Rule of Evidence 801(d)(2)(E).

On June 15, 2010, Stroud emailed a form "Due Diligence Questionnaire" to Tuberville at his th@msn.com account. (Hanners 000345-000367). About the form, Stroud explains the form as something which "we have to fill out for compliance reasons." (Hanners 000345). Stroud says that he will let Tuberville know what questions they need to ask him. (Hanners 000345).

On June 16, 2010, Stroud forwarded an email to Tuberville (at his th@msn.com account), Stuart Memory, and Broach with a proposal from Spicer Jeffries LLP in Colorado. (Hanners 000368-000374). Attached to the email was a fund audit/tax proposal. *Id.* It outlined a variety of services that Spicer Jeffries could provide to hedge funds and commodity pools. *Id.* These services included auditing and accounting, tax services, and start-up services. *Id.*

On June 17, 2010, Stuart Memory sent a draft mission statement for TS Capital to Evan Rapoport at HedgeCo. (Hanners 000376). It is clear from this email that things are being drafted for a new website. *Id.* Evan Rapoport responded to Memory and copied Stroud that the statement should be a little more focused on the goals for the fund. (Hanners 000375). Stroud replied to Evan Rapoport asking for old copies or a template for an Investment Policy Statement for another hedge fund. *Id.* Stroud stated that the Due Dilligence Questionnaire should be done that day as well as updates to the powerpoint. *Id.* Stroud stated that TS Capital had retained Bart Mallon as counsel and reached out to TPA and auditor and retained their services. *Id.* Stroud solicited a recommendation for a contact resource management system. *Id.* Stroud copied Tuberville's th@msn.com address on his message. (Hanners 000375). On that same day, Evan Rapoport emailed Stroud to check on the status of their deal on a lease, and Stroud told him they had what was needed and to send an invoice. (Hanners 000419-000422).

Also on June 17, 2010, G&S Fund Services sent the list of required documents necessary to finalize the agreement for G&S Fund Services to serve as third-party administrator for TS

Capital. (Hanners 000378-000399). A draft engagement letter from G&S Fund Services that day as well. (Hanners 000405-000408). Stroud forwarded this email and its attachment to Tuberville at th@msn.com. *Id.*

June 17, 2010 was a very busy day for TS Capital. Attorneys at Mallon P.C. forwarded the draft of the general partner's Delaware LLC filing, the management company's Delaware LLC filing, and the fund's Delaware LP filing. (Hanners 000400-000404). Mallon asked Stroud to review them and indicated that the documents could be filed once approved. (Hanners 000400-000404). Stroud first forwarded them to Broach. *Id.* Next, Stroud forwarded the whole email including the attachments with the documents which would be filed to legally organize TS Capital GP, LLC, TS Capital Management, LLC, and TS Capital Fund, L.P. to Tuberville at his personal th@msn.com address. (Hanners 000409-000413). Notably, the email itself reveals the names of the entities connected to each of the attachments. So even if Tuberville only looked at the email and did not click on the attached documents, he would have seen the names. (Hanners 000409). Later that day, Broach emailed the lawyers to say that everything looks correct except the address and indicated that they were "waiting on" information for that address. (Hanners 000414). That evening, Broach told the lawyers which address to use in New York; it was apparently one supplied by Evan Rapoport. (Hanners 000417-000418).

On June 17, 2010, Stroud filed the Certificate of Formation for TS Capital Management, LLC with the State of Delaware Secretary of State. (Calhoun Aff. ¶ 7). On June 17, 2010, Stroud filed a Certificate of Formation for another limited liability company with the Delaware Secretary of State; this one was called "TS Capital GP, LLC." *Id.* On June 17, 2010, Stroud also filed the Certificate of Limited Partnership for "TS Capital Fund, L.P." *Id.*

On June 18, 2010, Broach provided Tuberville with instructions for accessing the website. (Hanners 000423-000424). She offered to walk him through it if he had any problems. *Id.* Again this message was sent to the Tuberville email address at th@msn.com. *Id.* On this same day, Stroud forwarded a proposal for TS Capital Partners from HedgeCo regarding a new website. (Hanners 000425-000437). Stroud used the personal email address for Tuberville: th@msn.com and indicated that they would speak soon. (Hanners 000425). Interestingly, the proposal provided that the website would be accessible not only to existing investors, but also to potential investors who meet the manager's criterion. (Hanners 000430).

June 29, 2010 to July 1, 2010, Tuberville, Memory and Stroud took a trip to New York City to look for brokers for TS Capital. (Memory Dep. 62:18-64:23; Hanners 000438-000448). On this trip, Memory introduced himself to Tuberville as a new employee and said he was excited to work with Tuberville. (Memory Dep. 180:19-182:13). Tuberville, Stroud, and Memory visited Merrill Lynch, Lime Brokerage, and Bloomberg. (Memory Dep. 182:14-184:11). They also met with G&S Consulting and viewed HedgeCo Offices. (Hanners 000438 & 000446). Broach booked Tuberville's hotel room at the Marriott Marquis and arranged for a private car to pick him up at the airport. (Hanners 000440-000444; 000447-000448). The purpose of the trip was expanding the business and finding a real live broker to use instead of MF Global and Interactive Brokers. (Memory Dep. 185:5-14). TS Capital was also negotiating about office space in New York through HedgeCo Networks. HedgeCo 000723-734.[48] Interestingly in his emails to set up the trip, Stroud told HedgeCo that what he wanted to accomplish on the trip was to educate the "sales force" to make it more productive in raising

---

[48] All documents produced pursuant to subpoena to HedgeCo are certified business records admissible under Federal Rule of Evidence 803(6).

capital for the firm, and when asked for clarification, Stroud identified Tuberville along with himself as the sales force raising capital.  HedgeCo 000720-000721.

On July 8, 2010, a critical series of emails passed between Stroud and Tuberville. (Hanners 000449-000453).  Stroud sent an email to Tuberville's msn.com email address setting forth a breakdown of investors for an August 31 "launch."  (Hanners 000449-000450).  The email includes an example of compensation to partners with an assumption of a 20% annual return on the first $10 million taking into account a 2% management fee and 20% incentive fee. *Id.*  Those are the same percentage management fee and same percentage incentive fee included in the draft Offering Memoranda for the TS Capital Fund, L.P.  (Memory Dep. Pls.' Ex. 2 & Memory Dep. Def.'s Ex. 2).  Based upon those assumptions, the partners (Tuberville and Stroud) collectively would make a profit of $400,000 for the first year or $200,000 for the year or $16,670 per month for each of the two partners.  (Hanners 000449-000450).  Stroud's projections for the second $10 million would net *each* of Tuberville and Stroud an additional $25,000 per month or a total of $41,670 per month.  *Id.*  The assumed projections do not reflect an annual per partner profit for the second year, but at $41,670 per month, the annual profit for Tuberville alone would be an excess of $500,000.  *Id.*  On Friday, July 9, 2010, at 4:29 p.m., Tuberville replied to Stroud's July 8, 2010 email with the following statement:  "Sounds like a great plan.  I will start making plans on my end and findind [sic] new investors.  We need a good first quarter. Tub" *Id*.  Stroud responded to that with: "Sounds good.  Looking forward to a very successful venture.  We are about to head to your lake house.  I will call you tomorrow." (Hanners 000452).

On Tuesday, July 20, 2010, Stroud emailed Tuberville with the wiring instructions for "the fund" and stated that, if Tuberville can move over $200,000 to the account it gives *"us"* an

even $5 million dollars." (Hanners 000454; emphasis added). Stroud stated that "starting in October you [Tuberville] and I [Stroud] can begin taking partner distributions." (Hanners 000454). The email message contained routing wire transfer instructions for "TS Capital Partners, LLC" including its routing number and account number (ending in 6744) at Regions Bank in Auburn, Alabama. *Id.* As requested, Tuberville wired $200,000 to the TS Capital Partners, LLC bank account at Regions Bank ending in 6744. (Ex. 4 to Tuberville Dep. & Tuberville Dep. 87:23-88:5). Tuberville admits that by the time he transferred this sum he understood that there was an entity that Stroud was operating for their joint investments and that the entity was called "TS Capital Partners, L.L.C." (Tuberville Dep. 90:2-9).

On September 28, 2010, Stroud emailed Tuberville a link to the progress being made on the "TS Capital Partners, LLC" website. (Hanners 000462-000463). Stroud specifically notes that the website is being developed in conjunction with an iPad app. (Hanners 000462). Stroud sent this message to Tuberville's personal email address ending in th@msn.com. *Id.*

In October of 2010, TS Capital severed its relationship with Watkins. Ex. 12 at Scott Watkins 000005-000008. HedgeCo created a new website for "TS Capital Partners." (Ex. 8 at Hedgeco 000009 The Welcome/Member Login screen including the following:

> Welcome to TS Capital Partners
>
> In the summer of 2009, Tommy Tuberville and David Stroud collaborated their talents to form TS Capital Partners. They share the same vision that wealth is best created through long-term investing in undervalued assets. Tommy, a head football coach, and David, a veteran Wall Street trader, both bring a unique perspective to investing and running a solid business.
>
> The goal of TS Capital is teaming with their partners to achieve long-term wealth. This is done by taking advantage of opportunities that present themselves in the markets and diversifying risks.

34

*Id.*

As part of the creation of the new website, Stuart Memory created website investor registrations. (Memory Dep. 171:7-172:5; Hanners 000530-000586). Memory began this process with his own registration on November 9, 2010. (Hanners 000530). Between that date and June of 2011, Memory created approximately twenty-eight discrete investor registration notices for the "TS Capital Partners" clients. (Hanners 000530-000586).

Stroud told Broach that Tuberville was aware of the other TS Capital entities and a partner in those entities just as he was in TS Capital Partners. (Broach Dep. 29:10-30:20). There is evidence of Stroud's assertion in the email correspondence he sent to Tuberville. (Hanners 000295-000306; Hanners 000409-000413)

In the fall of 2010, Memory traveled to Lubbock, Texas. Memory Dep. 59:21-60:14. He met with a man named Johnny Owens and Tuberville in Tuberville's private office at Texas Tech. (Memory Dep. 60:13-23; 230:11-231:4). Tuberville admits that Owens was his friend. (Tuberville Dep. Ex. 2 at 3). Tuberville also admits that he told Owens that he had successfully invested some money "through David Stroud." *Id.* Memory didn't have to do much of a sales pitch to Owens because Tuberville had already told Owens what was going on. (*Id.*). Stroud had told Memory that Owens was a friend of Tuberville's who was ready to invest. (Memory Dep. 61:1-8). Owens invested $50,000 in TS Capital in October of 2010. (Regions-TSC Mgmt 000013). While Memory was in Lubbock, he and Tuberville exchanged contact information. (Memory Dep. 189:3-6).

From the fall of 2010 through the fall of 2011, Memory periodically communicated by telephone, email, and text message with Tuberville to seek information or to tell him how TS Capital was doing. (Memory Dep. 189:7-20; 190:11-191:19). At times, Tuberville responded,

but at times he did not. *Id.* Memory specifically remembers telling Tuberville how to access the website to view his account statements. (Memory Dep. 190:17-191:9).

Stroud made Memory "Chief Financial Officer" of TS Capital. (Memory Dep. 46:16-20). Memory had no access to TS Capital's accounts. (Memory Dep. 49:3-50:11).

### F. TS Capital in 2011

#### 1. Tuberville Gets His 2010 K-1

At some point in 2011, Tuberville's accountant requested a K-1 for the 2010 tax year. Tuberville Dep. 108:2-15. In response, "TS Capital Partners, LLC" issued a Schedule K-1 to Tuberville. *Id.* & Ex. 6 to Tuberville Dep. This K-1 identifies Tuberville as a "General partner or LLC member-manager." Ex. 6 to Tuberville Dep. It further indicates that Tuberville's share of profit was 50%. *Id.* It further indicates that this share of loss was 50%. *Id.* It also indicates that his share of capital was 50%. *Id.* With regard to Tuberville's capital account in "TS Capital Partners, LLC," it shows a beginning balance of $685,734 and an ending balance of $925,473. *Id.* It reports "withdrawals and distributions" of $63,121 and an additional capital contribution of $200,000 during 2010. *Id.* Tuberville denies receiving any distributions or withdrawing any money. Tuberville Dep. Tuberville Dep. 111:1-3.

#### 2. TS Capital Partners hires Glen Williams.

Glen Williams began working at TS Capital in January of 2011. G. Williams Dep. 113:8-11. Stroud initially told Glen Williams to prepare to test for the Series 3 license, but then decided he wanted Glen to just focus on research instead. G. Williams Dep. 117:3-12. Stroud also told Glen Williams not to communicate directly with Tuberville, but rather to send anything Tuberville needed to Stroud because Tuberville was too busy with his coaching duties to handle things at TS Capital Partners. G. Williams Dep. 123:4-124:2. Stroud limited Glen Williams

access to information about Stroud's trades and explained that by saying he did not want to skew Glen's analysis. G. Williams Dep. 136:15-139:1. Glen Williams accepted this explanation. *Id.*

### 3. TS Capital Partners hires Baron Lowe.

Stroud told Glen Williams that he wanted to hire Baron Lowe to increase the media presence and the image and marketing of TS Capital Partners. G. Williams Dep. 129:12-23. Baron's initial work was to do the branding, the marketing, to packaging of Stroud's image and to bring TS Capital to a certain standard to be marketable and have a company image. G. Williams. Dep. 129:17-130:10. Baron Lowe worked on such tasks exclusively until the China trip. G. Williams Dep. 130:9-10. After the China trip, Stroud said he wanted to move the operations side of TS Capital to let Baron handle that as well as the marketing. G. Williams Dep. 130:10-21.

### 4. Potential Fund Administrator Raises Issues

In March and April of 2011, TS Capital Partners was engaged in discussions with SS&C Technologies, Inc. (Hanners 000336-000344). It appears SS&C were asking many questions about the books and records, particularly individual accounts. *Id.* They were having a difficult time determining capital, contributions/withdrawals and income. *Id.* They particularly questioned the location of about $5.4 million dollars of assets. *Id.* SS&C wanted to schedule a conference call with Rothstein Kass, SS&C, and TS Capital because they want to get accounting advice. *Id.*

### 5. Accountants Issues in March and April of 2011

On March 24, 2011, Broach sends several emails to Lovoy, Summerville & Shelton, LLC firm of accountants and business advisors ("Lovoy"). The first email, the subject of which was "FW: ts capital partners," included numerous account statements for Stroud from December of

2010 through February of 2011. (Hanners 000036-000056). Stroud is listed as a "General Partner" on each. *Id.* Each statement indicates it is for "TS Capital Partners." *Id.* The next email which had the same subject line, contained Tuberville's "TS Capital Partners" statements, each indicating he is a "General Partner," for December of 2010 through February of 2011. (Hanners 000161-000180). Broach emailed a similar range of statements for Driscoll Colquett (Hanners 000090-Hanners 000111). Broach emailed a similar range of statements for Clark on which she is listed as a . (Hanners 000057-Hanners 000089). Broach emailed a similar range of statements for John Owens on which he is listed as a "Limited Partner" in TS Capital Partners (Hanners 000181-Hanners 000203). Broach mailed statements for David Moore. (Hanners 000033-000035). Broach mailed statements for Bill Scott (Hanners 000019-Hanners 000032). Broach mailed statements for Fredrick Glen Williams which showed him as a "Limited Partner" in TS Capital Partners. (Hanners 000112-Hanners 000138). Broach emailed statements for Kristy Williams which showed her as a "Limited Partner" in TS Capital Partners. (Hanners 000204-000230). Broach emailed statements for Glenda Memory. (Hanners 000139-Hanners 000160). Broach emailed statements for Stuart Memory. (Hanners 000231-000238). Broach emailed statements for DuBose, all of which showed him as a "Limited Partner" in TS Capital Partners and which showed sums which necessarily included the money which had once been with Stroud Capital due to the size of the amounts. (Hanners 000239-Hanners 000259). All these statements show investors in TS Capital Partners in the same three month time frame from December of 2010 through February of 2011.

On April 4, Laura Fountain of Lovoy, sent an email asking about the Wachovia transfers which had been said to come from an old TS Capital Partners account. (Hanners 000323). She asks if the money was from David or Tommy. *(Id.).* Broach responds "both." *(Id.*

On April 6, 2011, Laura Fountain of Lovoy, sent an email to Broach with some questions. (Hanners 000324-000326). She asks for Tuberville's new address. *Id.* She asks why there are transactions from a Stroud Capital bank account and says she though Stroud sold it. *Id.* She explains that if the Stroud Capital account is used for activity for the fund, management, or capital then she needs the bank statements for that account. *Id.* Fountain observes something interesting about the records she has and asks: "I know that management was supposed to be the management company, but since everything is going through partners, why are there transfers between partners and management?" *Id.* She adds that she need the management bank statements. *Id.* She closes by indicating that they hoped to be able to "finalize 2009 partners" but she needs these items first. *Id.*

### 6. April Brings TS Capital Partners Travel

On March 22, 2011, Broach sent an email to Tuberville's assistant at Texas Tech asking her to print the email and place it in Tuberville's hand. (Hanners 000009-000012). The email included information about the upcoming China trip. *Id.* Broach indicated that they were to meet with the accountant today and she hoped to have an update on that tomorrow. *Id.* The materials on China themselves show that they were created by Glen Williams who sent them to Stroud from a tscapital.net email address. *Id.* Broach and Tuberville's assistant then exchange further emails discussing the 2009 tax documentation Tuberville's assistant needs. (Hanners 000013-000018). Broach says that changes in the third party administrator, brokers, etc. have delayed the taxes. (Hanners 000014). Broach also mentions that "we" have to update some things with the "NFA (National Futures Association) and have the account update those." *Id.* Sherman then asks if there is a tax return for 2008. *Id.* Broach replies: "*No and the business didn't start 'til I believe July 09.*'" (Hanners 000013; emphasis added). Two days later,

Tuberville's assistant emails Broach again to ask the status of the 2009 saying that "this bank is wearing me out…LOL." (Hanners 000261). Broach doesn't know when it will be ready and notes more time is needed for changes. *Id.* Tuberville's assistant asks for the original one done for Tuberville's K-1 in April of 2010. (Hanners 000260).

On March 24, 2011, Stroud emailed Tuberville a TS Capital China Trip Summary. (Henners 000268-000275). This summary indicates that the trip will be attended by Stroud, Memory, Baron Lowe, and someone from Bloomberg. (Henners 000275). At the end of April of 2011, Stroud took a trip to China with Bloomberg Reporters covering it extensively. (G. Williams Dep. 213:13-14). Glen Williams held planned the trip, but did not go because he had just finished radiation treatment and had low white blood cell counts. G. Williams Dep. 236:11-23.

In April of 2011, TS Capital arranged for Tuberville to appear on the Sean Hannity Show and on Bloomberg. Tuberville Dep. 226:16-21. Tuberville does not dispute that TS Capital Partners paid for this expenses associated with this trip. Tuberville Dep. 227:17-230:17. Tuberville used his TS Capital credit/debit card at restaurants in New York. (Regions – 9442 CC TSC Partners 000001; Regions-TSC Partners 000107-000109). This card drew funds out of the "TS Capital Partners, LLC" account at Regions ending in 6744. *Id.* Broach arranged for a private car to pick Tuberville up from the airport and his hotel reservations. (Hanners 000327-000328; Hanners 000330-000332). Glen Williams elected not to meet Tuberville and Scott in New York where Tuberville was appearing on Bloomberg and Fox News Edition. G. Williams Dep. 236:23-237:6 & 243:13-22).

### 7. TS Capital Partners Gets Bad News At The Hedge Fund Conference.

In June of 2011, Baron Lowe and Memory went to Atlanta to attend a hedge fund conference. (Memory Dep. 194:19-195:2). On the drive back, they conferred about what they needed to do. (Memory Dep. Ex. 6; Memory Dep. 198:4-201:21). Memory composed a list of priorities. (Memory Dep. 194:19-195:2).

At some point after the June 2011 hedge fund conference, there were discussions between Stroud and the TS Capital employees about if Tuberville wanted to stay with the firm because he wasn't working. (G. Williams Dep. 205:9-15). When Glen Williams heard about those discussions, he said that they were crazy to even consider it because Tuberville lends name recognition and credibility to TS Capital. (G. Williams Dep. 208:10-16). Stroud later said he had talked to Tuberville and Tuberville wanted to stay with TS Capital and would be doing so. (G. Williams Dep. 205:15-206:1).

### 8. Tuberville Pays A Visit.

In July of 2011, Tuberville returned to Auburn. (Tuberville Dep. 260:25-261:25). While there, he stopped by the TS Capital offices and discovered that Stroud had moved into larger offices. (. Tuberville Dep. 260:25-261:25; G. Williams Dep. 306:17-307:5met with Stroud during the visit. (G. Williams Dep. 306:17-307:5). He also talked to Glen Williams and met two interns who were exchange students. (G. Williams Dep. 306:17-307:5; Tuberville Dep. 260:25-261:25). Glen Williams showed Tuberville all the places that Stroud and Bloomberg had visited on the China trip on a map and described what they had learned. (G. Williams Dep. 306:17-307:5). What Tuberville saw impressed him. (Tuberville Dep. 260:25-261:25).

After this visit, Stuart Memory emailed Tuberville some screen grabs of the portfolio showing winners and losers for the day. (Hanners 000455-000458). The date of this message was July 22, 2011, and it was sent to Tuberville at his th@msn.com address. *Id.* Memory signs

off by saying he will be sure to send Tuberville continuous updates in the future. *Id.* On August 2, 2011, Broach sent an email with a July statement to Tuberville at his th@msn.com address. (Hanners 000458-0060). Broach tells Tuberville that she will start sending him a weekly statement from that point on as well as a monthly statement, a quarter-to-date and a year-to-date statement. *Id.* Broach email more statements to Tuberville on August 18, 2011. (Hanners 000460-461).

### 9. Stroud Lies To Regulators.

In July of 2011, Stroud supplied his attorney with an email sent from tommy@tscapital.net in an effort to mislead government regulators about the source of the $50,000 Owens had invested in late 2010. (Ex. 7 to Tuberville Dep. & Tuberville Dep. 122:17-123:19). Tuberville denies ever using the tommy@tscapital.net email account. (Tuberville Dep. 123:3-10). Tuberville did not know about Stroud's creation of this email at the time. (Tuberville Dep. 123:16-22).

### 10. TS Capital Falls Apart.

In September of 2011, Stroud became increasingly hard to reach. (Memory Dep. 231:16-19). Tuberville reached out to Memory seeking information on TS Capital because he too was having trouble reaching Stroud. (Memory Dep. 231:14-232:3; Tuberville Dep. 278:22-279:15; 286:2-25).

On September 28, 2011, shortly after Baron Lowe's second call to Tuberville, Stroud came in to the office and said that he had spoken with Tuberville and TSCP was shutting down. (G. Williams Dep. 190:13-20). .

Baron Lowe sent an email to Stroud and Tuberville that night asking for the return of his investment, severance pay, and health insurance through October 31, 2011. (Hanners 000464-

000465).  In another email he sought the reimbursements owed for travel expenses.  (Hanners 000466-000465).  Stroud involved an attorney to negotiate severance and kept Tuberville in the loop on the process of negotiations.  (Hanners 000468-000498).

On September 28, 2011, Broach also called Tuberville to tell him they were behind on bills.  (Broach Dep. 70:6-72:3).  Tuberville said he would handle it with Stroud.  *Id.*  Tuberville told Broach to close down the shop and leave.  *Id.*  Tuberville asked Broach for a list of bills due.  (Hanners 000499-000500).  On September 28, 2011, Broach emailed the list to Stroud and Tuberville.  *Id.*  The list showed past due accounts including the payment on the Abrams life insurance policy, payments to BMW Financial, payroll taxes, rent, health insurance, accounting fees, and consulting fees totaling more than $93,130.00.  *Id.*

On October 2, 2011, Baron Lowe and Glen Williams called Tuberville and presented all of the issues about which they were concerned.  (G. Williams Dep. 128:9-10; 191:17-193:13).  Tuberville's response was to say he would call his "partner" David Stroud and get it straightened out.  (G. Williams Dep. 128:9-22).  Importantly, Glen Williams remembers the following comments Tuberville made in that telephone conversation.

> A:  …I went down all the list of everything,
> and Tommy listened to them, made a couple of
> comments, and once we were done, he said well,
> let me call my partner and get all this
> straightened out, we'll make sure everybody gets
> their money back.  We said how much money are we
> talking, we told him the amount.  He seemed
> surprised that it was such a low amount, he was
> like oh, it's just that much, okay, we'll make
> sure everybody's going to get their money back.
> Q:  Well, what amount did you tell him?
> A.   2.2 million.
> Q.   Which you came up with how?
> A.   We came up with that based on what we
> had thought we had in our accounts; Lowe's,
> Abrams, Williams, and Clarks.

(G. Williams Dep. 192:21-193:13).

On October 6, 2011, Tuberville emailed Broach for an update on if the bills had been paid. (Hanners 000501-000502). In the early afternoon, Broach indicated that there had not been progress. *Id.* That evening Broach emailed Tuberville at his th@msn.com email address to report that she had mailed out checks to the accountant, the health insurance company, the landlord and BMW. (Hanners 000503-000504).

On October 8, 2011, Baron Lowe emailed Stroud and Broach asking when he could expect the refund of his investment and the separation agreement. (Hanners 000505-000506). On October 12, 2011, Stroud sent Baron Lowe an email stating he would not continue to pay Lowe or offer benefits unless Lowe signed and returned the employment agreement by October 14, 2011 at 11:00 a.m. CT. (Hanners 000507-000509) Stroud characterized Baron Lowe's prior communications as threats and said he was in touch with attorneys and would not allow Lowe to slander Stroud or TS Capital. *Id.* Stroud indicated that redemption was governed by the Fund offering documents and could not be effectuated until January of 2012. *Id.* Baron Lowe sent a response to Stroud and Tuberville. *Id.* In this document he mentions unpaid bills, unpaid taxes, and an uncompleted NFA audit. *Id.* He notes inconsistencies between what he was being told now and what he had been told on September 28, 2011. *Id.* Lowe said that the situation had the "optics of a ponzi scheme." *Id.* Within a few hours, Tuberville emailed Stroud to ask if he had talked to Baron Lowe. *Id.* Stroud said yes and that the lawyers are preparing a response to the email. *Id.* Negotiations continued, but Baron Lowe got nothing he had asked for. (Hanners 000510-000527)

On October 19, 2011, Tuberville sent a series of text messages to Stroud. (Ex. 56 to Tuberville Dep. & Tuberville Dep. 263:15-22  The relevant statements from Tuberville are as follows:

- [text partially obliterated on screen shot Tuberville produced] "account numbers and take care of this myself. Tell Rachel to send me all account numbers and I will deposit money in all unpaid bill accounts. I cannot believe this has not been taken care of." Tuberville Dep. Ex. 56; Tuberville Dep. 267:3-18).

- "I need account numbers of bank in Troy that has money. *We* have to take care of bills today. You said *we* had several million dollars in that account. If it is CD money *we have to take it out And[sic] pay.* (Tuberville Dep. Ex. 56; Tuberville Dep. 265:5-12).

- "Now I hear the state securities commission is coming to investigate. I hope you have everything in order. Call me." (Tuberville Dep. Ex. 56; Tuberville Dep. 263:15-264:9).

While he tried to recast his motives for sending these messages at his deposition, there is no dispute that he wrote the text messages identified in Ex. 56 to his deposition, which are right justified and darker gray. (Tuberville Dep. 265:5-7; 267:15-16).

On October 20, 2011, Tuberville called Broach and asked her to provide him with the information so that he could login to the TS Capital Partners, LLC checking account with Regions Bank (account number ending in 6744). (Tuberville Dep. 197:16-200:25). Broach did not balk in any way about giving Tuberville access to this account information. (Tuberville Dep. 198:14-16). Tuberville printed out the account details for the account from June 1, 2010 through October 20, 2011. (Tuberville Dep. 198:17-199:14; Tuberville Dep. Ex. 39).

## 10. National Futures Association Action.

From about April 2011 to September 2011, the NFA performed an audit of TS Management. The NFA was unable to determine the location and amount of the assets held by and/or under management of the Entity Defendants, or the source of several deposits made to the Entity Defendants. On October 26, 2011, the NFA issued the NFA Notice, which prohibited TS Management from, among other activities, placing trades and soliciting funds, and required that TS Management provide copies of the NFA Notice via overnight courier to all customers and participants in any pools that it operates or controls, including the TS Fund, all investors in any other funds or investment vehicles over which TS Management or any of its principals exercised control, and all financial institutions in which TS Management maintained any accounts. Defendants did not provide copies of the NFA Notice to Plaintiffs, as required. Ex. 52 to Tuberville Dep. Attached to that Notice is an affidavit from Vilia Sutkus-Kiela, a Manager in the NFA's Compliance Department.[49]

On April 2, 2012, the Business Conduct Committee of the NFA issued a Complaint (the "NFA Complaint") against TS Management alleging that "TS Capital [Management LLC] provided false and misleading information to NFA concerning the operating of the firm and its affiliates and about numerous transactions, including bank deposits and wire transfer activity and the source of the funds for deposits." The violations "involved lying to NFA auditors and failing to cooperate with the audit team during NFA's audit of the firm." The Complaint also alleged

---

[49] Although the affidavit is not presently in admissible form, it nonetheless indicates the testimony Plaintiffs can obtain from her at trial. To the extent that Tuberville complains that her deposition was not taken during the discovery period, Plaintiffs note that binding precedent provides for the taking of "trial depositions" after discovery has closed for witnesses who are unavailable to testify at trial. *See, e.g., Charles v. Wade*, 665 F.2d 661, 664 (5th Cir. Unit B Jan. 11, 1982) (fact that discovery period had closed was an inappropriate reason for denying motion for a trial deposition of a witness unavailable for trial). Plaintiffs have long indicated that Sutkus-Kiela has relevant knowledge concerning this case. She lives and works more than 100 miles from the place of trial. The nature of her relevant knowledge is set forth in her affidavit, and Tuberville can claim no unfair surprise if she testifies about the substance of her affidavit.

that TS Management failed to cooperate with the NFA during examination and investigation of the firm by failing to produce records and failing to list Stroud as a principal.

TS Management received service of the NFA Complaint, but TS Management failed to answer. When the NFA sent a second copy of the NFA Complaint, TS Management again failed to answer. Its failure to do so was deemed by the NFA to be an admission of all allegations and of its right to a hearing. As a result, the NFA issued a Decision, dated June 13, 2012, concluding and finding that TS Management had committed serious violations and permanently barred TS Management from membership in the NFA and acting as a principal of an NFA member.

## 11. CFTC Action.

Tuberville called Scott in October and asked him to go get Tuberville's remaining personal items and memorabilia from the TS Capital offices in Auburn. (Tuberville Dep. 240:16-241:5; 242:2-6).

As part of its investigation, the Commodity Futures Trading Commission ("CFTC") interviewed Tuberville about Stroud in October of 2011. (Tuberville Dep. 103:1-104:24; Patrick Dep. 136:12). At his deposition, Joseph Patrick of the CFTC testified as to his recollection of Tuberville's statements[50] at that meeting as follows:

> Q. Okay. What can you tell me about what you recall now about what Thomas Tuberville said during that interview in October of 2011?
>
> A. That he met David Stroud in New York at a Hall of Fame dinner; that they discussed investments; that Stroud had told him he was investing in natural gas; and that he was doing very well. *He asked -- he asked Tommy Tuberville to invest.*
>     He also invited Tommy Tuberville to visit his office where he could observe him trading natural gas futures, which Tommy Tuberville did,

---

[50] Statements of Tuberville to the CFTC are admissible under Federal Rule of Evidence 801(d)(2)(A).

and saw him trading. He said that there was a desk full of computer screens and Bloomberg terminals; and that he was using these tools to trade on the screen; and that he was doing well from what he could see; and that he ultimately decided to invest.

*He gave him 250,000 to start with in spring of -- in the spring, and I believe it was '09. I want to say it's 09.* I think that's what my notes said. That he never sent any statements or records of his investment, hardcopy records of his investment with Stroud; that he relied on Stroud himself to provide updates about how the investment was doing; and that he said that Stroud told him the investment was doing very well; and that at one point Stroud had told him that he had doubled his money investing in this futures trading strategy.

He said that he got hired by Texas Tech; and that was at around the same time that *Stroud was discussing forming TS Capital; and that the idea that Stroud had was that they could go into business where Stroud would be able to leverage his, Tommy Tuberville's contacts, you know, people with money that might be able to invest in the hedge fund that Stroud was putting together; and that Stroud had already lined up investors; and that he had already commitments for about $6 million; and that they would be shortly coming in, these customers, this commitment that he had for $6 million in funds would be coming in shortly; and that would help kind of get the hedge fund off the ground;* and that he spoke with -- when he took the Texas Tech job, he moved to Texas, and Stroud was in Alabama. And they spoke anywhere from once or twice a month to once a week about just how things were going with the investment, how his money was performing, that sort of thing.

*He said that he introduced Stroud to his friend Bill Scott who was like a bridge builder, like a structural engineer, something like that, who had his own business, and so Bill Scott agreed to invest some money in the trading strategy. He said that he referred to two other individuals, one of whom was in Lubbock, Texas, that also agreed to invest with Stroud.*

48

He said that he first learned about the
problems with the entities about two weeks prior to
the call that we've had -- so that would have been
sometime in early October 2011 -- and that he had a
call from Stroud's offices from, I think it was
Baron Lowe, Baron, yes; and that he was informed
that the NFA had come in and done an exam; and that
they were asking a lot of questions about where
money was being kept and things like that.

 So he wasn't even -- he was made aware of
that in October 2011.  *He had a conversation with*
*David Stroud sometime after that point where he*
*said that Stroud needed to return the employees who*
*had invested money with the -- in the trading*
*strategy, in the hedge fund, that Stroud should*
*return that money if they didn't want to -- if they*
*wanted to pull that money out.*

 *He said that he had access to -- there was*
*a website that -- the companies had a website that*
*he had access to*; that Stuart Memory was the person
who was like the administrator of the website and
controlled access like user names and logons; and
so that *he would access the website through Stuart*
*Memory, starting him up with access*.

    That's basically what my notes -- what
I can recollect from my notes.

(Patrick Dep. 136:13-140:4) (emphasis added).  Thus, Tuberville admitted to the CFTC that he

had told Stroud to return the money to employees who had invested and wanted their money, a

fact he denied in his deposition.  (Tuberville Dep. 271:13-21).  He could not recall accessing the

website with Memory's help by the time of his deposition or seeing the login screen which

included information about the formation of TS Capital as a venture between Tuberville and

Stroud in 2009 which Stroud intended to solicit others to invest in TS Capital partnership.

(Tuberville Dep. Ex. 9; Tuberville Dep. 125:14-126:12).  Tuberville admitted soliciting investors

to CFTC.  (Patrick Dep. 138:17-139:1).  He also admitted having the discussions with Stroud

about the formation of TS Capital which included an understanding of participation by other

outside investors including some of Tuberville's "contacts" around the time of the formal launch

of the TS Capital hedge fund. (Patrick Dep. 137:21-138:11). This supplies important context to the emails between Tuberville and Stroud in June of 2010. (Hanners 000449-000450). It is a reasonable inference that those email discussions referred to the TS Capital joint enterprises between Tuberville and Stroud.

Plaintiffs submit that it is significant that Tuberville hid the full extent of his involvement with the TS Capital entities and Stroud from the CFTC. This is especially true, where, as here, Tuberville attempts to argue that the CFTC's failure to bring an action against him is some sort of evidence that he was not involved enough with the Entity Defendants to be liable to Plaintiffs in this action. Patrick had no recollection of Tuberville mentioning that the T in TS Capital stood for Tuberville. (Patrick Dep. 140:5-9). Patrick had no recollection of Tuberville mentioning receiving email updates about how his investments were doing. (Patrick Dep. 140:15-18). Tuberville did not mention receiving health insurance benefits for himself and his family from TS Capital Partners, LLC. (Patrick Dep. 140:23-141:5). Indeed, Tuberville did not mention any personal benefits he received at the expense of TS Capital other than a cell phone. (Patrick Dep. 141:7-142:9; 149:7-14; 163:7-15).

### IV. Evidence of Flow Through of Stroud Funds to TS Capital Accounts

Careful examination of the certified banking records for the various bank accounts to which Stroud had access between 2008 and 2011 reveals that Stroud moved money freely between accounts with different legal entities as owners; that he moved money between accounts held in the name of entities he created prior to his partnership with Tuberville and TS Capital entities created after that partnership formed. As to DuBose, J. Abrams, and P. Abrams, this evidence supports their contention that the money they held in the Stroud entities merged into the TS Capital entities. In this section of the factual narrative, Plaintiffs highlight some of the bank

records to establish these facts or at least to demonstrate that genuine issues exist as to whether Stroud entity money ended up in TS Capital accounts. This is not meant to be an exhaustive or all inclusive list, but rather to provide the Court with concrete factual examples of what Plaintiffs contend was Stroud's typical disregard of any boundaries between his personal accounts, his Stroud entity accounts, and the TS Capital Accounts.

### 1. Bank Accounts Held by David and Allison Stroud

| Account Owner(s) | Financial Institution and Last 4 Digits of Account Number | Account Open Date (if known) | Account Closing Date (if known or applicable) | Source in Evidentiary Record |
| --- | --- | --- | --- | --- |
| Allison M. & John David Stroud | Wachovia 7047 | Unknown | Unknown | Regions–TSC Partners 000185, Regions–TSC Partners 000186, Regions–TSC Partners 000192, Regions–TSC Partners 000193 |
| David Stroud & Allison M. Stroud[51] | Regions 1145 | December 2, 2009 | November 2, 2011 | Regions–David & Allison Stroud 000145 & 000147 |

### 2. Bank Accounts Held by Stroud Alone

| Account Owner(s) | Financial Institution and Last 4 Digits of Account Number | Account Open Date (if known) | Account Closing Date (if known or applicable) | Source in Evidentiary Record |
| --- | --- | --- | --- | --- |
| John David Stroud | Troy Bank & Trust Company – 2720 | October 22, 2004 | Account frozen per court order on March 7, 2012 | TB&T 000108, TB&T 000110 |

### 3. Bank Accounts Held by Stroud Entities

---

[51]

| Account Owner(s) | Financial Institution and Last 4 Digits of Account Number | Account Open Date (if known) | Account Closing Date (if known or applicable) | Source in Evidentiary Record |
|---|---|---|---|---|
| Stroud Development Group, LLC with John David Stroud the sole individual authorized to sign on the account | Troy Bank & Trust Company – 5617 | February 28, 2008 | December 7, 2010 | TB&T 000003, TB&T 000106 |
| Stroud Capital Management, LLC | Wachovia – 5494 | July 7, 2008 | September 22, 2008 | Wachovia 000038, Wachovia 000039 Wachovia 000046 |
| Stroud Capital Management, LLC | Wachovia – 5481 | July 7, 2008 | September 19, 2008 | Wachovia 000116, Wachovia 000124 |
| Stroud Capital Fund LP | MFGlobal-3159 | July 12, 2008 | Unknown | Patrick Declaration at 8; Ex. K to Patrick Declaration |
| Stroud Capital Management, LLC | Wachovia – 5381 | September 19, 2008 | June 8, 2010 closed by bank but last customer activity was September 24, 2009 | Wachovia 000128, Wachovia 000146 Wachovia 000170 |
| Stroud Capital Management, LLC | Wachovia – 5394 | September 22, 2008 | June 2, 2009 | Wachovia 000172, Wachovia 000192 |
| Stroud Capital Fund LP | Wachovia – 5446 | September 29, 2008 | November 30, 2009 | Wachovia 000050, Wachovia 000051, Wachovia 000102 |
| Stroud Capital Fund LP | Interactive Brokers – 2649 | October 30, 2008 | Unknown | Patrick Declaration at 8; Ex. K to Patrick Declaration |
| Stroud Capital Fund & David Stroud | Regions -7641 | December 1, 2009 | November 7, 2011 | Regions–Stroud Capital Fund 000001, |

| Account Owner(s) | Financial Institution and Last 4 Digits of Account Number | Account Open Date (if known) | Account Closing Date (if known or applicable) | Source in Evidentiary Record |
|---|---|---|---|---|
| | | | | Regions–Stroud Capital Fund 000057, Regions–Stroud Capital Fund 000059 |

### 4. Bank Accounts Held by TS Capital Entities

| Account Owner(s) | Financial Institution and Last 4 Digits of Account Number | Account Open Date (if known) | Account Closing Date (if known or applicable) | Source in Evidentiary Record |
|---|---|---|---|---|
| TS Capital Fund | MFGlobal-3246 | June 28, 2009 | Unknown | Patrick Declaration at 8; Ex. K to Patrick Declaration |
| "TS Capital GP, LLC" | Wachovia-5572 | June 25, 2009 | September 15, 2009 | Wachovia 000104, Wachovia 000114 |
| "TS Capital Partners LLC" David Stroud Thomas H. Tuberville Rachel D. Broach | Regions Bank - 6744 | August 19, 2009 | November 7, 2011 | Regions–TSC Partners 00001, Regions–TSC Partners 00146, Regions–TSC Partners 000149 |
| TS Capital Fund David Stroud Thomas H. Tuberville Rachel D. Broach | Regions Bank – 8961 | December 8, 2009 | November 7, 2011 | Regions-TSC Fund 000001, Regions-TSC Fund 000068, Regions-TSC Fund 000070 |
| TS Capital Fund | MFGlobal- 3292 | February 1, 2010 | Unknown | Patrick Declaration at 8; Ex. K to Patrick Declaration |
| TS Capital Fund | Interactive Brokers-5816 | September 27, 2010 | Unknown | Patrick Declaration at 8; Ex. K to Patrick Declaration |
| TS Capital Fund | Interactive Brokers-4626 | May 5, 2011 | Unknown | Patrick Declaration at 8; Ex. K to Patrick Declaration |
| TS Capital Fund | Interactive Brokers- | June 28, 2011 | Unknown | Patrick |

| | 7465 | | | Declaration at 8; Ex. K to Patrick Declaration |
| --- | --- | --- | --- | --- |

## V. Plaintiffs

### A. John and Priscilla Abrams

Priscilla Abrams is a retired school teacher. (P. Abrams Dep. 11:7). Prior to her investments with Stroud her only investing experience was her teacher's retirement account. (J. Abrams Dep. 50:13-51:12). John Abrams has been married to his wife Priscilla Abrams for going on forty-six years. (J. Abrams Dep. 7:10-16). He worked for twenty-two years as a bookkeeper for a timber company. (J. Abrams Dep. 11:19-12:6). He has worked for the past sixteen years as an office manager for an oil company. (J. Abrams Dep. 10:2-13).

The Abramses had invested with Stroud when he was with other companies prior to starting his own company. (P. Abrams Dep. 25:11-23; 29:13-16; 32:15-23). They expressed to him their desire to keep their money invested in very conservative and safe investments as this was their retirement savings. (P. Abrams Dep. 25:11-26:8). Stroud suggested stocks and annuities. (*Id.*) When the Abramses invested with Stroud's new company in 2008, Stroud did not tell them that those funds would be invested any differently than they had previously been invested. (P. Abrams Dep. 58:1-59:7). In 2008, Stroud assured John Abrams that his IRA with Stroud Capital had been set up so that Abrams could continue receiving monthly distributions and annual payment of an insurance premium of $20,000. (J. Abrams Dep. 150:1-156:7; P. Abrams Dep. 48:14-49:9). At a meeting in March of 2009, John Abrams reiterated that he wanted to continue to receive a monthly distribution and an annual distribution sufficient to cover the life insurance policy. (P. Abrams Dep. 67:7-11).

The aggregate value of John Abrams' initial investments was $794,480. On February 8, 2008, John Abrams wrote a check for $60,000 payable to "SDG." (TB&T 000011). On

February 20, 2008, Stroud deposited that check into an account held in the name of Stroud Development Group, LLC at Troy Bank & Trust Company. (TB&T 000003; TB&T 000010; TB&T 0000011). The last four digits of the account number are 5617. *(Id.).* Stroud was the sole authorized signatory on this account. (TB&T 000003). Stroud used this check to open the account which had not existed prior to the deposit. (TB&T 000010). In July of 2008, Stroud directed Troy Bank & Trust Company to transfer $475,000 from the account it held in the name of Stroud Development Group, LLC ending in 5617 to an account at Wachovia held in the name of Stroud Capital Management, LLC account, which had an account number ending in 5481. (TB&T 000038-TB&T 000043; Wachovia 000124). Shortly after each deposit hit the Stroud Capital Management, LLC which had an account number ending in 5481, sizable transfers were made from that account to several other accounts including: the Stroud Capital Management account at Wachovia ending in 5494 which Stroud had just opened in July of 2008 (Wachovia 000046 & Wachovia 000125) and the Stroud's marital account at Wachovia ending in 7047 (Wachovia 000116).

On September 17, 2008, John Abrams transferred his IRA, in the amount of $734,480.34, from Lehman Brothers to a Stroud Capital Management, LLC bank account at Wachovia Bank, to be invested in the Stroud Fund. (Wachovia 000038). The bank account into which his funds were deposited ends in 5494. (Wachovia 000038). Stroud closed out the bank account on that same day and transferred the $902,920.09 account balance into another Wachovia account for Stroud Capital Management, LLC which ended in 5394. (Wachovia 000038-39; Wachovia 000192). From there the funds were transferred into various other accounts: $25,000 went to the Allison and David Stroud Wachovia account ending in 7047; $500,000 went to a Stroud Capital Fund Account at another institution (which appears to be an MF Global account); and on

September 29, 2008, $600,000 was transferred into the Wachovia bank account in the name of the Stroud Capital Fund ending in 5446. (Wachovia 000193; Wachovia 000102).

In October of 2008, Stroud transferred $253,000 more from the 5394 account of Stroud Capital Management to the 5446 account of Stroud Capital Fund.[52] (Wachovia 000188; Wachovia 000098). Also in October, Stroud transferred another $25,000 into the Allison and David Stroud Wachovia account ending in 7047. (Wachovia 000188). On November 30, 2009, the Stroud Capital Fund LP account ending 5446 at Wachovia closed with the transfer of $20,500 to the Stroud marital account at Wachovia ending in 7047 and $140,601.66 into the Stroud Capital Fund Account opened at Regions on December 1, 2009, which ended in 7641. (Wachovia 000051; Regions-Stroud Capital Fund 000059-61).

Money from the Regions Stroud Capital Fund Account ending in 7641 later transferred into the "TS Capital Partners, LLC" account at Regions Bank ending in 6744. (Regions-TSC Partners 000023; Regions-TSC Partners 000018; Regions-Stroud Capital Fund 000001, 000004, 000011, 000050). Money also transferred from the Regions Stroud Capital Fund Account ending in 7641 later transferred into Interactive Broker accounts. (Regions-Stroud Capital Fund 000008, ). Additionally, Stroud deposited money in the "TS Capital Partners, LLC" account at Regions Bank ending in 6744 around this time from his marital account at Wachovia ending in 7047. (Regions-TSC Partners 000013; Regions-TSC Partners 000185-186; Regions-TSC Partner 000192-193; Regions-TSC Partners 000197-198; Regions-TSC Partners 000204-205). Indeed, Stroud transferred money from Stroud Capital accounts into the "TS Capital Partners, LLC"

---

[52] The Stroud Capital Fund Account ending in 5446 is the same account into which Tuberville's initial $250,000 was transferred. (Wachovia 000068). It is also the account into which DuBose's $250,000 check was deposited on July 20, 2009. (Wachovia 000064). Thus, the funds of Tuberville, DuBose, and Abrams were pooled in the 5446 account. Moreover, direct transfers from the Wachovia 5446 account were made to TS Capital Partners accounts in October of 2009. (Wachovia 000054-Wachovia 000055). Indirect transfers were also "washed" through other accounts to TS Capital accounts. (Wachovia 000051; Regions – Stroud Capital Fund 000060-61; Regions – Stroud Capital Fund 000017; Regions – Stroud Capital Fund 000011; Regions – Stroud Capital Fund 000004). A reasonable inference is that the TS Capital entities are in fact the successor entities to the Stroud Capital entities.

account at Regions Bank ending in 6744 in October of 2009 as well. (Regions-TSC Partners 000009). He also managed to get Regions Bank to allow him to deposit a check from Verizon payable to Stroud Capital Management, LLC into the "TS Capital Partners, LLC" account at Regions Bank ending in 6744 in October of 2009. (Regions-TSC Partners 000009; Regions-TSC Partners 000178-179). Regions also allowed the deposit of a countercheck from Wachovia Bank made payable to "TS Capital GP, LLC to be deposited into the "TS Capital Partners, LLC" account at Regions Bank ending in 6744 in September of 2009. (Regions-TSC Partners 000005, 000163-164). In September of 2009, Stroud wired $15,000 from the Wachovia account ending in 5446 held in the name of Stroud Capital Fund to the "TS Capital Partners, LLC" account at Regions Bank ending in 6744. (Regions-TSC Partners 000005; Wachovia 000058).[53]

In or about May 2009, Priscilla Abrams transferred her IRA, amounting to approximately $10,778.95, to Stroud Capital. (P. Abrams Dep. 168:1-14). On June 3, 2009, Stroud deposited this check into the Wachovia bank account held in the name of Stroud Capital Management, LLC ending in 5381. (Wachovia 000152). Stroud then paid the Abramses monthly disbursement of $3,500.00 from this account and transferred $6,500 to his marital account at Wachovia ending in 7047. *Id.* As previously explained, this account ultimate transferred sums into a Stroud account a Regions Bank which in turn deposited funds in the "TS Capital Partners, LLC" account at Regions ending in 6744.

In March of 2010, the Abramses met with Stroud at his office. (J. Abrams Dep. 175:4-11). The office was filled with memorabilia. (P. Abrams Dep. 75:12-20; J. Abrams Dep. 175:4-

---

[53] These examples are by no means intended to be an exhaustive list. This is merely an attempt to show the proof Tuberville erroneously says is wholly absent in this case that the fund from Stroud Entity accounts ended up in TS Capital Entity accounts, especially the TS Capital Partners, LLC account at Regions Bank ending in 6744, which Tuberville admits to co-owning and which is held in the name of TS Capital Partners. Further accounting can be made at trial, but this proof is intended to help demonstrate the existence of a triable issue as to the transfer of some or all of the DuBose and Abrams money to TS Capital.

11). Stroud said he had become friends with Tuberville. (J. Abrams Dep. 175:12-14). In May or June of 2010, Stroud sent J. Abrams an email, but instead of saying Stroud Capital Management on it as such emails had in the past, it now said TS Capital. (J. Abrams Dep. 203:10-204:1). On May 27, 2010, Broach sent John Abrams an email advising him that Stroud had a new email address (david@tscapital.net). (Plaintiffs 00001332 - which was part of Ex. 3 to J. Abrams Dep.) Beginning in June of 2010, the distributions to the Abramses came from either the "TS Capital Partners, LLC" account at Regions Bank ending in 6744 or the TS Capital Fund account at Regions Bank ending in 8961. (Regions-TSC Fund 000019; Regions-TSC Partners 000053; Regions-TSC Partners 000071; Regions-TSC Partners 000078; Regions-TSC Partners 000083; Regions-TSC Partners 000088). On August 16, 2010, Broach sent John Abrams an email with the new website address and a user id and password that would let the Abramses login to check on their accounts. (Plaintiffs 00001338 - which was part of Ex. 3 to J. Abrams Dep).

In or about April 2011, the Entity Defendants issued a Schedule K-1 to Priscilla Abrams, showing that she had a capital account in "TS Capital Partners" of $16,092 as of December 31, 2010. In or about April 2011, the Entity Defendants issued two Schedule K-1s to John Abrams, showing that he had capital accounts in "TS Capital Partners" totaling $815,764 as of December 31, 2010. (J. Abrams Dep. 237:14-16; Plaintiffs 00001461-1463 - which was part of Ex. 1 to J. Abrams Dep.; P. Abrams Dep. 99:1-7, 100:4-22) In or about August 2011, the TS Fund and the General Partner delivered a subscription agreement for a limited partner interest in the TS Fund to John and Priscilla Abrams, which they signed and returned to Defendants. (J. Abrams Dep. 230:9-231:5; P. Abrams Dep. Exs. 6 - 10; P. Abrams Dep. 186:12-192:10).

Prior to bringing suit, John and Priscilla Abrams sought the return of their monies. (Tuberville Dep. Ex. 59; Plaintiffs 00001346 - which was part of J. Abrams Dep. Ex. 3).

Contrary to Tuberville's contentions, as set forth above, there is evidence from which a reasonable jury could find that Stroud did transfer funds in such way that money held in Stroud Entity accounts ended up in TS Capital accounts.

## B. Debra Clark

Debra Clark and her husband Stan are former residents of Arkansas who now live in Georgia. (Clark Dep. 5:22-6:10; 8:1-21). Clark has a pharmacy degree from the University of Georgia, but she has not been able to work outside the home since she suffered a traumatic brain injury in an airplane crash. (Clark Dep. 11:7-12:7; 18:8-23; 21:19-27:16).

At one point Clark worked for the same company as Glen Williams, and they became friends. (Clark Dep. 27:17-23). Glen Williams introduced Clark to Lee Sanders. (Clark Dep. 39:16-20). It was Sanders who first told Clark about Stroud. (Clark Dep. 39:13-15). Sanders told Clark that Stroud had invested some of Sanders' money and had been very successful for him. (Clark Dep. 41:8-12). Later Glen Williams told Clark something similar about Stroud. (Clark Dep. 45:13-46:14). At some point, Glen Williams told Clark that Stroud had changed his business and was taking smaller accounts in conjunction with a partnership company Stroud had with Tuberville. (Clark Dep. 66:6-67:8). The fact that Stroud was in a partnership with Tuberville encouraged Clark's husband to go along with Clark moving her investment funds. (Clark Dep. 78:7-12; 79:2-11). Clark recalls that during Stroud's pitch to her, he told her that the money was pooled and only a small percentage was in the market at one time and that the returns were great. (Clark Dep. 83:18-84:21). Clark recalls that Stroud offered to introduce her and her husband to Tuberville and to take the Clarks to Tuberville's lake house. (Clark Dep. 96:21-22). At some point before Clark invested, her husband did some research on the Tuberville and Stroud partnership. (Clark Dep. 114:17-115:4).

Memory flew to Georgia and brought Clark some paperwork relating to her investment sometime prior to her actually putting funds in TS Capital. (Clark Dep. 91:21-95:10). Clark knows that one of the things Memory brought to her house was a business card with Tuberville's name on it in association with TS Capital. (Clark Dep. 110:1-14). Memory also delivered an iPad to Clark. (Clark Dep. 111:22-112:14). Clark understood that the iPad was how clients could watch the progress of their money. (Clark Dep. 112:19-113:8; Clark Dep. 123:10-124:11).

Clark gave the partnership between Tuberville and Stroud her money to invest. (Clark Dep. 179:18-180:18). On September 23, 2010, TS Capital Partners deposited a number of checks for the benefit of Clark:

- A Roth IRA transfer in the amount of $3,667.33
- An IRA transfer in the amount of $10,876.76
- A Roth IRA transfer in the amount of $699.17
- An IRA transfer in the amount of $9,847.76
- A Roth IRA transfer in the amount of $3234.65
- An IRA transfer in the amount of $11,756.69
- A Roth IRA transfer in the amount of $3,005.99
- An IRA transfer in the amount of $10,627.43
- A Roth IRA transfer in the amount of $2,088.73
- An IRA transfer in the amount of $14,114.51
- A Roth IRA transfer in the amount of $2,638.14
- An IRA transfer in the amount of $11,295.82
- A Roth IRA transfer in the amount of $2,872.26
- An IRA transfer in the amount of $10,888.68
- A Roth IRA transfer in the amount of $2,096.99
- An IRA transfer of $14,649.03

(Regions-TSC Partners 000362 - Regions-TSC Partners 000378). The total amount deposited on September 23, 2010 for the benefit of Clark was $114,359.94. *Id.* On September 27, 2010, four additional checks were deposited in the TS Capital Partners account ending in 6744 for the benefit of Clark's IRA and Roth IRA. (Regions-TSC Partners 000379 - Regions-TSC Partners 000383). These checks totaled $90.42. *Id.*

On September 29, 2010, Clark wrote a check to TS Captiatl[sic] Partners in the amount of $165,000. Regions-TSC Partners 000389. This investment was deposited directly into the Regions Bank account ending in 6744, which account was owned by "TS Capital Partners, LLC." Regions-TSC Partners 000388.

On March 25, 2011, Clark made a contribution of $5,000 to her Roth IRA with the TS Capital. (Regions-TSC Fund 000097). The payee on Clark's check was "TS Captiatl[sic] Partners." (Regions-TSC Fund 000097). On March 28, 2011, Clark's check was deposited into the TS Capital Fund Account ending in 8961. (Regions-TSC Fund 000045; Regions-TSC Fund 000096). Stroud, Tuberville, and Broach were all authorized on the signature card when account 8961 opened on December 8, 2009. (Regions-TSC Fund 000070). In the following month, there were numerous transfers between the Regions Bank account ending in 8961 into which Clark's money was deposited and other accounts including the "TS Capital Partners, LLC" account at Regions Bank ending in 6744. (Regions-TSC Fund 000048).

Therefore, the aggregate initial value of Debra Clark's investments in the TS Capital Partners was approximately $284,450.36. A daily account statement provided by the Entity Defendants to Debra Clark via the TS Capital Website shows a total value of her investments in TS Capital of $314,156.91 as of September 27, 2011. (Clark Dep. Ex. 9). In November of 2011, Debra Clark sought the return of her money. (Tuberville Dep. Ex. 60; Clark Dep. Ex. 8; Clark Dep. 177:13-178:5).

### C. Baron and Melanie Lowe

Baron and Melanie Lowe have been married since 1995. (M. Lowe Dep. 12:17-19). Since 2008, Baron and Melanie Lowe have lived in Hendersonville, Tennessee. (M. Lowe Dep. 9:15-22). They have two children. (M. Lowe Dep. 13:4-9). Melanie Lowe is a Nurse

Practitioner.  (M. Lowe Dep. 15:11-22).  Baron Lowe is a Pharmacist, who has previously worked as a district sales manager for Lily Pharmaceutical Company.  (B. Lowe Dep. 31:13-14; 33:17-34:4).  Prior to investing in the TS Fund, Baron and Melanie Lowe had never invested in commodities.  (M. Lowe Dep. 102:17-103:21).

On January 26, 2011, Baron Lowe transferred the proceeds of his 401(k) account, in the approximate amount of $249,261.61, to the "TS Capital Partners, LLC" bank account at Regions ending in 6744.  (Regions-TSC Partners 000461-462; Regions-TSC Partners 000087).  Baron Lowe obtained a check in the amount of $20,158.25 from Fidelity Investments dated February 7, 2011 from a Roth IRA held there.  (B. Lowe Dep. 21:4-16; Regions-TSC Fund 000094).  Baron Lowe endorsed the back of the check.  (Regions-TSC Fund 000094).  On March 22, 2011, it was deposited, along with another check, into the Regions Bank account held in the name of TS Capital Fund, which account ends in 8961.  (Regions-TSC Fund 000093; Regions-TSC Fund 000045).  The other check deposited into account 8961 on that date was a check dated March 17, 2011 from Wells Fargo Advisors, LLC payable to Baron and Melanie Lowe as joint tenants. (Regions-TSC Fund 000095).  The amount of this check was $174,501.88.  (Regions-TSC Fund 000095).  The total deposit on March 22, 2011 was $194,660.13.  (Regions-TSC Fund 000045). Over the next month or two, Stroud transferred more than $195,000 from the 8961 account into the "TS Capital Partners, LLC" account at Regions ending in 6744.  (Regions-TSC Fund 000045; Regions-TSC Fund 000048).

Melanie Lowe also had a Roth IRA with Fidelity which she transferred to TS Capital. (M. Lowe Dep. 105:15-106:21).  She too received a check from Fidelity dated February 7, 2011 in the amount of $20,158.25.   (Regions-TSC Fund 000099).  Melanie Lowe specially endorsed the back of the check for deposit only with a reference to the account number of the account

ending in 8961.  (Regions-TSC Fund 000099).  On April 4, 2011, this check was deposited into the Regions Bank account held in the name of TS Capital Fund, which account ends in 8961. (Regions-TSC Fund 000098).

On May 10, 2011, Baron and Melanie Lowe invested the college savings accounts of their daughter and son, in the amounts of $40,960.05 and $27,118.36, respectively, in the Regions Bank account held in the name of TS Capital Fund, which account ends in 8961. (Regions-TSC Fund 000101-000103; Regions-TSC Fund 000051).  Once again in signing over the checks, Melanie Lowe had specially endorsed them so that they were only for deposit in the account which ends in 8961.  *Id.*  Within days of the deposit, Stroud electronically transferred nearly all of the money to the "TS Capital Partners, LLC" account at Regions Bank ending in 6744; more transfers to that account followed in June of 2011.  (Regions-TSC Fund 000051; Regions-TSC Fund 000054).

Therefore, the aggregate initial value of Baron and Melanie Lowe's investments in the TS Capital Entities was approximately $532,158.40. The most recent account statement in Baron and Melanie Lowe's possession with respect to their joint tenant account shows an account balance of $202,834.79 as of August 31, 2011, an increase from $174,501.88 for that account. (Plaintiffs 00000889-00000893, which were part of B. Lowe Dep. Ex. 21).  Baron and Melanie Lowe sought the return of their money.   (M. Lowe Dep. Ex. 12; Hanners 000507-000509).

**D.  Flynn R. "Reggie" DuBose, Jr.**

Flynn Reginald DuBose, Jr. ("DuBose") is his full name, but he often goes by Reggie. (DuBose Dep. 6:19-7:2). For the last ten years, DuBose has lived in Pike Road, Alabama. (DuBose Dep. 8:13-22).  He is the managing member of DuBose Construction Company, LLC, a

company which provides site preparation services for utilities, highway projects, and the like. (DuBose Dep. 9:18-10:5).

DuBose is close friends with a man named Von Memory. (DuBose Dep. 15:11-14, 16:8-9). DuBose has known Von Memory's son Stuart Memory nearly all of Stuart's life. (DuBose Dep. 18:17-19). Von Memory was the first person to mention Stroud to DuBose; Von Memory suggested that DuBose meet Stroud. (DuBose Dep. 19:4-10). At the time Stroud worked for Lehman Brothers. (DuBose Dep. 20:11-12). At a later point, Stroud told DuBose he was leaving Lehman Brothers and going into business for himself. (DuBose Dep. 33:6-7). Stroud asked DuBose to consider transferring money into the new venture, but DuBose declined. (DuBose Dep. 33:11-21). Later, Stroud made another presentation to DuBose in October of 2008 to try to persuade him to and others to invest in the Stroud Entities. (DuBose Dep. 61:22-64:18). DuBose did not respond to the pitch. *(Id.).*

On July 16, 2009, Reggie DuBose wrote a check for $250,000 to the "Stroud Capital Fund, LP." (DuBose Dep. Ex. 8; DuBose Dep. 67:8-19). On July 20, 2009, this check from DuBose was deposited into the Stroud Capital Fund LP bank account at Wachovia Bank. (Wachovia 000007, Wachovia 000008, Wachovia 000064). This is the Wachovia account which ends in 5446. *Id.* On July 29, 2009, after the deposit of this check in Wachovia Account 5446, Stroud transferred money from the Wachovia Account 5446 held in the name of Stroud Capital Fund LP to the Wachovia Account 5572 held in the name of TS Capital GP, LLC. (Wachovia 000110, Wachovia 000064, Wachovia 000065).

DuBose recalls meeting Stroud on an occasion with Tuberville. (DuBose Dep. 97:8-14; 107:2-19; 109:17-110:6; 110:19-111:14). Stroud introduced DuBose and Tuberville. *(Id.).* During this meeting, Stroud said that Tuberville had bought into the firm and was a partner.

(*Id.*).  DuBose recalls chatting with Tuberville about his memorabilia which was in the offices where they met.  (DuBose Dep. 111:1-4).  Later, DuBose also read about the partnership between Tuberville and Stroud in *The Birmingham News*.  (DuBose Dep. 97:17-20; 107:19-109:16).  Later in the week, DuBose spoke to Stroud who said that Tuberville was going to bring in clients to the firm and help Stroud manage it.  (DuBose Dep. 111:18-23).  Tuberville's coming on board as a managing member made DuBose feel better about his investment.  (DuBose Dep. 148:11-149:8).

On or about March 7, 2011, DuBose invested an additional $10,000.  (Regions-TSC Mgmt 000066).  DuBose's check was made payable to TS Capital Management.  *Id.*  On March 7, 2011, DuBose's check was deposited into a Regions Bank account ending in 8354, which account was held in the name of TS Capital Management LLC, but owned by Stroud and Tuberville.  (Regions-TSC Mgmt 000046 – 000050; Regions-TSC Mgmt 000065; Regions-TSC Mgmt 000023).  With a few months more than $35,000 was transferred from the TS Capital Management account at Regions ending in 8354 into the TS Capital Partners, LLC account at Regions which ends in 6744.  (Regions-TSC Mgmt 000032; Regions-TSC Mgmt 000034; Regions-TSC Partners 000120; Regions-TSC Partners 000125).

At some point, Stroud provided DuBose with an iPad which was preloaded with an icon allowing easy login to his account statements.  (DuBose Dep. 93:11-94:1).  The icon on the iPad was named "TS Capital."  (DuBose Dep. 128:21-129:2).  DuBose printed a daily account statement for the period ended September 2011 from using the iPad.  (DuBose Dep. 93:8-17; DuBose Dep. Ex. 17).  This statement indicated that DuBose was a "Limited Partner" in "TS Capital Partners" with a balance of $359,855.22 and "addition from currency account of $10,373.32."  *Id.*  The September 2011 statement was the only one DuBose printed out and kept.

(DuBose Dep. 117:3-15). DuBose checked his balance periodically, but did not always print out the statements. (DuBose Dep. 116:13-117:2). Additionally, DuBose received K-1 tax forms from TS Capital Partners for 2009 and 2010. (DuBose Dep. Ex. 23; DuBose Dep. 134:4-14). Additionally, although he cannot recall the date on which he did so, DuBose signed a Subscription Agreement to become a limited partner in TS Capital Fund, LP. (DuBose Dep. Ex. 26; DuBose Dep. 138:5-22).

Sometime after September of 2011, DuBose met with Stroud and demanded a return of his money; Stroud said he would return the money by the following week. (DuBose Dep. 122:16-123:11; 126:11-19). DuBose did not get his money as promised. (DuBose Dep. 126:3-5). In total, DuBose invested $260,000, and he got none of it back. (DuBose Dep. 38:19-39:5). DuBose also did not receive any of the growth in his account as reflected in his September 2011 statement. (DuBose Dep. 39:5-10). On October 20, 2011, Von Memory copied DuBose on an email to Stroud in which he urged Stroud to take prompt action to commence payments to investors as promised. (DuBose Dep. Ex. 31; DuBose Dep. 158:22-160:6).

### E. Glen and Kristy Williams

Glen[54] and Kristy Williams have been married for fifteen years. (K. Williams Dep. 11:23-12:2). Kristy Williams is the daughter of John and Priscilla Abrams. (K. Williams Dep. 5:16-22; P. Abrams Dep. 8:23-9:11). Kristy Williams is a clinical pharmacist. (K. Williams Dep. 13:4-20). Glen Williams currently works as a pharmacist at East Alabama Medical Center. (G. Williams Dep. 8:7-10).

Glen and Kristy Williams first heard of Stroud from a college friend of Glen Williams named Lee Sanders. (K. Williams Dep. 15:13-16:6; G. Williams Dep. 26:7-14). Kristy and Glen Williams had a meeting with Stroud, who was then working for AG Edwards in

---

[54] Glen Williams' full legal name is Fredrick Glen Williams. (G. Williams Dep. 7:20-22).

Birmingham. (K. Williams Dep. 17:9-18:23; G. Williams Dep. 30:11-31:15). During the meeting, risk tolerance and investing philosophy was discussed, and Kristy Williams indicated that she was extremely conservative and Glen Williams had more of a middle level of risk tolerance. (K. Williams Dep. 19:1-21; G. Williams Dep. 39:6-12; 40:17-23). At some point, Kristy Williams recalls that Stroud moved from AG Edwards to a financial firm then known as Salomon Smith Barney, and they transferred their investments to that firm. (K. Williams Dep. 25:9-26:7; G. Williams Dep. 43:21-44:15). As Kristy Williams recalls, Stroud next moved to AG Edwards in Troy, Alabama. (K. Williams Dep. 27:17-22; G. Williams Dep. 50:22-52:18). Glen and Kristy Williams moved their investments back to AG Edwards. (K. Williams Dep. 28:1-8; G. Williams Dep. 53:7-14). Next, Williams believes that Stroud left AG Edwards in Troy for a position with Lehman Brothers in New York. (K. Williams Dep. 33:15-21; G. Williams Dep. 62:5-64:9). Glen and Kristy Williams left their investments with AG Edwards. (K. Williams Dep. 34:2-7; G. Williams Dep. 65:1-2, 20-22).

At some point before Lehman Brothers "went bust," Kristy Williams learned that Stroud had left his position with Lehman Brothers. (K. Williams Dep. 40:7-15). Kristy Williams first heard something about Stroud running a business called Stroud Capital, but later it became TS Capital after Tuberville got involved. (K. Williams Dep. 46:7-9; 49:13-50:15). Kristy thinks the first time she heard about the TS Capital entity and Tuberville's involvement[55] was in the summer of 2010 when Stroud stopped to see Glen Williams during a chemotherapy[56] treatment. (K. Williams Dep. 50:10-51:14). Stroud told Glen and Kristy Williams that he and Tommy Tuberville were in business together. (K. Williams Dep. 53:6-54:19). Stroud invited Glen and

---

[55] Stroud's statements to the Williams about TS Capital and Tuberville are admissible because they are offered to show the effect they had on the Williams rather than the truth of the matters Stroud asserted. FED. R. EVID. 801(c)(2). Additionally, the statements are admissible as statements in furtherance of the conspiracy. FED. R. EVID. 801(d)(2)(E).

[56] Glen Williams was diagnosed with Non-Hodgkin's Lymphoma in May of 2010. (K. Williams Dep. 51:4-5).

Kristy Williams to visit the office of his business with Tuberville. (K. Williams Dep. 53:6-54:19; 56:22-57:1).

Sometime in 2009, Glen Williams recalls Stroud telling him that Stroud and Tuberville had started a hedge fund. (G. Williams Dep. 89:17-90:11). Glen Williams met Tuberville at TS Capital office located at 2138 Moore's Mill in Auburn. (G. Williams Dep. 91:8-92:5; 92:12-22). Stroud introduced Tuberville to Glen Williams by saying that Tuberville was his partner. (G. Williams Dep. 127:9-128:3).[57] This was before TS Capital hired Glen Williams. *Id.* Another time Glen Williams stopped by, Stroud and Tuberville had just gotten their BMWs and they were talking about how much they would have to pay for the tags on those cars. (G. Williams Dep. 92:23-93:13).

In August of 2010, Glen Williams stopped by the office and Stroud told him that he was going to open a TSCP account which would allow investments of any size from anyone, and that they were getting ready to try to grow TS Capital. G. Williams Dep. 96:6-98:2. Prior to the date on which Glen Williams invested, Stroud told him that any funds Glen Williams invested with TSCP would be put in a pool and traded in commodity futures. (G. Williams Dep. 99:14-23). Stroud told Glen Williams that in the past 12 months he had earned a return of approximately 12 percent. (G. William Dep. 100:4-9).

Glen and Kristy Williams visited the office. (K. Williams Dep. 59:10-18). While there, they met Broach and Memory. *Id.* She remembers that the offices had memorabilia regarding Tuberville in it. (K. Williams Dep. 62:9-63:4). Stroud[58] told Kristy Williams that he and

---

[57] Tuberville cannot dispute this fact because he has no memory of whether Stroud ever introduced Tuberville as Stroud's partner. (Tuberville Dep. 177:12-15).
[58] Stroud's statements to the Williams about TS Capital and Tuberville are admissible because they are offered to show the effect they had on the Williams rather than the truth of the matters Stroud asserted. Fed. R. Evid. 801(c)(2). Additionally, the statements are admissible as statements in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E).

Tuberville had invested jointly and that the business was a hedge fund dealing in commodities. (K. Williams Dep. 69:5-17). Kristy Williams thinks Stroud initially mentioned natural gas investments, which he said had done well. (K. Williams Dep. 69:5-17).

Sometime prior to deciding to invest with TS Capital, Kristy Williams saw a newspaper article about Tuberville and Stroud together and TS Capital. (K. Williams Dep. 64:17-65:7). She believes that she ran a Google search and located this story possibly on al.com. (K. Williams 65:5-7; 68:23-4; 161:20-164:14). Kristy Williams believed Tuberville was a partner in TS Capital because of statements of Stroud to that effect, the al.com article, and statements on the TS Capital website. (K. Williams Dep. 131:6-132:1). Kristy Williams recalls seeing biographical material about Tuberville on the TS Capital website. (K. Williams Dep. 159:12-160:22; 178:18-179:13). Stroud also entertained Glen and Kristy Williams at Tuberville's lake house. (K. Williams Dep. 275:1-276:12). Stroud had security codes and total access to Tuberville's lake house. (K. Williams Dep. 277:14-278:3).

She also recalls seeing material on the TS Capital website relating to "Frequently Asked Questions for TS Capital Partners." (K. Williams Dep. Ex. 5; K. Williams Dep. 176: 20-177:9). Glen and Kristy Williams received some written materials from TS Capital, but Kristy Williams cannot remember if they got them before or after moving their money. (K. Williams Dep. 70:18-71:12). They also received verbal information from Stroud. *(Id.).* Kristy Williams believes that she received a copy of a Confidential Private Offering Memo for TS Capital Fund, LP., but she cannot recall if she received it before or after investing. (K. Williams Dep. 154:16-155:19). Moreover, in early January of 2011, Kristy Williams learned that TS Capital erroneously sent her parents a tax form for a Johnny C. Owens in Texas; because Tuberville was then coaching in Texas, Kristy Williams inferred that Tuberville had recruited after moving there to coach. (K.

Williams Dep. 132:2-133:19). Kristy Williams asked Glen Williams to return the tax document to TS Capital. *(Id.).*

Glen and Kristy Williams moved their investment nest eggs to TS Capital starting in August of 2010. (K. Williams Dep. 73:17-19; G. Williams Dep. 106:12-19). Kristy Williams moved money into TS Capital from accounts at Wells Fargo, the successor entity to AG Edwards. (K. Williams Dep. 70:3-17). On September 3, 2010, four checks from Glen and Kristy Williams were deposited in the Regions Bank account ending in 8961. (Regions-TSC Fund 000087 - 000091). The checks Kristy Williams signed over to TS Capital Fund were for $1,404.24 and $17,516.79. *Id.* The checks Glen Williams signed over to TS Capital Fund were in the amount of $43,818.02 and $3,629.89. *Id.* The depositions show up on the bank statement for the TS Capital Fund Account ending in 8961 on the monthly statement as a lump sum deposit of $66,368.94. (Regions-TSC Fund 000027). That monthly statement shows numerous transfers from the TS Capital Fund account ending in 8961 to other accounts including, but not limited to the "TS Capital Partners, LLC" account ending in 6744. (Regions-TSC Fund 000027). On January 4, 2011, a check for $72,557.41 payable to "TS Capital Partners FBO Fredrick Williams" was deposited into the TS Capital Partners account at Regions Bank with the account number 6744. (Regions-TSC Partners 000087, Regions-TSC Partners 000442, Regions-TSC Partners 000443). Therefore, the aggregate initial value of Glen Williams' investments in the TS Capital Entities was $120,005.32, and the aggregate initial value of Kristy Williams' investments in the TS Capital Fund was $18,921.03.

Later in 2010, Glen Williams asked Stroud for documentation showing that his funds and his wife's funds had been placed in retirement accounts for tax purposes. (G. Williams Dep. 109:6-19). Stroud provided a letter to that effect which indicated that the amounts from Wells

Fargo had been placed into a TS Capital IRA account as direct rollovers. (G. Williams Dep. 109:6-19; G. Williams Dep. Ex. 1 at A; G. Williams Dep. Ex. 1 at B). TS Capital Partners sent an account statement to Glen Williams dated December 31, 2010, which showed an increase in value of Glen Williams' IRA from $47,447.91 to $48,397.21 and an increase in Glen Williams' Roth IRA account from $3,629.00 to $4,003.09, a 10.31%. (K. Williams 76:7-77:19; G. Williams Dep. Ex. 1 at D). These statements showed Glen Williams as a "Limited Partner." (G. Williams Dep. Ex. 1 at D). TS Capital Partners sent account statements for the period ending December 31, 2010 to Kristy Williams as well. (K. Williams 76:7-77:19; G. Williams Dep. Ex. 1 at E). These statements showed an increase in the value of Kristy Williams' IRA Account from $17,516 to $19,346.77, a return of 10.45% percent. ( K. Williams 76:7-77:19; G. Williams Dep. Ex. 1 at E). The statement for Kristy Williams' Roth IRA from that same date showed an increase from $1,404 to $1,552.05, a return of 10.54%. *(Id.).* These statements showed Kristy Williams as a "Limited Partner." These statements showed Glen as a "Limited Partner." (G. Williams Dep. Ex. 1 at E).

At some point after Glen and Kristy Williams invested in TS Capital, Stroud started mentioning Glen Williams coming to work at TS Capital. (K. Williams Dep. 78:2-12). In September or October of 2010, Glen Williams stopped by the TS Capital Partner office to visit with Stroud, they started talking about certain charts and data on Stroud's screens. (G. Williams Dep. 111:13-112:1). After Glen Williams made some "assumptions and guesstimations" of which way the data was moving and why he thought that was so, Stroud told Glen Williams that he was really good at analyzing data and offered him a job. (G. Williams Dep. 111:20-112:12). Glen believed that his work as a nuclear pharmacist which exposed him to years of radiation had

caused him to develop Non-Hodgkin's Lymphoma, and the offer of a new career appealed to him for that reason. (G. Williams Dep. 113:12-114:1).

Account statements provided by the Entity Defendants to Glen Williams for online viewing through the TS Capital website until approximately August 2011 also showed positive returns in his investments in the Entity Defendants through approximately August 2011. Monthly account statements provided by the Entity Defendants to Kristy Williams for online viewing through the TS Capital website until approximately August 2011 also showed positive returns in the account through approximately August 2011. (Kristy Williams Dep. 147:15-148:5). Through their attorneys, Glen and Kristy Williams demanded the return of their investments. (K. Williams Dep. 129:23-130:7; G. Williams Dep. 284:4-17; G. Williams Dep. Ex. 43).

Before Glen Williams went to work for TS Capital, he asked Stroud pointedly why Tuberville wanted to work in a hedge fund, and Stroud replied that Tuberville did not want to coach football forever and planned to focus on TS Capital when he retired from football. (G. Williams Dep. 206:2-207-14).

## ARGUMENT

### I. Tuberville and Stroud Were and Are General Partners of an Alabama General Partnership known as TS Capital Partners, LLC.

As a result of the actions taken (and some not taken, such as not filing a limited liability company formation document), the conduct of the parties involved - particularly Tuberville and Stroud - prior to, during, and after the formation of "TS Capital Partners, LLC," and the laws applicable to the formation and operation of business enterprises, Tuberville and Stroud formed and operated a general partnership in 2009 under the various names of TS Capital Partners, TS Capital, and TS Capital Partners, LLC.

## A. Governing Law.

The type of the business enterprise that Tuberville and Stroud formed is determined by the applicable law, the conduct of the parties, and their intent. The governing law is that of the jurisdiction under which the business entity was formed. *Scrushy v. Tucker,* 70 So. 3d 289, 298 (Ala. 2011); *Ex parte Bentley*, 50 So. 3d 1063, 1071 (Ala. 2010); *Massey v. Disc. Mfg., Inc.*, 601 So. 2d 449, 454 (Ala. 1992). In this case, because no certificate of formation or articles of organization were filed on behalf of TS Capital Partners, LLC in any jurisdiction, because there was no written partnership agreement, because Tuberville and Stroud were Alabama residents at the time of the organization of TS Capital Partners, and because the relevant business activities were principally conducted in Alabama, Alabama law is the governing law for purposes of determining if a business entity existed among Stroud and Tuberville (and, if so, what type.

## B. Elements of a General Partnership.

Alabama partnerships were prior to January 1, 2011, principally governed by the Alabama Uniform Partnership Act (as codified in Chapter 8A of Title 10 of the CODE OF ALABAMA 1975).[59] CODE OF ALABAMA, section 10-8A-202(a) provides that, except as otherwise provided in subsection (b), the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership. The Alabama Supreme Court has held that:

> a partnership arises only from an express or implied agreement along the parties and is never established by implication or operation of law …. The surrounding circumstances as well as any express agreement between the parties may evidence the intention of the parties necessary to establish such a relationship.

---

[59] As a part of the reorganization of the laws into the Business and Non-Profit Entities Code, effective January 1, 2011, Title 10A of the CODE OF ALABAMA 1975, the Alabama Uniform Partnership Act (1996) codified as ALABAMA CODE §§ 10-8A-101 *et seq*., was repealed and replaced by the Alabama Uniform Partnership Law, now codified as ALABAMA CODE §§ 10A-8-1.01 *et seq*. The principal provisions of the 1996 Act were retained by the 2011 Act, but with changes in their numbering system, including references to Title 10A rather than Title 10. Because a majority of the relevant actions preceded January 1, 2011, in this Brief references are primarily made to the Title 10 section number and the Alabama and General Comments thereunder.

*Waters v. Union Bank of Repton*, 370 So. 2d 957, 960 (Ala. 1979). The comments to the Uniform Partnership Act (the "UPA") state "a partnership is created by the association of persons whose intent is to carry on as co-owners a business for profit regardless of their subjective intention to be 'partners.' Indeed, they may inadvertently create a partnership despite their express subjective intention not to do so." ALA. CODE § 10-8A-202 cmt. 1. The comments to the section also state that the UPA continues the "concept that a partnership is the residual for profit business association, existing only if another form does not." *Id*. cmt. 2.

### C. Tuberville Presumed to be a Partner.

Alabama law provides that a person who receives a share of profits of a business is <u>presumed</u> to be a partner in the business, unless the profits were received for certain specified reasons, none of which are applicable in this case.[60] CODE OF ALABAMA, section 10-8A-202(c). Accordingly, Tuberville is presumed to have been a general partner in the commodities hedge fund business with Stroud. The burden will be upon Tuberville to rebut that presumption.

### D. Creation of Partnership Involves Mixed Questions of Law and Fact.

Whether a partnership between Stroud and Tuberville was created and, if any was created, what type of partnership are mixed questions of law and fact. *Adams v. State*, 43 Ala. App. 281, 189 So. 2d 354, (Ct. App. 1966). There is no settled test for determining the existence of a partnership, but rather, a determination is made by reviewing all attendant circumstances, including the right to manage and control an enterprise. *Vance v.* Huff, 568 So. 2d 745 (Ala.

---

[60] The exceptions are set forth in Section 10-8A-202(c)(3): "A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment: (i) of a debt by installments or otherwise; (ii) for services as an independent contractor or of wages or other compensation to an employee; (iii) of rent; (iv) of an annuity or other retirement or health benefit to a beneficiary, representative, or designee of a deceased or retired partner; (v) of interest or other charge on a loan, even if the amount of payment varies with the profits of the business, including a direct or indirect present or future ownership of the collateral, or rights to income, proceeds, or increase in value derived from the collateral; or (vi) for the sale of the goodwill of a business or other property by installments or otherwise."

1990).  Although Tuberville apparently disputes that he and Stroud were general partners in TS Capital Partners, LLC, notwithstanding his admission that he was an "investment partner" in TS Capital Partners, LLC, there is substantial evidence that he was a general partner with Stroud.

E.    **Factual Support for a General Partnership**

In or about June 2009, Tuberville and Stroud associated to form a business enterprise that would operate a commodities hedge fund and in which they and others would invest capital in order to realize profits from the operation of the fund.  The entity was generally referred to by the name TS Capital Partners, LLC, the "T" standing for Tommy or Tuberville and the "S" for Stroud.  Initially, they were equal or 50% owners of the enterprise.  Notwithstanding the designation of LLC in the name (which ordinarily indicates that the entity is a limited liability company), no certificate of formation, articles of organization, or any other organizational document was publicly filed by TS Capital Partners, LLC. Such a filing was required in order for the enterprise to be a limited liability company.  *E.g.*, ALA. CODE § 10-12-9[61] (Alabama limited liability company formed by filing articles of organization with the Judge of Probate of the county in which the initial registered agent is located);  DEL. CODE Ann. tit. 6 § 18-201 (In order to form a limited liability company, one or more persons must execute a certificate of formation which shall be filed in the office of the Delaware Secretary of State);  *See also HOB Entertainment, Inc. v. SilkHOB, LLC*, 2011 WL 321780 (D.S.C. Jan. 28, 2011) (a Delaware limited liability company comes into existence when its certificate of formation is filed).  Consequently, TS Capital Partners, LLC was not properly organized as a limited liability company.

---

[61] Since the reorganization of the laws governing Alabama business entities under the business or non-profit entities code, effective January 1, 2011, the pertinent section reference is now ALA. CODE § 10A-5-2.01.

By default, TS Capital Partners, LLC was and is an Alabama general partnership comprised of Tuberville and Stroud, and the association between Tuberville and Stroud satisfied the requirements of a general partnership under Alabama law. ALA. CODE § 10-8A-202. Stroud and Tuberville associated to carry on as co-owners of a business for profit (namely the principal and manager of a commodities hedge fund operation). Tuberville was entitled (and expected) to receive a 50% share of the profits of the business, as evidenced by, among other things, his IRS Schedule K-1 issued by TS Capital Partners, LLC.

There is substantial evidence demonstrating that Tuberville was a co-owner and partner with Stroud. Among the facts and circumstances showing that Tuberville was a general partner with Stroud are:

1.  The name TS Capital Partners, LLC (as well as the names of the other TS Capital entities);

2.  Tuberville's admission that he was an "investment partner" with Stroud in TS Capital Partners, LLC;

3.  Tuberville's signature on multiple bank accounts as a partner of TS Capital Partners, LLC;

4.  Business card for TS Capital Partners listing him as "Managing Partner";

5.  Stroud's introduction of Tuberville to Reggie DuBose as Stroud's "partner" in the firm;

6.  Tuberville's travels to New York City on TS Capital Partners business, including meetings with personnel of HedgeCo about the TS Capital Partners website;

7.  Tuberville's signing a lease of a BMW automobile by TS Capital Partners as its partner for his personal use;

8.     Correspondence and communications from and to employees of the TS Capital entities, such as Stuart Memory and Rachel Broach, who understood that he was a partner with Stroud;

9.     Third parties' understanding that Tuberville was a partner, *e.g.*, an attorney for Michael Makori, a former employee of TS Capital Partners, LLC, who sued TS Capital Partners sending correspondence regarding her claims against TS Capital Partners to Tuberville as a partner of TS Capital Partners;

10.    Multiple emails and text messages to and from Tuberville regarding TS Capital Partners and its affiliates' business matters;

11.    Listing of Tuberville as a partner on TS Capital Partners, LLC's tax identification number application;

12.    TS Capital Partners, LLC unemployment insurance application showing Tuberville as a partner;

13.    Al.com and <u>Birmingham News</u> articles discussing Tuberville's association with Stroud in "T&S Capital Partners";

14.    IRS Form Schedule K-1 for TS Capital Partners showing Tuberville having a 50% partner interest in its capital, profits, and losses;

15.    Personal desk in his own office in the headquarters of TS Capital Partners in Auburn, Alabama;

16.    Projections provided to Tuberville showing that he and Stroud may begin in August 2009 receiving distributions from "the Fund" of more than $16,000 a month to be increased to more than $40,000 per month after one year.

The name of the business enterprise, **TS** Capital **Partners**, LLC, standing alone demonstrates two things: (1) the "T" stands for Tommy or Tuberville and the "S" for Stroud and (2) both Tuberville and Stroud intended to be partners.

The various communications (principally email messages and text messages) between Tuberville, on the one hand, and Stroud and the other employees of TS Capital Partners, on the other hand, demonstrate that Tuberville's role was more than a mere passive "investor." The degree and nature of the communication between Tuberville and Stroud and other employees of TS Capital Partners, although sporadic, and at times primarily one way from the employees of the partnership to Tuberville, demonstrate that he was a full partner and that the employees of TS Capital Partners knew he was a managing partner with important responsibilities for the operations of TS Capital Partners and the hedge fund. Their actions demonstrated that they understood Tuberville was entitled to confidential information about the partnership's operations. The email messages and particularly the text messages toward the melt-down of TS Capital Partners vividly evidence the depth of Tuberville's involvement in TS Capital Partners. Indeed, he apparently initially considered providing capital sufficient to provide a full return of all investors' funds. He ultimately decided not to, and did not, do that, but his even contemplating such action belies his argument that he was anything less than a full partner with Stroud.

Tuberville had expectations of substantial future profits that would result from his partnership with Stroud. The projections of distributions that Stroud prepared and sent to Tuberville on July 8, 2010, enticing Tuberville to make another $200,000 investment in TS Capital Partners/TS Capital Fund showed compensation to partners (that is Stroud and Tuberville) of $16,670 per month during the first year (or $200,000 for twelve months)

increasing to $41,670 <u>per</u> <u>month</u> during the next year. After receiving the first message from Stroud and a follow-up request for a $200,000 capital contribution, Tuberville promptly made the requested $200,000 contribution by wire transfer to TS Capital Partners, LLC's bank account at Regions Bank. In that string of emails, Tuberville stated that he "will start making plans on [his] end and findind [sic] new investors." Those sorts of potential financial returns and his and Stroud's active involvement in the solicitation of investors contradict Tuberville's assertion that he was a mere passive investor or "investment partner" (whatever that means).

Tuberville's claims that capital contributions to TS Capital Partners would be limited to him and his "friends" and that Stroud would not solicit investors for TS Capital Partners are not supported by the facts of the case. In March 2010, Stroud provided Tuberville with confidential projections for TS Capital which showed beginning proprietary (that is contributed) capital of $3 million increasing to $53 million in a span of less than five years. Although those projections proved to be wildly optimistic, they demonstrated the potential return that Tuberville expected from his partnership with Stroud. Moreover, those projections evidence the substantial investments by third persons that would be required and were contemplated by Stroud and Tuberville. It would be unrealistic to expect such growth without the active solicitation of new investors, not only by Stroud but also by Tuberville. Stroud's July 8 email message to Tuberville specifically names five potential outside investors for only the "launch" of the fund. As the email shows, additional, future outside investors were contemplated and expected. Tuberville expressly replied to the email stating that he too, along with Stroud, would seek out (find) new investors contradicts his currently stated position in the case.

Tuberville and Stroud's failure to form properly a limited liability company was a fatal defect to the organization of a limited liability company and, together with Tuberville and

Stroud's conduct, resulted in the formation of a general partnership between them, with the consequential duties, obligations, and liabilities of general partners of a general partnership.

## II. As a General Partner of TS Capital Partners, LLC, Tuberville is Jointly and Severally Liable With Stroud for the Acts and Omissions of TS Capital Partners, LLC and Stroud.

Because Tuberville was a general partner with Stroud, Tuberville is jointly and severally liable with Stroud subject to limited exceptions. ALA. CODE, § 10-8A-306(a).[62] "In a general partnership, all general partners are personally liable for the debts, liabilities and other obligations of the partnership merely on account of their status as partners. [That] liability is a hallmark of the general partnership." CODE OF ALABAMA, § 10-8A-306 Alabama cmt.

### A. Tuberville is Liable for TS Capital Partner, LLC's and Stroud's Actionable Conduct.

A partnership (and hence each partner) is liable for loss or injury caused to a person as a result of a wrongful act or omission, or other actionable conduct, of a partner acting in the ordinary course of business or with authority from the partnership. ALABAMA CODE § 10-8A-305.

Tuberville cannot escape joint and several liability for obligations of TS Capital Partners, LLC by claiming at this stage that any activity by Stroud or anyone else was not "authorized by the partnership."[63] Determining the "ordinary course of the partnership's business" and "what

---

[62] The exceptions for partners' liability under 10-8A-306 are for persons admitted as a partner into an existing partnership in which case they are not personally liable for any partnership obligation incurred before the person's admitted as a partner. ALABAMA CODE § 10-8A-306(b). That exception is inapplicable to Tuberville since as far as TS Capital Partners, LLC is concerned, he was a partner from the first day. A second exception is for partners in a registered limited liability partnership. ALABAMA CODE § 10-8A-306(c). That exception is also inapplicable, because TS Capital Partners, LLC was not a registered limited liability partnership; as it did not register to become such a partnership as it would have been required to do in accordance with ALABAMA CODE §§ 10-8A-1001, et seq.

[63] Tuberville refers in the Brief in support of his Mot. for Summ. J. to ALABAMA CODE §§10A-8-306(a) and 10A-8-305, which are substantially the same as §§ 10-8A 306(c) and 10-8A-305. As noted earlier, the recent amendment and restatement of the Alabama Uniform Partnership Act did not materially change the corresponding law in these and other relevant sections of the Alabama Uniform Partnership Act (1996) (codified as ALABAMA CODE §§ 10-8A-101 et seq., and the Alabama Uniform Partnership Law, enacted in 2009 effective as of January 1, 2011, codified as ALABAMA CODE §§ 10A-8-1.01 et seq.

was authorized" by the partnership are, at their very essence, factual questions and inappropriate to be decided on a motion for summary judgment. Rather, those are issues that must be determined by the jury or other trier of fact.

**B.    Tuberville and Stroud Subject to Strict Liability for Certain Actions Taken.**

Much of the actionable conduct taken by Stroud and TS Capital Partners, such as the solicitations and acceptance of Plaintiffs' investments and possibly other investors' funds, were not only authorized but essential to the existence and growth of a commodities hedge fund. Rather than ALABAMA CODE § 10-8A-305 serving as a basis for excusing Tuberville from liability, subsection (b) of that section is further support for his and the partnership's liability for losses incurred by Plaintiffs. ALABAMA CODE § 10-8A-305(b) provides:

> (b) If, in the ordinary course of business of the partnership's business, or while acting with authority of the partnership, a partner receives or causes the partnership to receive money or property of a person not a partner, and the money or property is misapplied by a partner, the partnership is liable for the loss.

Alabama general partnership law "imposes **strict liability** on the partnership for the misapplication of money or property received by a partner in the course of the partnership's business or otherwise within the scope of the partner's actual authority." ALABAMA CODE § 10-8A-305 General Comment (not the Alabama Comment). (Emphasis added.) Nothing could be clearer than that Stroud, if not also Tuberville, misapplied and received money or other property in the case of TS Capital Partners and its affiliates.

**C.    Tuberville's Claims of Unauthorized Actions by Stroud Are Not Factually Supportable.**

Tuberville's unsubstantiated allegations that solicitations by Stroud (as opposed to Tuberville solicitations of other persons) were not authorized is contradicted by direct communications between Stroud and Tuberville. For example, the email messages between

Stroud and Tuberville on July 8 and 9, 2010, regarding the "launch" of (apparently) TS Capital Fund, L.P. indicate that not only Tuberville, but also Stroud, would be soliciting investors for the new to-be-launched fund. No reference is made in that email to solicitations by Stroud for funds for Stroud Capital, which had effectively been shut down at that point in time. Rather, the solicitations by both Stroud and Tuberville were to be made for the benefit of TS Capital Partners, LLC and/or TS Capital Fund, L.P.

**D.    If Any Unauthorized Act Occurred, That Remains To Be Proven.**

Some activities conducted by Stroud and resulting expenses incurred without the knowledge or consent of Tuberville might not have been authorized by TS Capital Partners, LLC. If the Partnership paid for improper expenses (which is assumed, but has not been proven), and Tuberville was unaware of the incurrence of those expenses (which has also not been proven), those expenses may not have been authorized by the Partnership and only Stroud should be liable (to the Plaintiffs and Tuberville) for the damages caused by such limited expenses. However, as is the case with regard to many of Tuberville's claims, many relevant and material facts regarding such matters are not even known, much less proven, are subject to dispute and, hence, are not appropriate for summary judgment. Because of the unusual manner in which the TS Capital entities conducted their affairs generally, actions that would have not been "authorized" by a properly managed hedge fund partnership might have been authorized by TS Capital Partners. Tuberville has not and cannot at this stage of the litigation prove that there is no material factual dispute with respect to that defense to liability to the extent required to justify granting his Motion for Summary Judgment.

**III.    As a Result of the Default Judgments Taken Against Stroud and TS Capital Partners, LLC, Tuberville is Liable to the Plaintiffs Subject Only to a Determination of Damages.**

On May 7, 2013, the Court entered default judgments against TS Capital Partners, LLC and all other Defendants except Tuberville, subject to a later determination of the amount of damages to which Plaintiffs may be entitled from the defendants. If TS Capital Partners, LLC is determined to be an Alabama general partnership and Tuberville is held jointly and severally liable with Stroud and TS Capital Partners, LLC, subject only to the determination of damages, much of the remainder of the discussion of the claims in this litigation will be moot, because Tuberville's liability for them will have been established. Plaintiffs address the other elements of Tuberville's Motion for Summary Judgment, but intend to be clear that many of the legal arguments made in the balance of this Brief may not be necessary if Tuberville is so liable.

**IV.    Tuberville and Stroud Owed Fiduciary Duties to the Plaintiffs to, Among Other Things, Manage Properly the Affairs of TS Capital Partners, LLC, TS Capital Fund, L.P., and Their Affiliates.**

**A.    TS Capital Entities Were Improperly Organized and Operated.**

Tuberville, Stroud, and the TS Capital entities owed duties and obligations to Plaintiffs which were breached and for which Tuberville is liable separate and apart from his potential joint and several liability resulting from his status as a general partner of TS Capital Partners, LLC.

In addition to TS Capital Partners, LLC, Tuberville and Stroud formed at least three other business entities. As described in the various drafts of the Offering Memoranda for TS Capital Fund, L.P., Stroud and Tuberville's intent was to create a Delaware limited partnership by that name, in which other persons as investors would be limited partners. TS Capital Management, LLC and TS Capital GP, LLC were each, in different instances, denominated as the general partner of TS Capital Fund, L.P. The Certificate of Limited Partnership of TS Capital Fund, L.P. identifies TS Capital Management, LLC as the general partner and the Offering Memoranda state

that TS Capital GP, LLC was the general partner. The Offering Memoranda described the organizational investment structure for the fund, although incorrectly and improperly. Important documentation customarily prepared in connection with such an investment structure were not finalized or executed. For example, the Operating Agreements were, if signed at all, signed only by Stroud. A number of dates were obviously incorrect. Documents were presented to the Plaintiffs, in "draft" form. The condition of the documents regarding the organization of the investment entities were described by Tuberville's expert witness Mac Beale as "sloppy." (Beale Dep. 252:3-9). He would not have recommended to any client the use of the Confidential Offering Memorandum of T.S. Capital Fund, L.P. (*Id*. at 30:10 - 33:10).

## B. TS Capital Partners, LLC was Constructively a General Partner of TS Capital Fund, L.P.

Tuberville contributed some funds and then he and Stroud began raising capital from other persons, including the Plaintiffs. The funds raised were deposited haphazardly and improperly. Some funds were initially deposited to Stroud's personal bank account, Stroud's wife's account, Stroud Capital's accounts, and, to a limited extent, TS Capital Fund, L.P.'s bank account. However, a majority of the invested funds were ultimately deposited into the name of TS Capital Partners (sometimes using the suffix LLC and sometimes not). The principal operating entity of the hedge fund enterprise and effectively the manager of the hedge fund was TS Capital Partners, LLC, a general partnership, the general partners of which were Tuberville and Stroud. Although not identified as the general partner of TS Capital Fund, L.P., in its Certificate of Limited Partnership, TS Capital Partners, LLC constructively served as the general partner of TS Capital Fund, L.P. as it was the entity that performed the actual business operations of the fund and consequently was the constructive general partner for the fund.

Tuberville and Stroud's improper and grossly negligent organization of the TS Capital Entities and their failure to manage properly (and indeed gross mismanagement of those affairs) constituted breaches of their duties and obligations to the Plaintiffs. ALA. CODE § 10-8A-404(c) Tuberville, Stroud, and TS Capital Partners, LLC were effectively the general partners of TS Capital Fund, L.P., of which Plaintiffs were some of the limited partners.

### C. TS Capital Partners, LLC and therefore Tuberville and Stroud Owed Fiduciary Duties to the Plaintiffs.

It has long been held that a general partner owes fiduciary duties to the partnership and the other partners. Indeed, in the landmark case of *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928), the fiduciary duties and obligations of a partner were compared with those of a trustee. Justice Cardozo stated that "a trustee is held to something stricter than the morals of the marketplace. Not honesty alone but the punctilio of an honor the most sensitive, is then the standard of behavior .... the level of conduct for fiduciaries [has] been kept to a level higher than that trodden by the crowd." *Id*. at 464. The court held that the creation of a joint venture (a type of general partnership) created a fiduciary relationship in which each member is bound to a higher standard and determined that in such a relationship loyalty must be undivided and unselfish and that a breach of fiduciary duty can occur by something less than fraud or intentional bad faith.

### D. TS Capital Partners, LLC, Tuberville, and Stroud Failed to Satisfy Their Requisite Standards of Conduct as General Partners.

The standards of a general partner's conduct are set forth in CODE OF ALABAMA section 10-8A-404. A partner owes the partnership and the other partners the duties of loyalty and care as set forth in subsections (b) and (c) of that section. The duty of loyalty includes accounting to the partnership and holding as trustee for it any property, profit, or benefit derived by the partner

in the conduct of the partnership business or derived from a use by the partner of partnership property. *Id.* A partner's duty of care to the partnership and other partners in the conduct and winding up of the partnership business is limited to refraining from grossly negligent or reckless conduct, intent misconduct, or knowing violation of the law. *Id.* § 10-8A-404(c). A partner shall discharge the duties to the partnership and the other partners and exercise any rights consistently with the obligation of good faith and fair dealing. *Id.* § 10-8A-404(d).

E. **Tuberville Breached His Fiduciary Duties to the Plaintiffs.**

Tuberville breached his duty of loyalty to the Plaintiffs by accepting benefits from TS Capital Partners (in which their funds were invested, albeit possibly improperly) inconsistent with the customary operations of a properly managed commodities hedge fund. For example, Tuberville was provided unusual (and undisclosed to most, if not all, of the Plaintiffs) benefits and perquisites, such as the free use of a vehicle, including while he was coaching football in Lubbock, Texas. TS Capital Partners paid for his personal website, personal travel, and entertainment, all at the expense of funds provided by the Plaintiffs and others. Tuberville breached his duty of care to the Plaintiffs by engaging in grossly negligent or reckless conduct and indeed misconduct by not even attempting to perform any of his managerial responsibilities and duties as a general partner of TS Capital Partners and TS Capital Fund, L.P. Essentially, Tuberville abandoned and failed to perform any duty to TS Capital Partners or TS Capital Fund, L.P., or take any action to safeguard or otherwise protect their assets, which included the Plaintiffs' invested funds. Tuberville did not even know who key employees of TS Capital Partners were or what they did. Tuberville failed to perform any due diligence regarding Stroud prior to the formation and funding of the TS Capital entities. Although Tuberville had the right and ability to be informed of the activities of TS Capital Partners, LLC and TS Capital Fund,

L.P., he failed to take even any reasonable effort to be apprised of the partnership's business or participate in the partnership's business sufficiently to prevent or minimize Stroud's harmful actions.

**F.      Tuberville's Fiduciary Duties to the Plaintiffs Were Non-waivable and Not Restricted or Limited.**

Because there was no written partnership agreement regarding TS Capital Partners, LLC, there was no restriction or limitation imposed upon Tuberville's fiduciary duties by such an agreement.  Under Alabama law, the obligations of good faith and fair dealings could not have been eliminated by a partnership agreement had there been one.  CODE OF ALABAMA § 10-8A-103(b)(5).   A partnership agreement could not have eliminated the duty of loyalty or unreasonably reduced the duty of care.  *Id* § 10-8A-103(b)(3)and (4).

In addition to Tuberville and Stroud's duties of loyalty and care and obligation to discharge those duties in good faith and with fair dealing, TS Capital Partners, LLC, as the constructive general partner of TS Capital Fund, L.P. (and hence Tuberville as one of the general partners of TS Capital Partners, LLC), was required to furnish to a partner without demand any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partners rights and duties under the Alabama Uniform Partnership Act and on demand any other information concerning the partnership's business except to the extent the demand was unreasonable or otherwise improper under the circumstances.  CODE OF ALABAMA § 10-8A-403(c).  A partnership, <u>at a minimum</u>, must keep those books and records necessary to enable the partners to determine their share of the profits and losses as well as their rights on withdrawal. . . .the partnership must also maintain any books and records required by state or federal taxing or other governmental authorities."  CODE OF ALABAMA § 10-8A-403 cmt. 1.  The books and records of TS Capital Partners failed to satisfy even that minimum requirement.

**F.  Tuberville Failed to Provide an Accounting When Requested By The Plaintiffs and Thereby Breached His Duty to Do So.**

Neither TS Capital Partners nor Stroud nor Tuberville satisfied its or his duties to provide requisite information to Plaintiffs.  The limited partners of a Delaware limited partnership have a right of access to information regarding the limited partnership. DEL. CODE Ann. tit. 6 § 17-305. The limited information that was provided for Plaintiffs was generally incorrect.  Promptly upon determining that there apparently had been misappropriations of their investments in the fund, several of the Plaintiffs made demands for an accounting to Tuberville and Stroud, but no accounting to any of the Plaintiffs was provided.

The failure of Tuberville to comply with his duties of care and loyalty and his obligation to discharge those duties in good faith and with fair dealing constituted breaches of his duties to the Plaintiffs and resulted in losses for which he is liable to the Plaintiffs.

**V.  Assuming *Arguendo* that Tuberville Was Not an Actual Partner, He Was A Purported Partner and Liable to the Plaintiffs For the Misconduct of Stroud and TS Capital Partners, LLC.**

Tuberville admits that he was an "investment partner" with Stroud in TS Capital Partners, LLC.  For the reasons explained above, he and Stroud were general partners in a general partnership and as such, together with TS Capital Partners, LLC itself, had duties, obligations, and liabilities to the Plaintiffs.  The term investment partner has no independent legal meaning. There are only two types of partners recognized under the Code of Alabama, these are general and limited partners.  Tuberville does not assert that he was a limited partner, or offer any evidence that he entered into any limited partnership agreement or intended to be a limited partner in TS Capital Fund, L.P., an organization about which he has claimed no knowledge. Therefore, he was not a limited partner.  Hence, he was a general partner.

**A.  Tuberville is Liable to the Plaintiffs Even if He was not an Actual Partner.**

Even if Tuberville's self-anointed position as an "investment partner" had legal significance and were a supportable position and, therefore, he was not an actual general partner with Stroud, he is nonetheless liable to Plaintiffs as a purported partner with Stroud. The law applicable to the liabilities of purported partners is set forth in ALABAMA CODE § 10-8A-308:

Except as provided in Section 10-8A-306:

(a)     If a person, by words or conduct, purports to be a partner, or consents to being represented by another as a partner, in a partnership or with one or more persons not partners, the purported partner is liable to a person to whom the representation is made, if that person, relying on the representation, enters into a transaction with the actual or purported partnership. If the representation, either by the purported partner or by a person with the purported partner's consent, is made in a public manner, the purported partner is liable to a person who relies upon the purported partnership even if the purported partner is not aware of being held out as a partner to the claimant. If partnership liability results, the purported partner is liable with respect to that liability as if the purported partner were a partner. If no partnership liability results, the purported partner is liable with respect to that liability jointly and severally with any other person consenting to the representation.

(b)     If a person is thus represented to be a partner in an existing partnership, or with one or more persons not partners, the purported partner is an agent of persons consenting to the representation to bind them to the same extent and in the same manner as if the purported partner were a partner, with respect to persons who enter into transactions in reliance upon the representation. If all of the partners of the existing partnership consent to the representation, a partnership act or obligation results. If fewer than all of the partners of the existing partnership consent to the representation, the person acting and the partners consenting to the representation are jointly and severally liable. (Emphasis added.)

[Subsections (c), (d), and (e) omitted as not applicable.]

Tuberville was an actual, general partner with Stroud, but as provided by ALABAMA CODE 10-8A-308, he would have been liable to Plaintiffs even if he were not an actual partner but "merely" a purported partner. Tuberville and other persons associated with TS Capital Partners by his and their words, and particularly his and their conduct, represented to third persons that Tuberville was a partner in TS Capital Partners. Tuberville's acknowledgment that

he was an "investment partner" in TS Capital Partners, LLC, is and of itself his consent to his being represented to be a partner of TS Capital Partners, LLC. Tuberville's role as a partner in TS Capital Partners was represented in a public manner. That occurred in the <u>Birmingham News</u> and related al.com article that announced his working with Stroud in a "big-time hedge fund." The name of the entity itself - <u>TS</u> Capital <u>Partners</u> - is a representation that Tuberville (the "T" in TS) was a <u>partner</u> with Stroud (the "S" in TS).

The many actions of Tuberville and other persons and the other factual evidence of Tuberville's being an actual general partner with Stroud, which are described in the statement of facts and arguments above, also serve to prove that, if he was not an actual general partner, he was a purported partner. Accordingly, even if, assuming *arguendo* that Tuberville was not an actual general partner with Stroud, he was a purported partner and, under Alabama law (and also Delaware General Partnership Law) liable to persons to whom such representations were made as if he were an actual partner. ALABAMA CODE § 10-8A-308(a); *see also* DEL. CODE Ann. tit. 6 §15-308.

## VI. Tuberville's Arguments That He was a Member of a Limited Liability Company by Estoppel and that Alabama Law <u>Requires</u> a Sharing of Losses in Order to Create a Partnership are Incorrect as a Matter of Law.

TS Capital Partners, LLC was not formed as a limited liability company in any state and thus, by default, was and is a general partnership under Alabama law. No evidence to the contrary has been produced by Tuberville or any other person. Tuberville attempts to rectify Stroud and Tuberville's negligent failure to properly form a limited liability company under the law of any state by extending the principle of "corporation by estoppel" to limited liability companies. Tuberville acknowledges that there is no such case supporting that principle in Alabama. Rather, he refers to *Duray Dev., LLC v. Perrin*, 792 N.W. 2d 749, 760 (Mich. Ct. App

2010), a Michigan case which purportedly concluded that the doctrine of "corporation by estoppel" extended to limited liability companies. However, even that case is not affirmative authority for that proposition, because the issue was not raised in the lower court in that case, as the court expressly stated in its decision. It explicitly states that it may reasonably be extended to LLCs.

### A. Partnerships are the Default Business Association in Alabama.

Tuberville, in the Brief filed in support of his motion, poses the question whether the "default" situation is a general partnership. Tuberville Brief at p. 42. In Alabama, the answer to that question is yes. ALA. CODE § 10-8A-202 Comment 2 (the UPA continues the concept that partnership is the residual for profit business association, existing only if another form does not).

### B. Tuberville Would Nevertheless Have Fiduciary Duties to the Plaintiffs Even If TS Capital Partners, LLC were a Limited Liability Company.

If the court should accept Tuberville's argument that TS Capital Partners, LLC was a limited liability company by estoppel, that would not relieve Tuberville of his fiduciary duties to the Plaintiffs. TS Capital Partners was constructively serving as the general partner of TS Capital Fund, L.P., as it was performing (albeit badly) the management functions of a general partner of the Fund. As a member or manager (possibly a member or manager by estoppel) of the limited liability company by estoppel, Tuberville would have fiduciary duties to the same persons for whom the limited liability company had such duties. The members and managers of a limited liability company that is the general partner of a Delaware limited partnership have the same fiduciary duties to its limited partners as does the LLC general partner. *Paige Capital Management LLC v. Lerner Master Fund*, Civ. A. 5502-CS, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011) ("a director, member or officer of a corporate entity serving as the general partner

of a limited partnership, like [the defendant in that case], who exercises control over the partnership's property owes fiduciary duties directly to the partnership and its limited partners"). *See also In re USA Cates, L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991); *Bay Center Apartments Owner, LLC v. Emory Bay PKI, LLC*, Civ. A. 3658-VCS, 2009 WL 1124451, at *8-9 (Del. Ch. Apr. 20, 2009).

Tuberville's arguments for a limited liability company by estoppel involve not only making new law, but would necessitate the resolution of a number of disputed material facts, including what entity would be created by estoppel, which, right, if any, of estoppel would be factually justified (if legally permitted), and who would the "members" and "managers" of the created entity be. Consequently, even if the argument had merit, resolution of the issue is not appropriate for summary judgment.

## C.    Holding in *Bailey v. Bailey* Case Is Not Applicable or Otherwise Determinative.

As noted earlier, under Alabama law (except as provided in ALABAMA CODE § 10A-8-202(b), which is not applicable in this instance), the association of two or more persons to carry on as co-owners of a business <u>for</u> <u>profit</u> forms a partnership, whether or not the persons intend to form a partnership. ALABAMA CODE § 10-8A-202(a) (emphasis added). The statute does <u>not</u> "require" the partners to have agreed to share in losses; the statute only requires an intent to share in profits. The statute expressly so states. *Id.* Nonetheless, Tuberville cites as support for the proposition that there is a requirement for the sharing of losses among partners, a case that was decided under pre-Alabama Uniform Partnership Law. The case cited by Tuberville, *Bailey v. Bailey*, 345 So. 2d 304, 308 (Ala. Civ. App. 1977), does hold that the parties must have agreed to share losses in order to form a partnership. However, that is not a correct interpretation of ALABAMA CODE § 10-8A-202(a), which sets forth the current requirements for forming a general

partnership under Alabama law. Indeed, that interpretation is contrary to the statute. The Court in *Bailey v. Bailey* specifically recognized that, because the alleged business enterprise that was the subject of that case was formed prior to the effective date of the Uniform Partnership Act, such an association was explicitly exempted from the applicability of the Act. 345 So. 2d at 308.

Plaintiffs recognize, as noted by Tuberville in his Brief, that at least one case decided subsequent to the adoption of the Uniform Partnership Act in 1972 has cited the *Bailey* case as authority: *Adderhold v. Adderhold*, 426 So. 2d 457, 459 (Ala. Civ. App. 1983), which quotes from the *Bailey* case. The court in *Adderhold* stated that a partnership is defined as an "association of two or more persons to carry on as co-owners a business <u>for profit</u>" citing Ala. Code § 10-8-2(7) (the predecessor of Ala. Code §§ 10-8A-306 and 10A-8-306). *Id*. at 459. (Emphasis added.) The court noted that a receipt by a person of a share of the profits in a business in prima facie evidence that he is a partner in the business referring to Ala. Code § 10-8-20(4) (the predecessor statute to Ala. Code §§ 10-8A-202(c)(3) and 10A-8-2.02(c)(3)). *Id.* The court also stated that "another factor" in determining whether a partnership relationship exists is the existence of a legal binding obligation to share in the losses of the business, the court referred to Ala. Code § 10-8-52, the *Bailey* case, and a discussion in 59 AmJur., Partnerships § 39 (1971). In the first instance, the *Adderhold* case does not stand for the proposition that there <u>must</u> be a legally binding obligation to share in losses of the business, but rather that that is a factor (albeit a critical one) in determining whether a partnership relationship exists. *Adderhold,* 426 So. 2d at 459. The court makes clear that a variety of facts and factors must be considered. *Id*.

The *Adderhold* court quotes approvingly from <u>American Jurisprudence</u> noting that, "both at common law and under the Uniform Act, no one fact or circumstance can be taken as a

conclusive test nor is it possible to state any number of facts that would be in all cases decisive of the existence of a partnership relationship. In the last analysis, there is no arbitrary test for a determining the existing of a partnership and each case must be decided according to its own particular facts." *Id*. at 459-60. In short, although the *Adderhold* decision could be questioned as placing too much importance on the existence of a legally binding obligation to share in the losses of a business, because it appears to base that conclusion on an incorrect statute (the joint and several liability provision of the then existing Alabama Partnership Act rather than the provision regarding the formation of partnership), the decision nonetheless emphasizes that the resolution of the issue as to whether Tuberville and Stroud were partners in a general partnership will be fact dependent.

This is an issue that should not be resolved on summary judgment, at least not in Tuberville's favor. In the first instance, there are disputed facts. Moreover, there is an overwhelming abundance of evidence, including Tuberville's own acknowledgement that he was an "investment partner," that he was a partner with Stroud. Last, but not least, there is a presumption that Tuberville was a partner. CODE OF ALABAMA § 10-8A-202(c)(3). Accordingly, the burden of proof will be upon Tuberville to rebut that presumption. This is scarelessly an issue in which Tuberville would be entitled to summary judgment. Indeed, although Plaintiffs do not argue that they would be entitled to summary judgment on the issue, the facts of the case clearly favor Plaintiffs' position.

### D. Tuberville Did Agree to and Did Share in Losses of TS Capital Partners, LLC.

Nonetheless, even if there were a <u>requirement</u> (as opposed to a factor) by the members of an association to share in losses in order for the association to be treated as a partnership (and, to be clear, under current applicable Alabama law, there is no such requirement), that

"requirement" was met in the case of Stroud, Tuberville, and TS Capital Partners, LLC. Tuberville may have testified that he refused to pay expenses of the Entity Defendants, because he did not own them. However, as an "investment partner," Tuberville was an owner of TS Capital Partners, LLC. Thus, if he did, in fact, as he testified in his deposition, refuse to pay expenses of "Entity Defendants" he was not referring to TS Capital Partners as he clarified later in his deposition. (Tuberville Dep. 247:2-9). With respect to TS Capital Partners, LLC, Tuberville replied that he had no duties to its creditors, not that he would not share in its losses. (Tuberville Dep. 247:4-6). Tuberville's position in his Brief is not consistent with his deposition testimony.

The projections performed for TS Capital, prepared by Donald A. Howell, CPA, and provided to Tuberville on or about March 29, 2010, which was prior to his $200,000 capital contribution to TS Capital Partners, LLC made on July 22, 2010, demonstrate that Tuberville would, in fact, share in losses as well as profits. The IRS Schedule K-1 of TS Capital Partners, LLC for Tuberville showed that he had a 50% interest in losses. Moreover, as Tuberville repeats *ad nauseam*, he did "participate" and, consequently, did "share" in the losses of TS Capital Partners. His losses were reduced by the financial benefits that he received from the partnership, but he nonetheless shared in its losses. This is yet another issue with respect to which the facts are disputed, but the evidence and the applicable law more fully support the Plaintiff's position than Tuberville's position.

## VII.    Tuberville's Ignorance of Partnership's Affairs - Whether Real or Feigned - Is Not a Defense to or Excuse from his Liability as a Partner.

Tuberville claims that he was not aware of many of the activities of TS Capital Partners. Even if that is true, it is not a defense or excuse for the breach of his fiduciary duties and obligations to Plaintiffs. The essence of Tuberville's claim is that he did not know Plaintiffs or

that he had any duties to Plaintiffs, because he was only a football coach. That "defense" is insufficient as a matter of law.

### A. Tuberville's Ignorance of Fiduciary Duties is No Excuse for His Breaching Those Duties.

Under Alabama partnership law, a partner's fiduciary duties are statutory. ALA. CODE § 10-8A-4.04 (1975). Moreover, a partner's fiduciary duty of care, loyalty, and good faith and fair dealing are nonwaivable. ALA. CODE § 10-8A-1.04 (1975). Thus, fiduciary duties arise automatically as an operation of law and, as a matter of statutory construction, are not contingent upon whether the partner is aware of such obligations. While Alabama courts have apparently not expressly addressed ignorance of the law in the context of partnership law, it has been applied in other civil contexts. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 130 S. Ct. 1605, 1611 (2010) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'") (citation omitted)); *McDaniel v. Cain*, 48 So. 52, 54 (Ala. 1908) ("[I]gnorance of the law excuses no man for crime, or for an ordinary civil wrong."); see also *Demers v. Adams Homes of Nw. Fl, Inc.*, 321 F. App'x 847, 853 (11th Cir. 2009) (holding that employer's erroneous belief that it was not covered by Title VII did not preclude liability, "[a]s is well-established, ignorance of the law is not a defense").

At least one court has addressed this precise issue. In *Noel v. Hall*, CIV. 99-649-AC, 2012 WL 3241858 (D. Or. Apr. 27, 2012) report and recommendation adopted, 3:99-CV-649-AC, 2012 WL 3241814 (D. Or. Aug. 7, 2012), the court held that the "a purported good faith belief that a fiduciary duty did not exist is insufficient to excuse an actual breach of that duty." *Id*. at *18. The court explained that "[t]he elements of breach of fiduciary duty under Oregon law are simple: a relationship, breach of a duty occasioned by that relationship, and an injury

resulting from the breach. There is no intent or bad faith element needed to establish the claim for breach of fiduciary duty." *Id*. Similarly, the elements of a breach of fiduciary duty under Alabama law are as follows: "(1) the existence of a fiduciary duty between the parties; (2) the breach of that duty; and (3) damages suffered as a result of the breach." *Regions Bank v. Lowrey*, 101 So. 3d 210, 219 (Ala. 2012); s*ee also Green v. McAllister*, 14 P.3d 795, 804 (Wash. Ct. App. 2000) (finding that partner breached fiduciary duty, holding that "[i]gnorance of the affairs of a business to which one owes a duty of diligence, care and skill is not a defense from liability for fraud or malfeasance"); *Hoye v. Meek*, 795 F.2d 893, 896 (10th Cir. 1986) ("directors and officers are charged with knowledge of those things which it is their duty to know and ignorance is not a basis for escaping liability").

### B. Tuberville's "Investment Partner" Defense Is No Defense.

Tuberville's defense to Plaintiffs' claims are essentially that he was merely an "investment partner," was unaware of the business and affairs of the TS Capital entities, and did not have the knowledge and experience to understand such matters.

The facts of this case evidence that Tuberville was aware of financial and other important information that would be required to operate and grow the fund and the plans for the solicitation of substantial funds by outside investors. However, if he was not (and that appears doubtful), he has only himself to blame for that. He was provided on multiple occasions with information regarding the formation of TS Capital Fund, L.P. and its affiliated entities and the projected capital requirements as well as the projected profits for the fund and the entities in which he and Stroud were equal owners. These amounts were of such magnitude (tens of millions of dollars) that they could not have been reasonably expected to be raised only from Tuberville and his "friends." For example, Stroud's email of July 8, 2010, and Tuberville's response to it regarding

the break down for an August 1, 2010, "launch" refer to soliciting funds from outside investors and Stroud specifically identifies five persons by name, and one unnamed person in order to reach the goal $15 million for the first quarter. Stroud's projections in the email state that "we should reach of first milestone of $100M in 12 to 14 months." The raising of that amount of capital necessarily would require solicitations beyond Tuberville and his "friends." Because Tuberville specifically replied to the email on the next day, he obviously received it and was informed of its substance. The email exchanges on July 8 and July 9 between Tuberville and Stroud specifically refute his claims of lack of knowledge of the plan to solicit outside investors.

A consultant for TS Capital Partners prepared projections including projected annual balance sheets for the periods ending December 31, 2010 - 2014, which were provided to Tuberville by email from Broach on March 29, 2010. Broach received a delivered confirmation shortly thereafter. Those projections included substantial contributions of so-called "Proprietary Capital," totaling $53 million at December 31, 2014. Those projections were provided to Tuberville by an email from Broach on March 29, 2010.

A copy of a document review and administration proposal prepared by Joe Goldstein of G&S Fund Services, dated June 11, 2010, was provided from Stroud to Tuberville by email on the same date. The report included a review of the PPM (presumably Private Placement Memorandum) together with a letter to T.S. Capital Fund, LP from Goldstein outlining the services that G&S Fund Services, LLC could provide to TS Capital Fund, LP.

Stroud sent to Tuberville an email on Thursday June 17, 2010, that attached drafts of Certificates of Formation of TS Capital GP, LLC and TS Capital Management, LLC and the Certificate of Limited Partnership of TS Capital Fund, L.P. These documents in the same form were filed for record with the Secretary of State of Delaware later that same day. Consequently,

Tuberville's denial of the knowledge of those entities is subject to substantial question. Furthermore, Tuberville states that the organizational documents "**were not** provided to Tuberville at time." (Def. Mot. for Summ. J. 41). That factual assertion is simply not correct, at least in the sense that drafts of the documents were actually delivered by email to his regular email address.

The investment partner claim is ineffective as a defense for the reasons described in Parts I and V.A. of the Argument portion of this Brief. His claims of ignorance - rather than being a valid defense - are actually further bases of liability, because Tuberville made no, and certainly not a reasonable, effort to be informed about the business and affairs of the TS Capital entities. If he was not capable of performing his fiduciary duties, he should not have accepted them. Tuberville is liable to the Plaintiffs for the losses that they incurred as a result of the breaches of his fiduciary duties to them, including his failure to exercise due care, and is jointly and severally liable with Stroud for the breaches by Stroud of his fiduciary duties to Plaintiffs.

## VIII. Plaintiffs' Evidence Warrants Trial on Breach of Fiduciary Duty Claim in Count 11.

### A. Choice of Law Principles Dictate Application of Alabama Law and Delaware Law.

The law of the place of formation of each entity applies to the claims in Count 11 of the Second Amended Complaint. "When a federal court decides a state law claim, whether acting pursuant to diversity or supplemental jurisdiction, it applies the choice-of-law rules of the jurisdiction in which it sits." *Benchmark Med. Holdings, Inc. v. Rehab Solutions, LLC*, 307 F. Supp. 2d 1249, 1258-59 (M.D. Ala. 2004). Thus, the Court must apply Alabama choice-of-law rules to the claims arising under state law which are before the Court pursuant to its supplemental jurisdiction. With respect to claims involving the internal corporate relationship or

breach of fiduciary duty such as an action for the appropriation of a corporate opportunity, Alabama applies the "internal affairs doctrine" law which applies the law of the place the entity's domicile or formation. *See, e.g., Scrushy v. Tucker,* 70 So. 3d 289, 298 (Ala. 2011); *Ex parte Bentley*, 50 So. 3d 1063, 1071 (Ala. 2010); *Massey v. Disc. Mfg., Inc.*, 601 So. 2d 449 (Ala. 1992). TS Capital Partners, which Tuberville and Stroud erroneously denominate "TS Capital Partners, LLC," is a general partnership domiciled in Alabama, the state in which Tuberville and Stroud formed that general partnership. Consequently, the claims of breach of fiduciary duty arising out to Tuberville's actions as a general partner in TS Capital Partners must be analyzed under Alabama law. As set forth in more detail in the factual recitation, all of the other "Entity Defendants" were formed in Delaware. Consequently, the claims of breach of fiduciary duty arising out of Tuberville's actions with regard to those other entities must be under the laws of Delaware.

**B.      Tuberville Had Fiduciary Duties to Plaintiffs Under Alabama and Delaware Law.**

With respect to fiduciary duties of the partners of TS Capital Partners, LLC, Alabama law governs. With respect to the Defendant entities formed under Delaware law, the laws of that jurisdiction would control. However, under the laws of both states Tuberville and Stroud owed fiduciary duties to the Plaintiffs. Tuberville was one of the two managers and members of TS Capital GP, LLC, which under at least some versions of the "draft" organizational documents for the TS Capital entities, served as the general partner to TS Capital Fund, L.P., a Delaware limited partnership. Although Tuberville would have owed fiduciary duties to Plaintiffs, if the entities at issue had been corporations, his duties and responsibilities were even greater, because he and Stroud organized the TS Capital Fund, L.P. as a partnership of which (depending on which document prepared by the Defendants is considered) he was a general partner and/or the

managing member of a general partner.  General partners owe to the partnership and the other partners the highest standards of conduct.  *See, e.g., Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928) and its progeny.

### C.  Delaware Law is Controlling with Respect to Certain TS Capital Entities.

If the organizational structure described in the several versions of the Offering Memoranda are to be believed, the TS Capital entities, but excluding TS Capital Partners, LLC, were Delaware organizations.  Tuberville attempts to disclaim any responsibility for the slipshod operations of TS Capital Fund, L.P. and its affiliated organizations.  However, his disclaimers are hollow and unsupported and, at minimum, raise factual issues that should not be addressed and cannot be properly resolved in connection with a Motion for Summary Judgment.  The Plaintiffs' claims against Tuberville are not only plausible, but are entirely logical and naturally flow from the customary duties and responsibilities of a manager of an LLC and a general partner of a limited partnership.  *See* DEL. CODE Ann. tit. 6, § 15-404 (2011) (general partner owes duties of loyalty and care to partnership); *Auriga Capital Corp. v. Gatz Props., LLC*, No. 4390-CS, 2012 WL 361677, at *8-*11 (Del. Ch. Jan. 27, 2012) (imposing duties of loyalty and care on managers of LLC by default); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A. 2d 1146, 1149-50 (Del. Ch. 2006) (same); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A. 2d 121, 153 (Del. Ch. 2004) (same); *VGS, Inc. v. Castiel*, C.A. 17995, 2000 WL 1277372, at *4-5 (Del. Ch. Aug. 31, 2000), aff'd 781 A. 2d 696 (Del. 2001) (same).

### D.  Tuberville Had Responsibility, Authority, and Power to Prevent Losses to the Plaintiffs.

As a general partner of a partnership (whether Delaware or, as explained above, Alabama), Tuberville was legally entitled to full disclosure by Stroud of anything he did on behalf of the partnership and Tuberville had the right to withhold his consent to any such actions. *See* DEL. CODE Ann. tit. 6, § 15-403(a) (2011) ("Each partner and the partnership shall provide partners . . . access to the books and records of the partnership and other information concerning the partnership's business and affairs . . . ."); *Id*. § 15-102(f) ("A partner's knowledge, notice or receipt of a notification of a fact relating to the partnership is effective immediately as knowledge by, notice to or receipt of a notification the partnership . . . ."). As co-managers of TS Capital GP, LLC, Tuberville and Stroud were and are both responsible for conferring and agreeing on the appropriate management and operation of that entity. *See Id*. § 18-404(d) (2011) (unless otherwise specified in the operating agreement, managers are to make decisions by vote at meeting of the managers); *Auriga Capital Corp.,* 4390-CS, 2012 WL 361677, at *8-*11 (imposing duties of loyalty and care on managers).

### E. Tuberville's Failure to Perform Any Due Diligence Was a Breach of His Duties to the Plaintiffs.

In addition to the misrepresentations included in the Offering Memorandum regarding the engagement by TS Capital Fund, L.P. of legal counsel and auditors, the failure of the managers and/or general partners, including Tuberville, to engage such advisors deprived TS Capital Fund, L.P. and, hence the Plaintiffs who purchased limited partners interests in the Fund, and other such purchasers, of the protections that would be afforded by independent advisors. Indeed, it is likely that, if not entirely prevented, some and possibly much of the misappropriations and misdealing would have been discovered sooner if TS Capital Fund, L.P. had had such advisors. The determination of the identity and existence of legal counsel and accountants would be a fundamental element of due diligence. If Tuberville had performed even minimal due diligence,

doubtless substantial amounts of the Plaintiffs' losses could have been prevented. That a nationally known and well-respected law firm and certified public accounting firm were identified as the Partnership's legal counsel and auditors magnified the degree of the problems caused by Tuberville's failure to perform properly and prudently his fiduciary duties.

A difficulty in this case, although a difficulty generated entirely by Tuberville and Stroud because of their negligent and imprudent actions, results from the ineffective and improper organization of TS Capital Partners, LLC and its affiliated entities and indeed the Stroud Capital entities. The improper organization was compounded by the improper operation of TS Capital Partners, LLC and its affiliated entities. The failures of the Defendants to afford the Plaintiffs customary safeguards, such as failures to engage legal counsel to prepare legal documents, improper or no use of accountants to perform proper accounting functions, failure to employ an independent third-party administrator, failure to have audited financial statements, etc., do "complicate" this case. However, such complications are not a defense by Tuberville or Stroud to the Plaintiffs' claims. Rather those defective and improper actions form the basis and support for some of the Plaintiffs' claims, particularly those concerning violations of the securities laws and breaches of fiduciary duties.

The evidence produced by the Plaintiffs more than satisfies the requirements to justify the denial of Tuberville's Motion for Summary Judgment on this issue as well as all other claims made by the Plaintiffs on this case.

## IX. Plaintiffs are Entitled to the Protections Afforded Limited Partners including Protections Afforded to Persons Who Erroneously Believe Himself/Herself to be a Limited Partner.

Notwithstanding the confused state of affairs caused by the inadequate and improper documentation of various elements of the organizational and offering documents relative to the

TS Capital entities, including TS Capital Fund, L.P., the Plaintiffs are entitled to the protections afforded to limited partners under the applicable state law.[64]  The Delaware Limited Partnership Act and the Alabama Limited Partnership Act of 1997, which were in effect at the relevant times are similar.  Consequently, it may not matter which state's governing law applies, but the Plaintiffs are entitled to the protections afforded by the Alabama Limited Partnership Act and the Delaware Limited Partnership Act for persons who erroneously believe themselves to be limited partners if any of the Plaintiffs should be in that category, which the Plaintiffs do not believe to be the case.

Tuberville in his Brief in support of his Motion for Summary Judgment alleges that "at some time or other, all of the Plaintiffs put their money in entities other than TS Capital Fund, L.P."  (Def. Mot. For Summ. J. 51).  The allegation is at minimum misleading, if not incorrect.  Most of the Plaintiffs invested funds were either ultimately deposited into the account of TS Capital Fund, L.P. or used for the purposes (albeit not always proper) of TS Capital Fund, L.P.  See analysis at pages 42 – 45 of this Brief.

There does appear to be some confusion by at least some of the Plaintiffs regarding the various TS Capital entities, including TS Capital Fund, L.P.  That is not surprising in view of the extremely unorthodox and improper manner in which the TS Capital entities were formed and operated by Tuberville and Stroud and the partial, and often incorrect information, including securities offering disclosures, provided to them.

Tuberville attempts to cloud ("complicate" in his terminology) matters by referring to similar named LLCs that were organized, albeit insufficiently and inadequately, under Delaware law.  Tuberville's efforts to use the "sloppy" (Tuberville's expert witness' term for the condition

---

[64] Because TS Capital Fund, LP was organized as a Delaware limited partnership, Delaware law may govern the Plaintiffs' rights as limited partners of that limited partnership.

of the documents of the TS Capital entities[65]) state of affairs of the organization of the TS Capital entities are not effective as a defense to the Plaintiffs' claims. To the contrary, the "sloppy" state of affairs is further evidence of his and his partner Stroud's grossly negligent acts and omissions, and liability to the Plaintiffs are a result thereof.

Notwithstanding the confusing state of affairs, Plaintiffs were entitled to the protections afforded limited partners of the limited partnership and were not properly treated as a general partner. DEL. CODE ANN. tit. 6 § 17-304; and ALA. CODE § 10-9B-304. A person who makes a contribution to a business enterprise and erroneously, but in good faith believes that he or she have become a limited partner in the enterprise is not a general partner enterprise and is not bound by its obligations by reasons of making the contribution, receiving distributions from the enterprise. or exercising any rights of the limited partner if, upon ascertaining the mistake he or she takes certain actions. DEL. CODE ANN. tit. 6 § 17-304(a); ALA. CODE §10-9B-304.[66] There is no allegation or evidence that such a third party exists or no third party has made any such claim of which the Plaintiffs are aware. However, the Plaintiffs note the protections afforded them by Delaware and Alabama limited partnership laws, as a matter of caution.

## X. DEFENDANTS HAVE VIOLATED RULE 10b-5 (COUNT 1) AND THE CORRESPONDING STATE SECURITIES FRAUD STATUTES (COUNT 8).

### A. Defendants Made Material Misrepresentations And Omissions, And Engaged In A Comprehensive Scheme To Defraud.

Defendants violated Rule 10b-5 and the corresponding provisions of state securities laws in connection with their sales of securities to Plaintiffs. Section 10(b) of the 1934 Act makes it unlawful, "directly or indirectly" for "any person … [t]o use or employ, in connection with the

---

[65] (Beale Dep. 252:3-9; 252:23; 253:2).

[66] A person who makes a contribution of the kind described in those Code sections could be liable as a general partner to certain third parties who actually believed the contributing person was a general partner at the time of the transaction and extended credit to the business enterprise in reasonable reliance on the credit of that person. DELAWARE CODE subsection (c).

purchase or sale of any security … any manipulative or deceptive device or… contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe." Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78(j)(b).[67] Exercising its authority delegated through § 10(b), the SEC promulgated Rule 10b-5 to define "manipulative or deceptive devices or contrivances" as follows:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. A duty to disclose arises under Rule 10b-5 when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States*, 445 U.S. 222, 228 (1980).

Defendants have engaged in a "comprehensive scheme to defraud,"[68] rendering the securities that Plaintiffs purchased valueless. For example, the TS Capital entities and Stroud reported grossly inflated values of their assets and delivered fabricated account statements to Plaintiffs showing positive returns, when in reality Plaintiffs' funds were being spent on Stroud's and Tuberville's misappropriations, including Tuberville's BMW car, website development, cell

---

[67] The Securities Exchange Act is hereinafter referred to as the "1934 Act."

[68] Misrepresentations and omissions are not the only bases for liability under 10b-5. In addition to their Count under subsection (b) of the Rule, Plaintiffs have alleged violations under subsections (a) and (c). *See Competitive Associates, Inc.,* 516 F.2d 811, 814 (2nd Cir. 1975) ("Not every violation of the anti-fraud provisions of the federal securities law can be, or should be, forced into a category headed "misrepresentations" or "nondisclosures." Fraudulent devices, practices, schemes, artifices and courses of business are also interdicted by the securities laws."), discussed at Section �juni of the Argument.

phone, and lavish trips to New York. Tuberville failed to disclose[69] in the Offering Memorandum that investor funds would be used for his and Stroud's personal benefit. Moreover, the Operating Memorandum does not even mention TS Capital Partners[, LLC], the general partnership between Tuberville and Stroud, much less disclose that it would hold and misappropriate investor funds. The identity of the entity that will hold (and in this case misappropriate) a hedge fund's assets under management is certainly a fact material to the purchase of an interest in a hedge fund. Thus, a reasonable jury could determine that Tuberville's omissions violated Rule 10b-5.

In addition to Tuberville's failures to disclose, the Offering Memorandum includes material affirmative misrepresentations. It states that the general partner would at all times maintain $1 million of capital in the partnership. Such a minimum capital requirement is material to investors, because it provides some level of protection. The expenses of operating the business (including Tuberville's and Stroud's perquisites) were paid directly from accounts holding investor funds, even though the Offering Memorandum stated that such expenses would be paid by TS Capital Management, LLC. The Offering Memorandum represented that Rothstein Kass, a well-known accounting firm, would perform an annual audit of TS Capital Fund, L.P., but no audit was ever performed. That was a material misrepresentation because an audit can provide comfort to investors that their funds are not being mismanaged. Similarly, the Offering Memorandum included fraudulent misrepresentations that Lovoy Summerville & Shelton would serve as the third-party administrator for TS Capital Fund, L.P. If an audit had been performed and a third party administrator employed, the fraudulent scheme might have

---

[69] Tuberville conveniently forgets that both representations **and omissions** are actionable under Rule 10b-5, when he asserts that Counts 1 and 8 must fail because "Plaintiffs can identify not a single misrepresentation that Tuberville himself made…" (Tuberville Brief at 33). He must have a short memory, as he does include omissions in the first sentence of the same paragraph. *Id.*

been discovered before all of Plaintiffs' funds were misappropriated. A reasonable jury could determine, and Tuberville apparently does not dispute, that these were material misrepresentations that constitute violations of § 10(b) and Rule 10b-5 by the TS Capital entities and Stroud.

Tuberville apparently would have the Court believe that a misrepresentation must have come out of his mouth and directly into the ears of Plaintiffs in order for the misrepresentations made in the Offering Memorandum to serve as the basis for his liability. That is not the case under Rule 10b-5, or virtually any other securities law for that matter. "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). Tuberville and Stroud were the general partners of TS Capital Partners[, LLC], or the members and managers of TS Capital Management, LLC. As such, they jointly had ultimate authority over the business and affairs of TS Capital entities, including the content of the Offering Memorandum and other disclosure documents.[70] If Tuberville did not review and participate in the drafting of the Offering Memorandum, he should have. He had a duty to disclose to Plaintiffs that the hedge fund in which Plaintiffs invested would be operated through TS Capital Partners and that investor funds would be used for the benefits he and Stroud received, among other material facts.

As a separate basis for liability under Rule 10b-5, Plaintiffs allege that Stroud and TS Capital Partners failed to disclose to Plaintiffs that an investment in the TS Capital entities and the underlying commodities and derivatives were not suitable investments for Plaintiffs, and/or misrepresented that they were safe investments. A failure to make a determination regarding

---

[70] See Section ▢ of the Argument for a discussion of Tuberville and Stroud's roles, duties, and authority.

whether investments being offered are suitable for the investor can also constitute securities fraud under § 10(b) and Rule 10b-5. *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 252-53 (S.D. Ga. 2005) (*citing Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 599-600 (2d Cir.1978); *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 896-97 (10th Cir.1992)).  Stroud and the TS Capital entities knew or reasonably believed that TS Capital Fund, L.P. (or TS Capital Partners) was not a suitable investment for them.   For example, Stroud knew that John Abrams had previously invested in annuities and stocks, from which he and his wife relied upon a monthly distribution, but Stroud nonetheless solicited and accepted Abrams' funds and transferred them to  the TS Capital entities.  Furthermore, Stroud did not disclose to Abrams that his funds would be invested any differently than they previously had been.  A commodities hedge fund is one of the most complicated types of investment. (Waters Dep. 5, note 5). A reasonable jury could determine that Stroud and TS Capital Partners made material misrepresentations and/or failed to disclose material facts regarding the unsuitability of investments in TS Capital Fund, L.P. (or TS Capital Partners) for Plaintiffs.

**B.      Tuberville Acted With Severe Recklessness In Ignoring His Duties.**

Tuberville's ignorance of his duties satisfies the scienter requirement for a Rule 10b-5 claim.  In the Eleventh Circuit, scienter for purposes of Rule 10b-5 consists of "intent to defraud or severe recklessness on the part of the defendant."  *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011) *cert. denied,* 133 S. Ct. 109 (2012) (emphasis added). The Eleventh Circuit has described severe recklessness as follows:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve ... an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 1300, (*citing Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)). Tuberville essentially abandoned and failed to perform any duty to TS Capital Partners or TS Capital Fund, L.P., or take any action to safeguard or otherwise protect their assets, which included the Plaintiffs invested funds. Tuberville did not even know who key employees of TS Capital Partners were or what they did. Based on Tuberville's omissions and failures to act, a reasonable jury could conclude that Tuberville's ignorance of his duties constitutes severe recklessness. In the alternative, there are genuine issues of material facts regarding Tuberville's position with the TS Capital entities and relationship with Stroud that preclude the entry of summary judgment.

C.     **Tuberville Is Liable For The Violations Committed By The TS Capital Entities, And Sufficient Evidence Exists From Which A Reasonable Jury Could Find That He Violated Rule 10b-5 In His Individual Capacity.**

Tuberville apparently does not dispute that the TS Capital entities and Stroud have violated § 10(b) and Rule 10b-5. Indeed, they have perpetrated a comprehensive and pervasive scheme of fraud, of the sort from which the securities laws were enacted to protect investors. Liability of the TS Capital entities and Stroud for Count 1 was established when the Court's default judgments were entered. Tuberville is liable for those judgments, as a control person of the TS Capital entities and Stroud, and as a general partner with Stroud in TS Capital Partners.[71] Moreover, Plaintiffs have sufficient evidence to show, and a reasonable jury could find, that Tuberville failed to disclose material facts to Plaintiffs in violation of Rule 10b-5.

D.     **Defendants Have Violated The Alabama, Tennessee, And Arkansas Corollaries To Rule 10b-5 (COUNT 8).**

Defendants, through their scheme of fraud, misrepresentations, and omissions, have violated ALA. CODE § 8-6-17(a) (1975), ARK. CODE § 23-42-507, and TENN. CODE § 48-1-

---

[71] See Sections ▆ and ▆ of the Argument.

121(a). Defendant's fraud, misrepresentations, and omissions violated these statutes for the same reasons that they violated Rule 10b-5. These statutes impose liability for representations, omissions, and fraudulent schemes in connection with the sale of a security, with provisions similar to those of Rule 10b-5. Because there are few cases under these statutes, courts may look to federal securities case law for guidance in interpretation. *See Buffo v. State*, 415 So. 2d 1158, 1162 (Ala. 1982). However, courts should look first to the plain language of the statute itself, and if the language is clear and unambiguous, the court need not look further. *Green v. Green*, 293 S.W.3d 493, 507 (Tenn. 2009).

None of the state securities fraud statutes in question by their terms impose any reliance requirement.[72] In fact, the Tennessee Supreme Court has held that reliance is not required. *Id.* at 508. Moreover, scienter is also not a required element under any of these state statutes.[73] *See Buffo v. State*, 415 So. 2d 1158, 1165 (Ala. 1982); *Lane v. Midwest Bancshares Corp.*, 337 F. Supp. 1200, 1208 (E.D. Ark. 1972). Accordingly, to the extent Tuberville's motion for summary judgment is based on his allegations that Plaintiffs did not rely, it is due to be denied with respect to Plaintiffs' claims under ALA. CODE § 8-6-17(a) (1975) and TENN. CODE § 48-1-121(a). Likewise, Tuberville is not entitled to a judgment as a matter of law with respect to Plaintiffs' claims under ALA. CODE § 8-6-17(a) (1975), ARK. CODE § 23-42-507, and TENN. CODE § 48-1-121(a), to the extent that his motion is based on his denials of scienter.

## XI.  DEFENDANTS HAVE VIOLATED § 12(a)(2) OF THE 1933 ACT (COUNT 2).

Defendants have offered and sold securities to Plaintiffs by means of the Offering Memorandum and other written and oral communications. The Offering Memorandum and

---

[72] However, courts have held that reliance is an element under ARK. CODE § 23-42-507.

[73] Likewise, a scienter element was not included in Rule 10b-5 and was not implied by courts until 1976. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).

other communications made by Defendants to Plaintiffs included false statements of material facts and omitted to state material facts, in violation of § 12(a)(2) of the Securities Act of 1933, 15 U.S.C.A. § 77l.[74]

Conveyance of title to the security is not required for liability under § 12(a)(2). Rather, a purchaser may be liable as a "statutory seller," which includes one who solicits a purchase and is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Ryder Int'l Corp. v. First Am. Nat. Bank,* 943 F.2d 1521, 1526 (11th Cir. 1991) (*quoting Pinter v. Dahl*, 486 U.S. 622, 642 (1988)).[75] Courts have held that general partners, directors, officers, shareholders and the like who "substantially participate" in securities transactions may be held liable under § 12(a)(2). *See, e.g., Jubran v. Musikahn Corp.*, 673 F. Supp. 108, 113 (E.D.N.Y. 1987); *Tobias v. First City Nat. Bank & Trust Co.*, 709 F. Supp. 1266, 1273 (S.D.N.Y. 1989) (president, director and sole controlling shareholder of one of two general partners in limited partnership was "seller" within meaning of § 12(2) who could be found liable for limited partnership's sale of securities on basis of untrue statements of material fact in prospectus or oral communication).

Tuberville, in his role as a general partner of TS Capital Partners and/or a managing member of TS Capital Fund, L.P. and TS Capital Management, LLC, substantially participated in the offerings by which limited partner interests were sold to plaintiffs. As an example of such participation, in July 2010 Tuberville emailed Stroud: "Sounds like a great plan. I will start making plans on my end and findind [sic] new investors. We need a good first quarter. Tub".

---

[74] Hereinafter, the "1933 Act."

[75] Tuberville has misinformed the Court regarding the law in the Eleventh Circuit on who may be liable under Section 12 (formerly 12(2)) of the 1933 Act. Tuberville's brief includes the following citations for the proposition that Plaintiffs will have to show that Tuberville sold or offered a security to them: "*Ryder Int'l Corp. v. First Am. Nat. Bank*, 749 F. Supp. 1569, 1573 (N.D. Ala. 1990) *aff'd*, 943 F.2d 1521 (11th Cir. 1991) (emphasizing that a showing of strict privity is necessary to impose liability upon a seller)." Neither the district court nor the Eleventh Circuit emphasized or even indicated that a showing of strict privity is necessary.

That email was sent less than a month after the TS Capital entities were formed in Delaware, and in response to an email from Stroud listing potential investors and forecasting expected profits.

## XII. DEFENDANTS HAVE FAILED TO REGISTER SECURITIES IN VIOLATION OF § 5 AND § 12(a)(1) OF THE 1933 ACT (COUNT 9).

Defendants have offered and sold unregistered securities to Plaintiffs, without an exemption from registration, in violation of § 5 and § 12(a)(1) of the 1933 Act. As described in Section XI of the Argument, Tuberville is a "statutory seller" with respect to such sales and, as such, he is liable to Plaintiffs for his participation in the sale of unregistered securities to Plaintiffs in violations of these statutes.

## XIII. DEFENDANTS HAVE FAILED TO REGISTER SECURITIES IN VIOATION OF ALA. CODE § 8-6-4 (1975), ARK. CODE § 23-42-501, AND TENN. CODE § 48-1-104 (COUNT 10).

Defendants have offered and sold securities to Plaintiffs in Alabama, Arkansas, and Tennessee, without registration or exemption therefrom, in violation of ALA. CODE § 8-6-4 (1975), ARK. CODE § 23-42-501, and TENN. CODE § 48-1-104. In addition to offering and selling securities to Plaintiffs through the Offering Memorandum and other written documents, Tuberville offered and sold securities directly to John Owens.

The securities sold by Defendants were limited partnerships interests in TS Capital Fund, L.P. or TS Capital Partners[, LLC]. The Offering Memorandum misrepresented that these interests were offered pursuant to Regulation D, when in fact no exemption from registration was available. Tuberville does not dispute that the limited partnership interests were sold without registration or exemption. No Form D (or similar state form) was filed with the SEC, the Alabama Securities Commission, or the securities regulatory agencies of the states of Arkansas and Tennessee, as required under Regulation D. 17 C.F.R. § 230.503. Moreover, Defendants engaged in general solicitation or advertising, a practice which at the time of the offerings in

question was not permitted under any offering made pursuant to Rule 506 or 505.[76]  Defendants' general solicitation included participating in the preparation of and consenting to the publishing of an article that appeared on www.al.com and elsewhere, which touted Tuberville's role in "drumming up business" for a new hedge fund named T.S. Capital.  The article noted that the "T" stood for Tommy and "S" for Stroud.  Moreover, general solicitation was conducted on the TS Capital Partners website, the home page of which described Tuberville's formation of TS Capital Partners with Stroud in the summer of 2009. Further, the Due Diligence Questionnaire states that TS Capital Partners attracts new clients through appearances on Bloomberg Television.  As a result of these general solicitations, no exemption under Regulation D was available.

The absence of a Rule 506 exemption is notable because Rule 506 preempts state securities registration requirements.  15 U.S.C.A. § 77r.  Without a Rule 506 exemption, an issuer is required to register in each state in which it offers securities, unless it avails itself of an exemption in each such state.  The only exemption that could have potentially applied in Alabama without first filing with the Alabama Securities Commission includes as a prerequisite that no more than ten purchasers during any twelve-month period and certain other conditions are met. ALA. CODE § 8-6-11(a)(9) (1975).  However, even that exemption was not available, because the TS Capital entities engaged in general solicitation.  *Id.*  Similarly, the TS Capital entities perfected no exemption under the laws of Arkansas and Tennessee.

The Alabama Securities Act includes the following definition:

Sale" and "sell" includes every contract of sale of, contract to sell, or disposition of a security or interest in a security for value. "Offer" or "offer to sell" includes every attempt to offer or dispose of, or solicitation of an offer to buy, a security or interest in a security for value. Any security given or delivered with, or as a bonus

---

[76] These were the only Regulation D exemptions potentially available to the TS Capital entities, because Rule 504 offerings are limited to $1,000,000.  17 C.F.R. § 230.504.

on account of, any purchase of securities or any other thing is considered to constitute part of the subject of the purchase and to have been offered and sold for value. A purported gift of assessable stock is considered to involve an offer and sale. Every sale or offer of a warrant or right to purchase or subscribe to another security of the same or another issuer, as well as every sale or offer of a security which gives the holder a present or future right or privilege to convert into another security of the same or another issuer, is considered to include an offer of the other security.

ALA. CODE § 8-6-2(8) (1975). Federal courts have held that, under a § 12(a)(1) (as well as 12(a)(2)) of the 1933 Act, which also proscribes the sale of unregistered securities and is worded similarly to § 8-6-2(8), conveyance of title to the security is not required for liability. Rather, a purchaser may be liable as a "statutory seller," which includes one who solicits a purchase and is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Ryder Int'l Corp. v. First Am. Nat. Bank,* 943 F.2d 1521, 1526 (11th Cir. 1991) (*quoting Pinter v. Dahl*, 486 U.S. 622, 642 (1988)). The statutory seller rule is discussed in more detail with respect to 12(a)(2) of the 1933 Act at Section XI of this Argument. Material facts exist regarding Tuberville's roles and participation in the operations of the TS Capital entities, including their offers and sales of securities. For example, Plaintiffs have proffered evidence that Tuberville corresponded by email with Stroud to make plans regarding their solicitation (or "findind" [sic]) of investors in the Summer of 2010 and sharing of profits forecasted in connection therewith. However, Tuberville asserts that he solicited no investors and was not involved in the TS Capital entities' sales of securities. Therefore, genuine issues of material fact preclude summary judgment with respect to this Count.

## XIV. TUBERVILLE IS LIABLE TO PLAINTIFFS AS A CONTROLLING PERSON.

### A. Tuberville Is A Controlling Person Under The 1933 Act, The 1934 Act, And The Alabama Securities Act.

Both the 1933 Act and the 1934 Act include liability provisions under which certain "controlling persons" are liable for certain federal securities law violations of the persons they

control, jointly and severally with and to the same extent as the violators are liable. Section 20 of the 1934 Act imposes controlling person liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of [the 1934 Act] or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). Section 15 of the 1933 Act is similarly worded, but imposes controlling person liability only with respect to violations of § 11 or § 12 of the 1933 Act.[77] 15 U.S.C. § 77o(a). Although the statutes are worded slightly differently, both statutes are generally interpreted the same for purposes of who qualifies as a controlling person.[78] *Pharo v. Smith*, 621 F.2d 656, 673 *on reh'g in part*, 625 F.2d 1226 (5th Cir. 1980). The Alabama Securities Act includes the following provision concerning controlling person liability:

> Every person who directly or indirectly controls a person liable under subsections (a) or (b) of this section, including every **partner**, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and every dealer or agent who materially aids in such conduct is also liable jointly and severally with and to the same extent as the person liable under subsection (a) or (b)...

ALA. CODE § 8-6-19(c) (1975). Thus, under Alabama's statute, every "partner" of a violator is identified as a controlling person. Where provisions of the Alabama Securities Act are virtually identical to their federal securities law counterparts, courts have looked to the federal cases concerning those statutes to aid in interpretation. *Buffo v. State*, 415 So. 2d 1158, 1162 (Ala. 1982).

---

[77] In Counts 2 and 9, Plaintiffs allege violations of Sections 12(a)(2) and 12(a)(1), respectively.

[78] The standards of conduct that must be proven by a controlling person in order to avail himself of the respective affirmative defenses included in the two statutes are different, but Plaintiffs need not fully address those issues for purposes of responding to Tuberville's motion.

Neither the 1933 Act nor the 1934 Act includes a definition of the term "control." However, the Securities and Exchange Commission has, in the regulations promulgated under the 1933 Act, defined the term as follows:

> The term control (including the terms controlling, controlled by and under common control with) means the **possession, direct or indirect, of the power** to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 230.405. Under the law of the Eleventh Circuit, a person is a controlling person if he "**had the power to control** the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] **had the requisite power** to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996) (*quoting Brown v. Mendel*, 864 F. Supp. 1138, 1145 (M.D. Ala. 1994)) (emphasis added). The Eleventh Circuit has also looked to the above-quoted definition of control in the regulations under the 1933 Act. *Id.* at 396. The determination of whether a defendant is a controlling person is an "intensely factual question." *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993) (*citing* 4 Louis Loss & Joel Seligman, *Securities Regulation* 1724 (1990)).

With respect to the first prong of the Eleventh Circuit's controlling person test, Plaintiffs have substantial evidence to prove that Tuberville had the power to control the general affairs of the TS Capital entities at the time they violated the securities laws. Among other facts demonstrating Tuberville's power to control are: the inclusion of "T" for Tommy in the names of the entities; his signature on multiple bank accounts as a partner of TS Capital Partners, LLC; business card for TS Capital Partners listing him as "Managing Partner"; his signing the lease agreement for his BMW as a partner of TS Capital Partners; and Stroud and TS Capital Partners'

employee keeping Tuberville abreast by email of developments with the business concerning the engagement of professional firms, and the hiring and termination of employees, among other matters; and Tuberville's corresponding with Rachel Broach to ascertain the status of payment of past due bills of the TS Capital entities.[79]  Genuine issues of material fact exist with respect to many of these matters.

Plaintiffs also can prove the second prong of the controlling person test - that Tuberville "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Enstar*, 84 F.3d at 396-97.  The primary securities law liability of the TS Capital entities and Stroud is based on (1) written and oral misrepresentations and failures to disclose material information to Plaintiff's in connection with their purchases of interests in the TS Capital entities, including misrepresentations and omissions in the Offering Memorandum, the Due Diligence Questionnaire, the FAQ, the TS Capital Website, client account statements, and other written documents and information; (2) material misrepresentations and failures to disclose material information relating to the unsuitability of TS Capital Fund, L.P. or TS Capital Partners[, LLC] as investments for John and Priscilla Abrams, Debra Clark, and the college funds of Baron and Melanie Lowe's son and daughter; and (3) sales of unregistered securities in violation of § 5 and § 12(a)(1).  As a general partner of TS Capital Partners,[80] Tuberville had the authority to control (a) the content of the disclosures made by the TS Capital entities and Stroud to investors, (b) the policies and practices of the TS Capital entities concerning the suitability of investors, and (c) the policies and practices of the TS Capital entities concerning its sales of securities. *See In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1246 (N.D. Ga. 2002) (holding that plaintiffs' allegations that alleged controlling person

---

[79] See prior section concerning Tuberville's role as a general partner for further examples of his power and authority.
[80] Or possibly a managing member of TS Capital GP, LLC.

was an officer and CEO of corporation who through his position could control corporation's general affairs and that he possessed the authority to control the content of the disclosures and financial statements disseminated to the public were sufficient for plaintiffs to state a cause of action for controlling person liability). The following email sent by Tuberville to Stroud in July 2010 is an example of Tuberville's involvement in and authority with respect to the securities offerings of the TS Capital entities:

> "Sounds like a great plan. I will start making plans on my end and findind [sic] new investors. We need a good first quarter. Tub"

This email was sent by Tuberville less than a month after TS Capital Fund, L.P. and two of its affiliates were formed, and was a reply to an email by Stroud including a list of prospective investors and a computation of projected profits in connection with the "launch" of the TS Capital entities hedge funds.

In an attempt to avoid responsibility and liability as a controlling person of the TS Capital companies by downplaying his role and actions at the time of the collapse of the companies' operations in September 2011, Tuberville refers in his Brief (at page 49) to a telephone call that Baron Lowe made to Tuberville regarding Lowe's concerns about the status of the companies and his inability to communicate with Stroud. Tuberville states that Lowe called Tuberville as a "friend" (in bold) of Stroud. In dealing with a troubling and awkward situation, Lowe may not have used technically incorrect terminology. However, the important fact of the conversation was not the point that Tuberville emphasizes, but rather that Lowe contacted Tuberville, not as a friend of Stroud, but as an owner of the companies and a person to whom Lowe justifiably believed Stroud would respond and who should be concerned about the status of the companies. Tuberville doubtless knows why Lowe contacted him. To overemphasize Lowe's politeness and avoid the real purpose of the call is not appropriate and, more importantly, does nothing to assist

the Court with its consideration of the case and Tuberville's pending motion. The real significance of Tuberville's reaction and response to the telephone call was that he did not know, even at that late date, who Baron Lowe was and that it was Lowe and not Tuberville initialing action and attempting to remedy matters at that time.

Thus, Tuberville's motion for summary judgment with respect to Counts 1, 2, 8, 9, and 10 should be denied because Plaintiffs can show that the requisites of controlling person liability have been satisfied, namely that Tuberville (a) had the power to control the general affairs of the TS Capital entities, and (b) had the requisite power to directly or indirectly control or influence their disclosure and suitability practices.

### B. Tuberville's Ignorance And Nonperformance of His Duties Do Not Provide Him A Basis To Avoid Liability Through A Good Faith Defense.

In his discussion of the first prong of the Eleventh Circuit's controlling persons test, Tuberville inappropriately focuses on whether or not a controlling person participated in the role or office that gives him the power of control. However, the test does not include a participation requirement. Neither does the Securities and Exchange Commission's definition of control. Rather, the *Enstar* test and the SEC's control definition refer to the **"power to control."** *Enstar*, 84 F.3d at 396-97; 17 C.F.R. § 230.405. Moreover, the Eleventh Circuit has expressly rejected the so-called "culpable participant" standard for controlling person liability required by some other circuits. *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 724-25 (11th Cir. 2008). In any event, after Tuberville's discussion of the degree of a controlling person's participation, he concedes that a controlling person need not exercise his power in order to be liable as a controlling person:

> A defendant need not have exercised their controlling power, 'possession of the power is enough to support a finding that the defendant was a 'controlling person." *Mendel*, 864 F. Supp. at 1144. Indeed, the regulations promulgated

> under the Securities Exchange Act define "control" as including "indirect" power
> to direct or "cause the direction of . . . management and policies."

(Tuberville Mot. for Summ. J. 49).

Tuberville has not effectively raised the "good faith" affirmative defense to controlling person liability, by arguing that his lack of participation in the roles of authority he held with respect to the TS Capital entities should absolve him of liability. That is so because, as demonstrated above, no level of participation in such roles is required to state a claim of controlling person liability in the Eleventh Circuit. The defendant need only have had the "power to control." *Enstar*, 84 F.3d at 396-97; 17 C.F.R. § 230.405. In any event, Tuberville cannot establish the good faith defense. The Eleventh Circuit has described a controlling person's burden of proof with respect to the good faith defense as follows:

> In *G.A. Thompson & Co., Inc.*, the former Fifth Circuit held that a controlling person attempting to invoke the affirmative defense has the burden of establishing that 'he did not act recklessly in inducing, either by his action or his inaction, the act or acts constituting the violation.' *G.A. Thompson & Co., Inc.,* 636 F.2d at 960. Accordingly, we interpret section 20(a) as requiring a controlling person to prove more than a lack of participation in the primary violation. A controlling person is derivatively liable under section 20(a) for the violations of its controlled person if the controlling person **'acted recklessly in failing to do what he could have done to prevent the violation.'** *Id.*

*Laperriere*, 526 F.3d at 724-25 (emphasis added).

In *San Francisco-Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co., Inc.*, a shareholder and director unsuccessfully sought to avail himself of the good faith defense under § 12, based on arguments that he was a figurehead only and took no active role in a corporation, which sold securities without registration or an exemption. 765 F.2d 962, 964 (10th Cir. 1985). The court analyzed the defendant's arguments as follows:

> As a director he certainly had the duty to know the basic or sole function for the corporation-the sale of undivided interests-and how this was being carried out-by mail-and whether this was in accordance with the basic statutory requirements . . . he attempted to [establish a lack of knowledge] by taking the position that he was

a **figurehead**; that his name was used because his son could not use his, he **did not participate in any way**; and that he had made no effort to learn what the corporation was doing. When reliance is placed on his testimony it demonstrates that he must have made a conscious effort not to know. This established that he had not performed his duties as a director.

*Id.; See also G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 959 (5th Cir. 1981) (good faith defense not proven where defendant "could have exercised his power in the day-to-day administrative matters to minimize the chance of a 10b-5 violation by Partridge [or] used his power to influence Partridge or to attempt to monitor Partridge's acts and act appropriately where Partridge had erred.")  Tuberville recklessly breached his duties by doing nothing.  He completely ignored and did not even attempt to perform any of his responsibilities and duties as a general partner or managing member, as discussed in detail with respect Plaintiff's breach of fiduciary duty Count in Section IV of this Argument.  Accordingly, any attempt by Tuberville to escape his controlling person liability based on a good faith defense should fail.[81]

**C.     Even Though Tuberville Need Not Have Actually Participated In The Operation Of The TS Capital Entities To Be Liable, Plaintiffs' Evidence Shows That Tuberville Did Participate.**

Facts indicating that Tuberville participated in his role as a general partner of TS Capital Partners, or possibly a managing member of two of the TS Capital entities, include among others:  his signature on multiple bank accounts as a partner; his trip to New York to meet with HedgeCo about the development of the TS Capital Partners website and other matters concerning the launch of the hedge fund; and his personal desk in his own office at TS Capital Partners' headquarters in Auburn, Alabama.

**D.     Plaintiffs Need Not Prove A Sale Of Securities To Impose Controlling Person Liability On Tuberville.**

---

[81] To the extent that this is affirmative defense Tuberville must do more than he has to prevail.

Controlling person liability is "purely derivative of the controlled entity's liability." *Pitten v. Jacobs*, 903 F. Supp. 937, 951 (D.S.C. 1995) (*citing Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 279 (3rd Cir. 1992). Direct liability against the TS Capital entities and Stroud for the securities violations in question has already been established by way of the default judgments entered by the Court. Tuberville cannot now reopen issues concerning the direct liability. *In re Adler, Coleman Clearing Corp.*, 469 F. Supp. 2d 112, 130 (S.D.N.Y. 2007) (where controlling person had ability to contest entry of judgment by default but chose not to do so, he was barred from reopening those issues because "it would be incongruous indeed if a control person were allowed to challenge imposition of liability upon him for a judgment entered by default against his alter ego-a result that the controlling person had the ability to contest and was in the best position to avert…"). Thus, Tuberville's argument that he cannot be liable as a controlling person because there were no sales of securities should not be considered by the Court.

**E.      The TS Capital Entities and Stroud Sold Securities To Plaintiffs.**

Plaintiffs clearly did purchase securities of the TS Capital entities, although they need not prove it in order for Tuberville to be liable as a controlling person. Some plaintiffs executed TS Capital Fund, L.P. subscription agreements, which stated that they were purchasing limited partner interests. Limited partner interests are securities. *Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025 (S.D.N.Y. 2013). Tuberville's arguments in this regard - that the interests were not securities because Plaintiffs did not ask the right questions or did not understand exactly what they were buying - are laughable. The failure to disclose the nature of the securities offered and sold to Plaintiffs is a prime example of the TS Capital entities' and Stroud's breaches of their disclosure obligations under federal and state securities laws. Moreover, the securities

laws are designed to protect investors, especially those like Plaintiffs[82] who have less business acumen than more sophisticated investors. *See, e.g.*, 17 C.F.R. § 230.502[83] (imposing more stringent disclosure requirements for investors who do not qualify as "accredited investors"). The TS Capital entities and Stroud (and consequently Tuberville, as their controlling person) cannot avoid liability because they misrepresented and failed to disclose facts concerning the nature of the investments that Plaintiffs made.

## XV. TUBERVILLE IS LIABILE FOR VIOLATIONS OF THE COMMODITIES EXCHANGE ACT (COUNTS 3 – 7).

### A. Tuberville Is Liable As A General Partner Of Stroud And A Controlling Person Of The TS Capital Entities And Stroud.

Liability of the TS Capital entities and Stroud under Counts 3 through 7 has been established by the Court's default judgments. Tuberville, as a general partner with Stroud in TS Capital Partners, is jointly and severally liable with Stroud for those judgments. Summary judgment with respect to Counts 3 through 7 is not appropriate because material factual and legal disputes remain concerning whether Tuberville was a general partner with Stroud in TS Capital Partners.[84]

### B. Tuberville Was Required To Register As An Associated Person Under § 4(b)(e) Of The Commodities Exchange Act (Count 4), But Failed To Do So.

Section 4k of the Commodities Exchange Act provides:

---

[82]  As set forth in the Facts, Plaintiffs, with the possible exception of DuBose, are not experienced investors. The Plaintiffs include an office manager for an oil company, a retired school teacher, and a former pharmacist with serious memory and concentration problems from a traumatic brain injury.

[83] This section sets forth certain general conditions that must be met for an issuer of securities to qualify for an exemption from registration under Regulation D.  *Id.*  The interests in TS Capital Fund, L.P. sold to the Plaintiffs were purportedly exempt from registration under Regulation D, but no exemption applied because the requirements for exemption were not satisfied. See Section ___ concerning Count 10.

[84] Plaintiffs concede that there is no private right of action for control person liability under Section 13(b) of the Commodities Exchange Act, 7 U.S.C.A. § 13c(b).  However, contrary to Tuberville's assertions, Plaintiffs claims in Counts 3 through 7 of the Second Amended Complaint are not premised solely on Section 13(b).

It shall be unlawful for any person to be associated with a commodity pool operator as a **partner**, officer, employee, consultant, or agent (or any **person occupying a similar status** or performing similar functions), in any capacity that involves (i) **the solicitation of funds, securities, or property for a participation in a commodity pool** or (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an associated person of such commodity pool operator and such registration shall not have expired, been suspended (and the period of suspension has not expired), or been revoked. It shall be unlawful for a commodity pool operator to permit such a person to become or remain associated with the commodity pool operator in any such capacity if the commodity pool operator knew or should have known that such person was not so registered or that such registration had expired, been suspended (and the period of suspension has not expired), or been revoked.

7 U.S.C.A. § 6k (emphasis added).

Both TS Capital Management, LLC and TS Capital Partners, LLC were commodities pool operators under the Commodities Exchange Act and the regulations promulgated thereunder. As a partner in TS Capital Partners, and a member and manager of TS Capital Management, LLC, Tuberville was required to register as an associated person of a commodities pool operator, but he failed to do so. He participated in the solicitation of investors, and the plans concerning the sale of securities, as evidenced by his July 9, 2010 email in which he stated he would start "findind [sic] new investors." Summary judgment with respect to Plaintiff's claims against Tuberville for his failure to register as an associated person is not appropriate because, as discussed elsewhere in this brief, genuine issues of material fact exist regarding Tuberville's role, position, and participation with respect to TS Capital Partners, LLC and TS Capital Management, LLC, facts which are essential to this Count.

## XVI.  PLAINTIFFS ARE NOT REQUIRED TO PROVE RELIANCE WITH RESPECT TO COUNT 1 (1934 ACT), COUNT 8 (ALA. CODE § 8-6-17 (1975)), TENN. CODE § 48-1-104, ARK. CODE § 23-42-507), COUNT 15 (FRAUDULENT MISREPRESENTATION), AND COUNT 16 (FRAUDULENT SUPRESSION), BUT COULD DO SO IF THEY WERE.

Plaintiffs need not prove reliance, because (1) a presumption of reliance applies in cases such as this, and (2) reliance is not an element of securities fraud under of ALA. CODE § 8-6-

17(a) (1975) and TENN. CODE § 48-1-104. Even if Plaintiffs were required to prove reliance with respect to such Counts, a reasonable jury could determine that they did rely. A reasonable jury could determine that Plaintiffs relied with respect to Counts 15 (Fraudulent Misrepresentation) and 16 (Fraudulent Suppression).

## A. Plaintiffs Are Not Required To Prove Reliance.

Even if the liability of the TS Capital entities and Stroud for the Counts in question had not already been disposed of, Plaintiffs would not be required to prove reliance because the Defendants have perpetrated a "comprehensive scheme to defraud." Moreover, this case is based in large part on failures to disclose, a separate basis for presumption of Plaintiffs' reliance.

## 1. This Case Involves A "Comprehensive Scheme To Defraud."

Plaintiffs need not prove reliance because "a showing of reliance is not required where a comprehensive scheme to defraud is shown." *Kennedy v. Tallant*, 856, 1976 WL 840, at *14 (S.D. Ga. Oct. 22, 1976) *aff'd*, 710 F.2d 711 (11th Cir. 1983) (*quoting Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811, 814 (2nd Cir. 1975)).

In *Competitive Associates, Inc.*, the plaintiff alleged that the accounting firm of a private investment fund (similar to TS Capital Fund, L.P.) knowingly, with intent to defraud, and in exchange for payoffs, certified financial statements that were materially false and misleading with respect to the size and quality of the fund's assets and its profit and loss performance, and failed to disclose its true financial condition. The plaintiff, a publicly traded mutual fund, had retained the investment advisor (like TS Capital Management, LLC) of the private investment fund (like TS Capital Partners) to serve as one of the plaintiff's portfolio managers. That arrangement resulted in substantial trading losses for the plaintiff. The district court granted the

defendants' motion for summary judgment on the theory that direct reliance on the financial statements of the private investment fund was an indispensable element of the plaintiff's cause of action, which the plaintiff could not prove. In reaching that decision, the district court relied on testimony, given by the president of the plaintiff before the Securities Exchange Commission, that he had not seen the financial statements prior to the date of his testimony. *Competitive Associates, Inc.*, 516 F.2d at 813. The circuit court reversed, holding:

> Not every violation of the anti-fraud provisions of the federal securities law can be, or should be, forced into a category headed "misrepresentations" or "nondisclosures." Fraudulent devices, practices, schemes, artifices and courses of business are also interdicted by the securities laws. In the case before us, plaintiff has charged the accounting defendants not only with affirmative misrepresentations in the financial statements, but also with a failure to disclose the true financial condition of Takara Partners and the alleged receipt of payoffs in return for its certification; furthermore, both misrepresentations and omissions are alleged to be only one aspect of an elaborate scheme to defraud. Under these circumstances, plaintiff need only show causation in fact…

*Competitive Associates, Inc.*, 516 F.2d 811, 814 (2nd Cir. 1975). The Supreme Court has also emphasized that not all forms of securities fraud should be pigeonholed, as follows:

> "(We do not) think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that s 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involved a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

*Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, n. 7 (1971) (*quoting A. T. Brod and Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967)).

The nature of the fraud perpetrated in this case is wide-reaching and severe – it concerned the entire operation of the TS Capital entities and rendered Plaintiffs' investments valueless. Like the defendants in *Competitive Associates*, the TS Capital entities and Stroud falsified financial statements and other information to inflate the value of the assets and the performance of the TS

Capital entities. The cases are also similar in that the company in *Competitive Associates* was a private investment fund (also known as a hedge fund), similar to TS Capital Fund, L.P. However, the scheme of fraud in this case is much more comprehensive and severe. Virtually everything Plaintiffs were told by the TS Capital entities and Stroud about the business of the TS Capital entities was incorrect. Plaintiffs have not been able to identify any piece of information, written or oral, provided by any Defendant to any Plaintiff that included any accuracy concerning the value of the assets or the performance of the TS Capital entities.[85] In addition to affirmative misrepresentations, Defendants failed to disclose material facts to Plaintiffs, as discussed elsewhere in this brief.

The comprehensive and pervasive scheme to defraud in this case is further evidenced by the Alabama Securities Commission's criminal prosecution of Stroud and the CFTC's civil action against Stroud and certain of the TS Capital entities. *See Marcus v. Sprayregen*, 1979 WL 1241, at *3 (S.D.N.Y. Aug. 7, 1979) (holding that the defendant's criminal conviction "conclusively establish[ed] the existence of a comprehensive scheme to defraud" and citing, as examples of the fraud, the defendant's authoring of false financial statements, fallacious accounting entries, and falsification of credit memoranda and bills of lading).

If this is not a case of a "comprehensive scheme to defraud investors," then one does not exist. Thus, Plaintiffs need not prove reliance and Defendants are not entitled to a judgment as a matter of law.

>     **2.      Reliance Is Presumed Because Plaintiffs Claims Are Based In Large Part On Failures To Disclose.**

---

[85] After or around time that the TS Capital entities ceased operations, Stroud did admit to certain of the Plaintiffs that the funds of the TS Capital entities were gone. That may have been an accurate statement.

In addition to the bases for a presumption of reliance discussed above, Plaintiffs are entitled to a presumption of reliance because the representations and omissions are based in large part on failures to disclose. The Supreme Court has held:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.

*Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972).

Defendants failed to disclose to Plaintiffs a host of material facts, including the expenses of the offering, the suspension of Stroud's registration with FINRA, FINRA arbitration awards entered against Stroud, and the failure to take the requisite steps to comply with an exemption from registration, to name a few. Tuberville failed to disclose that investor funds would be used for his and Stroud's personal benefit, including his BMW car and lavish trips to New York, and that the general partnership he formed with Stroud would hold and misappropriate investor funds.

### 3. Reliance Is Not Required For Plaintiffs' State Law Securities Fraud Claims.

Reliance is not an element of Plaintiffs' claims in Count 8 under ALA. CODE § 8-6-17(a) (1975) and TENN. CODE § 48-1-121(a), as discussed in Section XVI of this Brief. The presumptions of reliance discussed above in Section XVI also apply to Plaintiffs' claims in Count 8 for securities fraud under ARK. CODE § 23-42-507 because the language of that statute is virtually identical to Rule 10b-5 and state courts generally look to federal case law to interpret securities statutes, to the extent they are virtually identical to their federal counterparts. *Buffo v. State*, 415 So. 2d 1158, 1162 (Ala. 1982).

### C. A Reasonable Jury Could Determine That Plaintiffs Relied On Defendants Misrepresentations and Omissions, With Respect To Their State Securities Fraud Claims In Counts 15 and 16.

The reasons for presuming reliance discussed above exist also with respect to Plaintiffs' fraudulent misrepresentation and fraudulent suppression counts. Considering the egregious and comprehensive frauds alleged in this case, a presumption of reliance with respect to Plaintiffs' state law fraud counts is appropriate. Moreover, a large portion of the instances of fraud alleged by Plaintiffs are omissions, including several failures to disclose by Tuberville, the only Defendant remaining in this case. Accordingly, to the extent Tuberville's motion for summary judgment is predicated on a lack of reliance, it should be denied.

## XVII. TUBERVILLE HAS BEEN UNJUSTLY ENRICHED (COUNT 12).

Tuberville has been unjustly enriched by the benefits and perquisites he received from the TS Capital entities. Alabama courts have held that to succeed on a claim of unjust enrichment, the plaintiff must show that the "defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1193 (Ala. 2008) (*quoting Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006). Other Alabama cases have elaborated the elements of the claim as follows: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation. *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139, 145 (Ala. 2011).

Tuberville has been unjustly enriched by Plaintiffs under either elaboration of the claim. Under the *Flying J Fish Farm* approach, he has been unjustly enriched under both alternatives for liability. The benefits[86] conferred on Tuberville by Plaintiffs were paid from Plaintiffs' funds. The funds were fraudulently solicited by Defendants and thus, in equity and good conscience, did not belong to Tuberville. In addition to fraud, Tuberville received Plaintiffs' funds by mistake – Plaintiffs' were told and mistakenly believed that the TS Capital entities were profitable and sound.

Tuberville has also been unjustly enriched under the *Matador Holdings* elucidation of the cause of action. In his brief, Tuberville has misconstrued the "knowingly" requirement. That element protects the unknowing beneficiaries of so-called officious intermeddlers,[87] who have conferred a benefit on another without being requested or having a legal duty to do so. *See Allstate Ins. Co. v. Reeves*, 440 So. 2d 1086, 1089 (Ala. Civ. App. 1983) ("There can be no equity in requiring one to pay for an unintentional benefit conferred upon him without his knowledge or consent, by the voluntary, officious and self-serving acts of the one demanding payment."). "If the words [benefits conferred] are interpreted to mean that there is no liability in restitution for a benefit that the defendant is unaware of receiving, they can lead to serious error." Restatement (Third) of Restitution & Unjust Enrichment § 1 (T.D. No. 7, 2010).

Tuberville admits that he received the use of a BMW and payment of travel expenses, among the other benefits. Whether or not he "knew" that those funds belonged to Plaintiffs is

---

[86] These benefits include the use of a BMW vehicle, health insurance, trips to New York City, and other benefits discussed elsewhere in this Brief.

[87] An officious intermeddler is defined by *Black's Law Dictionary* as "[a] person who confers a benefit on another without being requested or having a legal duty to do so, and who therefore had no legal grounds to demand restitution for the benefit conferred." *Black's Law Dictionary* 1195 (9th ed. 2009)

irrelevant.  Accordingly, sufficient evidence exists from which a reasonable jury could find that Plaintiffs' have established a prima facie case of unjust enrichment.

## XVIII. TUBERVILLE HAS NEGLEGENTLY AND WANTONLY BREACHED HIS DUTIES TO PLAINTIFFS (COUNTS 13 AND 14).

Tuberville has negligently and wantonly breached his duties and obligations to Plaintiffs. As a general partner of TS Capital Partners,[88] Tuberville owed Plaintiffs, as limited partners, duties to exercise reasonable care in the management, practices, controls and financial affairs of the TS Capital entities, and not to divert or otherwise use the assets of the TS Capital entities for their own gain.[89]  He breached those duties by failing to perform any due diligence whatsoever with respect to the operations of the TS Capital entities, among other omissions and failures to act.[90]

Tuberville does not dispute that Plaintiffs' damages were proximately caused by him, but argues Count 13 "should not be examined independently of" Plaintiffs' fiduciary duty claims. Tuberville cites no authority for that proposition, but it is apparently based on the so-called "economic loss rule," which prevents tort recovery when a product damages itself, causing economic loss, but does not cause personal injury or damage to any property other than itself. *Pub. Bldg. Auth. of City of Huntsville v. St. Paul Fire & Marine Ins. Co.*, 80 So. 3d 171, 184 (Ala. 2010).  "However, the economic-loss rule does not prevent a tort action when the injury caused is personal or is to property other than the complained – of product." *Pub. Bldg. Auth. of City of Huntsville v. St. Paul Fire & Marine Ins. Co.*, 80 So. 3d 171, 184 (Ala. 2010).

---

[88] Or, if the TS Capital entities were organized as represented by the Offering Memorandum, as a member and manager of TS Capital GP, LLC.

[89] See section ____ of the Argument for a discussion of those duties.

[90] See section ____ of the Argument for a discussion of Tuberville's breaches.

The economic loss rule does not apply in this case because Plaintiffs' injuries do not involve any product. Accordingly, Tuberville is not entitled to a judgment as a matter of law with respect to Count 13.

## XIX. TUBERVILLE MAY BE HELD LIABLE FOR THE CONVERSION (COUNT 17) OF PLAINTIFFS' FUNDS BY THE TS CAPITAL ENTITIES AND STROUD.

Tuberville is liable for Stroud's conversion of Plaintiffs' assets, as Stroud's principal. Under Alabama law, a principal, employer, or other master may be held liable for intentional torts committed by its agent if the principal "knew or should have known of the unfitness of the agent, employee, or servant, and employed him or continued to employ him, or used his services without proper instruction with a disregard of the rights or safety of others." ALA. CODE § 6-11-27 (1975). If Tuberville would have performed due diligence with respect to Stroud and the TS Capital entities, he may have prevented the conversion of Plaintiff's funds. Tuberville should have known that Stroud was unfit. Moreover, there are general issues of material fact regarding Tuberville's relationship with Stroud, a crucial element to this Count.

## XX. TUBERVILLE HAS COMMITTED FRAUDULENT MISREPRESENTATION (COUNT 15) AND FRAUDULENT SUPPRESSION (COUNT 16) UNDER ALABAMA LAW.

Defendants' misrepresentations and omissions in the Offering Memorandum and other written and oral communications to Plaintiffs in connection with their purchases of interests in TS Capital Fund, L.P. or TS Capital Management, LLC concerned material facts and were known by Defendants to be false when made, or were made recklessly by Defendants with knowledge that they had insufficient information upon which to base such representations. Tuberville's fraudulent misrepresentations included several omissions, in breach of his duty to disclose. As demonstrated in Section XVI of this Argument, Plaintiffs' reliance on Tuberville's omissions should be presumed. Moreover, genuine issues of material fact exist concerning

Tuberville's role and relationship with the TS Capital entities and Stroud, facts which are germane to a determination of his duties to disclose with respect to Plaintiffs.

## CONCLUSION

As set forth above, many of the material facts are in dispute. A reasonable jury could find for Plaintiffs. Additionally, Tuberville has failed to show that he is entitled to judgment as a matter of law. For the foregoing reasons, Plaintiffs respectfully submit that Tuberville's motion for summary judgment should be denied. In the alternative, Plaintiffs respectfully move for leave to file a properly supported Rule 56(d) motion with respect to the deposition of Goldberg upon Chief Magistrate Judge Walker's ruling and supplement their arguments in opposition to Tuberville's motion.

Respectfully submitted this the 28th day of May, 2013.

*/s/ Barbara J. Wells*
HENRY H. HUTCHINSON (HUT007)
ROBERT T. MEADOWS, III (MEA012)
BARBARA J. WELLS (GIL037)

*ATTORNEYS FOR PLAINTIFFS*

Capell & Howard, P.C.
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, AL 36102-2069
Telephone: (334) 241-8000
Facsimile: (334) 323-8888
Email: hh@chlaw.com
rtm@chlaw.com
bjw@chlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of May, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Via email to counsel for Thomas H. Tuberville at the following addresses:

vhayslip@burr.com
rrutherford@burr.com
gburge@burr.com
ddolive@burr.com
benjamin.coulter@burr.com

Via email to counsel for Charles Goldberg at:
bsewell@lightfootlaw.com

Via email to David Stroud at: stroudcapital@me.com

I further certify that on the 28th day of May, 2013, I have provided the foregoing to the other parties in this suit by email and U.S. Mail to the persons listed below:

**John David Stroud**
(as an individual defendant and on behalf of the following other Defendants: TS Capital Fund, L.P., TS Capital GP, LLC, TS Capital Management, LLC, TS Capital Partners, and TS Capital Partners, LLC) at:

Post Office Box 287
Uriah, AL  36480

*/s/ Barbara J. Wells*
OF COUNSEL